Donald M. Falk, Cal. Bar #150256
SCHAERR | JAFFE LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
(415) 562-4942
dfalk@schaerr-jaffe.com

Gene C. Schaerr*
H. Christopher Bartolomucci*
Edward H. Trent*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
cbartolomucci@schaerr-jaffe.com
etrent@schaerr-jaffe.com

*Pro hac vice application
forthcoming

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA CARANO, | ) Case No.: 24-cv-1009 |
| | ) |
| Plaintiff, | ) **COMPLAINT** |
| | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| THE WALT DISNEY COMPANY, | ) |
| LUCASFILM LTD. LLC, and | ) |
| HUCKLEBERRY INDUSTRIES (US) | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

COMPLAINT

**COMPLAINT**

Plaintiff Gina Carano, through undersigned counsel, files this Complaint for damages and equitable relief against Defendants The Walt Disney Company ("Disney"), Lucasfilm LTD. LLC ("Lucasfilm"), and Huckleberry Industries (US) Inc. ("Huckleberry") (collectively, "Defendants").

**INTRODUCTION**

A short time ago in a galaxy not so far away, Defendants made it clear that only one orthodoxy in thought, speech, or action was acceptable in their empire, and that those who dared to question or failed to fully comply would not be tolerated.  And so it was with Carano.  After two highly acclaimed seasons on *The Mandalorian* as Rebel ranger Cara Dune, Carano was terminated from her role as swiftly as her character's peaceful home planet of Alderaan had been destroyed by the Death Star in an earlier Star Wars film.  And all this because she dared voice her own opinions, on social media platforms and elsewhere, and stood up to the online bully mob who demanded her compliance with their extreme progressive ideology.

Defendants' wrath over their employees' social media posts also differed depending on sex.  Even though "the Force is female," Defendants chose to target a woman while looking the other way when it came to men.  While Carano was fired, Defendants took no action against male actors who took equally or more vigorous and controversial positions on social media.

But the rule of law still reigns over the Defendants' empire.  And Carano has returned to demand that they be held accountable for their bullying, discriminatory, and retaliatory actions—actions that inflicted

not only substantial emotional harm, but millions of dollars in lost income.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332 and 1343 because Carano's claims are between persons and entities of different states and the amount in controversy exceeds $75,000 exclusive of interest, costs, and attorneys' fees.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

2.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendants reside in this District; because a substantial part of the events or omissions giving rise to Carano's claim occurred in this District; and because Carano was employed by Defendants in this District.

3.     Carano brings this action under Cal. Lab. Code §§ 1101-1105, § 98.6, and Cal. Gov't. Code § 12940.

4.     Carano has requested and received a Notice of Right to Sue from the California Civil Rights Department and has otherwise exhausted her administrative remedies and complied with all necessary conditions precedent to filing this suit.  A true and correct copy of the Notice of Right to Sue is attached as Exhibit A.

## NATURE OF THE CASE

5.     This is a civil action arising from Defendants' wrongful termination of Carano's employment in retaliation for Carano's lawful exercise of her right to speak and express her views.  Specifically, Defendants—under the regime of former Disney CEO Bob Chapek—fired Carano because of her posts ("the Posts") on various social media platforms including X (formerly known as Twitter).  Carano composed

and published the Posts while she was off-duty and away from the workplace.

6.    In her Posts, Carano expressed her personal political views, opinions, and beliefs.  In retaliation for Carano's exercise of her speech rights, Defendants terminated Carano's employment and took other retaliatory actions to limit and deny her future employment opportunities, including but not limited to making maliciously false statements about Carano with the intention of damaging her reputation and, thus, her ability to find and retain work.

7.    Further, Defendants treated Carano differently than her similarly situated male co-workers, who likewise expressed their personal political views on social media but, upon information and belief, were not counseled or disciplined, let alone terminated.

8.    Because Defendants took action that harmed her, in violation of the law of this State, Carano is entitled to the relief sought herein.

**PARTIES**

9.    Carano is a citizen and resident of the State of Montana, County of Gallatin.

10.    Defendant The Walt Disney Company is incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California.  Accordingly, The Walt Disney Company is a citizen of the States of Delaware and California.  The Walt Disney Company does business in Los Angeles County, California.

11.    Defendant Lucasfilm LTD. LLC is incorporated under the laws of the State of California with its principal place of business in San Francisco, California.  Accordingly, Lucasfilm is a citizen of the State of California.  Lucasfilm is a wholly owned subsidiary of The Walt Disney Company.  Lucasfilm does business in Los Angeles County, California.

12.     Defendant Huckleberry Industries (US) Inc. is incorporated under the laws of the State of California with its principal place of business in San Francisco, California.   Accordingly, Huckleberry is a citizen of the State of California.   Huckleberry is a wholly owned subsidiary of The Walt Disney Company.   Huckleberry does business in Los Angeles County, California.

13.     Defendants were joint employers of Carano, or alternatively, constitute a single integrated employer for purposes of the allegations in this Complaint.

## FACTUAL ALLEGATIONS

### Carano's Acting Career Takes Off

14.     Carano began her professional career as a successful mixed martial arts fighter before she was given the opportunity to try her hand at movies.   Indeed, Carano is the first-ever female star in mixed martial arts cage fighting to successfully transition to a career in movies, breaking down substantial barriers for women in the sport.

15.     Carano received roles in Hollywood and independent film productions such as *Haywire,* for which she was nominated for a Critics Choice Award for Best Actress in an action film, *Fast & Furious 6, Heist, Deadpool, Almost Human, Extraction, Daughter of the Wolf,* and *Madness in the Method.*

16.     On May 13, 2008, "Gina Carano" was the fastest rising search on Google and third most searched person on Yahoo! while being ranked no. 5 on Yahoo!'s "Top Ten Influential Women of 2008" list.[1]

---

[1]  Vera H-C Chen, *Top 2008 Trends: Top 10 Influential Women*, YAHOO, http://tinyurl.com/fs75x5ya  [http://tinyurl.com/bz8s9b2b]  (last visited Feb. 6, 2024).

17.   In 2012, Carano was the first recipient of the ActionFest Film Festival's Chuck Norris Award for Best Female Action Star.

18.   In 2017, Carano received the Artemis Action Warrior Award.

19.   In 2019, Carano received The Rising Star award at Ischia Film Festival.

20.   Also in 2019, Carano was selected to present the Saturn Visionary Award to Jon Favreau at the 45th Saturn Awards.

21.   Carano was employed by Defendants effective September 18, 2018, for the role of Cara Dune on the *Disney+* series *The Mandalorian*.

22.   Defendants prominently featured Carano when promoting the new series as part of the launch of Disney's new streaming service *Disney+*.  Following is an example of Defendants' promotional materials.[2]



_____

[2] Jodi Guglielmi, *First Look of 'The Mandalorian': Pedro Pascal Describes His Character as a 'Badass'*, PEOPLE MAGAZINE (Apr. 14, 2019), http://tinyurl.com/bdhnycve.

23.     Although her character instantly became one of the most recognized and popular characters in the series, Carano's master agreement listed her as a Guest Actor at the minimum salary of $25,000 per episode.   Carano fulfilled all obligations under the terms of her master agreement and each SAG-AFTRA HBSVOD (Screen Actors Guild – American Federation of Television and Radio Artists, high-budget subscription video on demand) Minimum Three-Day or Weekly Agreement.

24.   Because of Carano's contributions to the success of Season 1 of *The Mandalorian*, her agent sought an increase in her pay, but Defendants refused, instead offering her a one-time bonus of $5,000 and again the minimum of $25,000 per episode in which she was to appear in Season 2.   Carano again fulfilled all obligations under the terms of her agreements with Defendants.

25.   Carano was again instrumental in the success of Season 2 of *The Mandalorian.*   In fact, Carano was responsible for over half of the talent engagement on social media related to Season 2 by early November 2020.

26.   Indeed, on November 21, 2020, Lynne Hale of Lucasfilm emailed Carano to congratulate her on the success of the first episode of the season when Carano's character made an appearance, noting: "Just wanted you to know that people loved the episode today!  As we knew they would...  Congrats!"

27.   In October/November 2020, Jon Favreau, creator and Executive Producer of *The Mandalorian,* informed Carano that her "life is about to change" because Disney had approved a new Star Wars spinoff entitled *Rangers of the New Republic* that would feature Carano's Cara Dune as one of the lead characters.

28.    Lucasfilm President Kathleen Kennedy confirmed the production of the spinoff *Rangers of the New Republic* at Disney Investor Day in December 2020.[3]

29.    Carano would have been a series regular on *Rangers of the New Republic*. The standard agreement for a series regular would have been comparable to what other *Disney+* actors received for other Star Wars spin-offs, a contract for approximately six years at a base compensation beginning at $150,000 to $250,000 per episode. Each season of a series typically has between 8 and 10 episodes.

### *Defendants Terminate Carano Because of Her Speech*

30.    All of this came to an end on February 10, 2021, when Defendants announced through the media that Carano had been terminated from her role as Cara Dune and would not be hired for any other projects with Defendants, all because she expressed her political opinions on social media.

31.    In announcing Carano's termination, Lucasfilm made the following public statement: "Gina Carano is not currently employed by Lucasfilm and there are no plans for her to be in the future. Nevertheless, her social media posts denigrating people based on their cultural and religious identities are abhorrent and unacceptable."[4]

32.    Defendants' statement characterizing Carano's social media posts as "denigrating people based on their cultural and religious

---

[3] Anthony J. Salazar, *Every New Lucasfilm Project Announced at Disney Investor Day*, DISCUSSING FILM (Dec. 15, 2020), http://tinyurl.com/mrxnvhnz.

[4]  Daniel Holloway, *Lucasfilm, UTA Drop 'Mandalorian' Star Gina Carano Following Offensive Social Media Posts*, VARIETY (Feb. 10, 2021), http://tinyurl.com/3ac2rybe.

identities" was false.  It was also made with knowledge of its falsity, with the purpose of harming Carano, and to distract from Defendants' illegal termination and treatment of Carano.

33.    Defendants targeted, harassed, publicly humiliated, defamed, and went to great lengths to destroy Carano's career, all because she made political statements that did not align with what they believed was an acceptable viewpoint.

34.    Disney's then-CEO Bob Chapek has been quoted as saying Carano was fired "because she didn't align with Company values."  In doing so, Chapek said those company values are "values that are universal: values of respect, values of decency, values of integrity, and values of inclusion."[5]

35.    Chapek's statement that Carano does not stand for values of respect, decency, integrity, and inclusion is false.  His statement was also made knowing it was false, and with the intent to harm Carano.  But it also shows that Carano was fired, not for her performance as an actress, but because her political opinions did not align with those of Disney management.

36.    Defendants also discriminated against Carano by treating her differently from her male co-stars who also made public, political statements on social media.  Her male co-stars were not disciplined, let alone terminated in a way to destroy their careers even though some would find their statements "abhorrent."

37.    Defendants harassed Carano for her political statements, subjected her to vilification, and allowed other employees to harass her

---

[5]  Naledi Ushe, *Disney CEO Says Company Stands for 'Values That Are Universal' in Wake of Gina Carano's Firing*, PEOPLE MAGAZINE (Mar. 9, 2021), http://tinyurl.com/mvkz39pe.

COMPLAINT

because of her political views.  Yet Defendants did nothing when her male co-stars made statements that many people would find equally if not more objectionable.

38.    Defendants retaliated against Carano when she objected to the harassment and efforts to force her to adopt positions against her conscience.

39.    In addition to terminating her, Defendants refused to hire her for roles already promised, including but not limited to Season 3 of *The Mandalorian,* the new series *Rangers of the New Republic,* and planned future Stars Wars full length feature films (which have recently been announced)—all because of her political beliefs and in disparate treatment from her male co-workers.

40.    Defendants' actions were calculated, malicious, and knowingly in violation of California law that protects employees such as Carano from discrimination because of the employee's political views and her sex (female).

***Carano Exercises her Right to Express her Thoughts on Issues of the Day – Only to be Harassed Because She Did Not Espouse a Progressive Orthodoxy***

41.    X, formerly known as Twitter, is a social networking platform. Carano has had an X or Twitter account since 2009.

42.    X allows its users to post content and see content posted by other users.  X also allows its users to follow, and be followed by, other users who post on X.  Carano uses X to associate with and communicate with other X users, especially her followers and those she is following.  X thus provides a vehicle for the exercise of several constitutionally protected freedoms, including the freedom of thought, the freedom of belief, the freedom of speech, and the freedom of association.

43.    Carano uses X to express her views, opinions, and beliefs. Carano appreciates that X has never attempted to censor her speech, including the posts for which Defendants subjected Carano to discrimination and harassment.  Carano knows that she is responsible for the content of her posts on X.

44.    Similarly, Instagram is a social networking platform. Plaintiff has had an Instagram account since 2012.

45.    While the incivility directed towards her started much earlier, over the summer of 2020 Carano was constantly harassed and bullied on social media to support various causes, adopt various ideologies, and hold herself out in certain ways in her social media profiles.

46.    When she declined, Carano was called all sorts of names, including that she was a racist for not publicly adopting the Black Lives Matter moniker and a "transphobic bitch" for not including pronouns in her profile's biography section.[6]

47.    Social media users demanded that Carano publicly support the Black Lives Matter movement, including adopting their slogans as noted in the following examples:

---

[6]   Joanna Robinson, *As Gina Carano and Star Wars Fans Clash, Hero Worship Turns to Scorn*, VANITY FAIR MAGAZINE (Nov. 19, 2020), http://tinyurl.com/3849dku5.

COMPLAINT



48.   ACAB stands for "All Cops Are Bastards," a sentiment with which Carano does not agree.

49.   On August 4, 2020, one social media user posted:



50.   That same day, another posted:



COMPLAINT

1    51.    One user even went so far as to claim that the abuse was to

2 "educate" Carano.



12    52.    Carano responded, not with insults but with an explanation

13 of why the bullying needed to stop.  For example:



14

53.   Even when Carano explained she had no hate for anyone, people continued to accuse her of being racist, solely because of her refusal to endorse the BLM movement.  For example:



COMPLAINT

54.    While Defendants did nothing to support Carano, fortunately, one of her castmates did have the courage to stand up for her.   Chris Bartlett responded to the controversy as follows:



COMPLAINT

55.   Other users expressed their support, noting the extensive and unfair abuse Carano had to endure.  For example:



17

56.   The online abuse worsened when she encouraged standing up to bullies by sharing an article with a famous, historical photo of someone standing up to fascism.



COMPLAINT

57.    Carano was also attacked for questioning the strict lockdowns on businesses and churches, but not on protests, as noted in the following September 5, 2020 posts:



Open up your businesses & churches. Put whatever regulations you want to because that is your right but open them up. You're telling me Covid-19 knows the difference between a protest or praise & worship. I haven't even been to church in over a decade but I sure would go now.

10:50 PM · Sep 5, 2020 · Twitter for iPhone



The world IS open but no one is allowed to work. Working is a right you, as an American have. It gives us purpose, focus, pride and most importantly a way to support the ones we love. People are dropping like flies from depression and suicide, overdoses, MURDER. Enough already.

10:59 PM · Sep 5, 2020 · Twitter for iPhone

58.    Defendants made it known they did not agree with or approve of Carano's political views on the Covid lockdowns and vaccine mandates.

59.    Another source of constant harassment was the demands that she put pronouns in her profile.

COMPLAINT

60.    On social media, a user can create a profile that heads any posts.  A profile will include a name (even one that is not the user's actual name), a picture, and other information at the discretion of the user.

61.    One news report noted that the harassment became worse when Carano allegedly liked a post (not identified) that some claimed was not supportive of the transgender community.  "Late last week, Carano 'liked' a tweet on Twitter that allegedly mocked users who practiced this method of self-identification (however, as of writing, the tweet has been 'unliked' and has yet to be specifically identified.)"[7]

62.    Some social media users denigrated Carano for simply not putting pronouns in her profile, such as one post on September 10, 2020.



**ness she/her**
@greensabers

Replying to @ginacarano and @EmmyLocke

50% of Hollywood wears masks and respects the trans community. To bad ur not included in that

10:44 AM · Sep 10, 2020 · Twitter for iPhone

63.    The next day, another user also criticized Carano for not listing pronouns in her profile.



**master moon ! / ceo of bailobi**
@sadkenobis

Replying to @ginacarano

hey do you just not go by any pronouns it's hard to tell

9:57 AM · Sep 11, 2020 · Twitter for iPhone

---

[7]  Spencer Baculi, *The Mandalorian Star Gina Carano Accused of Transphobia for Refusal to List Pronouns in Twitter Bio*, BOUNDING INTO COMICS (Sept. 14, 2020), http://tinyurl.com/5n7xszmn.

1

2      64.    The unhinged criticism for Carano's refusal to state pronouns

3  continued:

4

5      **Emira|BLM**
       @Ahscka

6

7  Replying to @ginacarano

8  Gina just so you know, pronouns are a part of most
   languages and putting them in your bio is just a decent

9  thing to do. Your even your own co-worker Pedro has
   put pronouns in his bio out of decency. So you liking

10 tweets that mocks that just sits wrong with many

11 people

12

13 3:42 AM · Sep 12, 2020 · Twitter for iPhone

14     65.    On or about September 12, 2020, having had enough of the

15 abuse that had been going on for some time, Carano put three simple

16 words in her Twitter profile, a reference to sounds a droid would make,

17 "boop/bop/beep."  She left this up for a short time before deleting it.

18

19

20

21

22

23

24

25

26

27

28

66.    In doing so, Carano also provided an explanation for her previous response on the use of pronouns:

**Gina Carano boop/bop/beep** ✔
@ginacarano

Replying to @Ahscka

Yes, Pedro & I spoke & he helped me understand why people were putting them in their bios. I didn't know before but I do now. I won't be putting them in my bio but good for all you who choose to. I stand against bullying, especially the most vulnerable & freedom to choose. 💯

3:56 AM · Sep 12, 2020 · Twitter for iPhone

67.    The response was swift, with many praising her for standing up to bullies and others accusing her of mocking transgender individuals. Yet those attacking her would not accept that she had been bullied at all, they just wanted her compliance.

68.    Then there were others who could not understand the controversy, as the following post demonstrates:



**Joe Pags Pagliarulo** ✔
@JoeTalkShow

.@ginacarano not being coy.. what is the #woke world mad at you about?  I'm looking at your tweets.  Are they mad you called two women in a #UFC fight "ladies?"  Fill a brother in.

1:16 AM · Sep 13, 2020 · Twitter Web App

69.     Again, Carano explained the situation:



Gina Carano boop/bop/beep ✔
@ginacarano

Replying to @JoeTalkShow

They're mad cuz I won't put pronouns in my bio to show my support for trans lives.
After months of harassing me in every way. I decided to put 3 VERY controversial words in my bio..
beep/bop/boop
I'm not against trans lives at all. They need to find less abusive representation.

2:26 AM · Sep 13, 2020 · Twitter for iPhone

70.     Carano remained consistent and respectful in explaining why she would not bow to bullies on the internet.  For example:



C A S S @CassPereyra · Sep 13
can you see how some would read that as ...mocking?

💬 20            ⟲            ♡ 103            ⬆

Gina Carano boop/bop/beep ✔
@ginacarano

Replying to @CassPereyra

I don't think trans people would like all of you trying to force a woman to put something in her bio through harassment & name calling EVERYDAY for MONTHS.
Such as "Racist" Transphobe" "Bitch" "Weirdo" " I hope you die" "I hope you lose your career" "your fat, you're ugly".

2:53 AM · Sep 13, 2020 · Twitter for iPhone

71.   And yet again she explained:



I know trans people wouldn't condone this harrasment when they hear about the CHiLDREN, women & men who have contacted me, thanking me for taking a stand against these bullies because it effected their mental health to the point of near suicide at times. Ya. That's happening.

2:56 AM · Sep 13, 2020 · Twitter for iPhone

72.   As if the above explanations were not enough, Carano made yet another attempt to counter the claims of her being "transphobic" with the following post:



COMPLAINT

73.    And as Carano explained to Defendants at the time, "Beep, bop, and booping is simply droid noises," identifying with Star Wars characters as referenced in her post above.  She thought it would simply be a playful way to defuse all the harassment she had received on social media and "a fun way of expressing independence and freedom to do whatever you want to do with your social media accounts" and respond to "the trolls and bots, nothing more."

74.    Indeed, many transgender people came to Carano's support.





*Defendants Engage in Harassment of Their Own*

75. However, like her online abusers, Defendants were not satisfied. They subjected Carano to long phone calls demanding an explanation and criticizing her for not embracing what some see as mandatory solidarity with a vocal element of the transgender activist community. Even when she expressed that Defendants' demands were excessive and asked for some time away from the constant meetings, Defendants refused, demanding that she continue with her "re-education" program.

76. Defendants even required Carano to meet with representatives of GLAAD (Gay & Lesbian Alliance Against Discrimination), a national organization that promotes LGBTQ+ acceptance, something she willingly did. Carano had a very positive discussion with two of their representatives during a 90-minute Zoom meeting, even reviewing several documentaries they asked her to watch. Upon information and belief, the representatives of GLAAD with whom she spoke provided positive feedback to Defendants from their discussion.

77. Even so, Defendants continued to demand a public apology, finding the above social media statements insufficient. Defendants went so far as to try and convince Carano's publicist to force Carano to issue a statement admitting to mocking or insulting an entire group of people, which Carano had never done.

78. After she refused to issue the statement Defendants demanded, and Defendants rejected Carano's proposed alternate statement, Defendants increased their harassment of Carano.

79. As a sign of good faith, Carano went to donate to a GoFundMe page allegedly set up in support of the transgender community. When she opened the link, she read that the fund was supposedly created by a

26

Lucasfilm creative and was directly targeting Carano, defaming her by accusing her of being a "bigoted" actress. Accordingly, Carano did not donate.

80.    Carano brought this to Lucasfilm's attention, who denied the GoFundMe account was established by any Lucasfilm employee. Shortly thereafter, the account was changed to call Carano "ignorant" and the identity of the organizer was changed to no longer identify a Lucasfilm employee. To Carano's knowledge, no employee was disciplined for their public harassment of Carano.

81.    Defendants nevertheless communicated to Carano's publicist that they were going to require Carano to participate in a Zoom call with Lucasfilm president Kathleen Kennedy and 45 employees who identify as part of the LGBTQ+ community, going so far as to say that her willingness to endure such harassment and humiliation was a "litmus test" for her.

82.    The publicist was encouraged to explain that the group was "a friendly group that WANT Gina to succeed" even though several had contributed to the anti-Carano GoFundMe account, including filmmaker Leslye Headland, who was scheduled to produce a Star Wars production.

83.    The purpose was clear, Carano had to "grow" and "learn," and Defendants wanted to know "where her mindset is currently" with regard to the controversy over pronouns. Until then, they were not going to allow her to speak to the media or include her in any promotions.

84.    Carano declined to be subjected to a Zoom meeting with 45 other people but did offer to take 5 or 6 to dinner so they could talk face-to-face. Defendants refused the offer.

85.    Given Defendants ongoing harassment, Carano let Defendants know that perhaps she needed to get legal counsel to help

resolve the issue.  Thereafter, Defendants changed course and decided to require Carano to take media training.

86.    Accordingly, by September 25, 2020, Defendants' harassment of Carano was in full swing with the launch of Season 2 of *The Mandalorian* right around the corner.

### Carano Endures More Online Bullying

87.    Carano was also criticized for her posts following the November 2020 elections.

88.    On November 5, 2020, Carano made the following post that expressed the sentiments of many across the country regarding how the 2020 elections were conducted during the Covid pandemic.

← Post



Gina Carano ✨ ✔
@ginacarano                                    ...

We need to clean up the election process so we are not left feeling the way we do today.
Put laws in place that protect us against voter fraud.
Investigate every state.
Film the counting.
Flush out the fake votes.
Require ID.
Make Voter Fraud end in 2020.
Fix the system. 🇺🇸

11:18 AM · Nov 5, 2020

89.    The social media backlash from those who do not share Carano's political perspective was swift and matched the incivility responding to her earlier posts.  For example, one started with name calling.

COMPLAINT



90.  Another  suggested  more  drastic  action  against  Carano because the user did not agree with Carano's sentiments.



91.    And then there were more false claims of racism as noted in the following post.



92.    As she explained, Carano was not trying to be divisive and respected the right of all Americans to vote for whomever they chose.



93.    At no point did Defendants defend Carano, but rather they continued to express dismay that Carano's political views did not match what they expected from their stars.

94.    Yet, during all of this, as noted above, the fan reaction to her appearance in Season 2 of *The Mandalorian* was a huge success.

***Defendants Strike Again***

95.    Even with Carano's star rising, Defendants continued to harbor animosity against Carano for her political beliefs.  On January 8, 2021, Carano was inadvertently sent an email by Lynne Hale of Lucasfilm explaining that Defendants were consumed with some on social media calling for Disney to fire Carano.  They monitored a hashtag, meaning a string of related posts, calling on Disney to #FireGinaCarano.

96.    Hale's email was the most recent in a string of emails that began with Disney CEO Chapek's statement on the events of January 6. There was significant backlash to Chapek's statement, including harsh criticism of Disney for doing business with China given the country's extensive human rights abuses and internment camps for the indigenous Uyghur people.

97.    Yet very quickly the focus of the emails turned to Carano as some on social media chose to insert calls to fire Carano in responses to Chapek's online statement.  Rather than focus on the criticism of Disney's business dealings in China, Disney instead was going to prepare a report on Carano, which Hale recommended "start [by] saying that she didn't do anything to support the riots on DC."  Of course, Carano had nothing to do with the events of January 6.

98.    It was apparent that Chapek and his team were looking for ways to deflect from his failed leadership as Disney's CEO, a pattern that included his obsession with and ultimate termination of Carano, his subsequent failings in Disney's contract dispute with Scarlett Johansson in July 2021, and political missteps in his criticism of Florida's Parental Rights in Education law, all leading to his termination in November 2022.

99.    On January 12, 2021, Carano posted an interview she gave where she was asked about the controversy surrounding her social media posts, an interview that clearly demonstrates that she was not seeking to "denigrate" anyone but chose to speak up because there was a "large group of people that were being silenced" and that "conversations [were] not happening," and because of her belief that "discussion is good."  She was not seeking a political platform but believed that discussing issues makes everyone better.  She also understands that simply speaking up made her "a punching bag."[8]



---

[8]  The Federalist, *The Gina Carano Interview: The Mandalorian Star Takes FDRLST Behind The Scenes Of Her Life & Politics* (Jan. 13, 2021), http://tinyurl.com/asprmk5h.

1    100.  All this occurred while Lucasfilm was publicly supporting
2    "Krystina Arielle and her declaration that all white people are racist."[9]

3    101.  Indeed, Defendants even publicly claimed that people should
4    speak their mind based on their conscience.  Of course, when Carano did
5    so, Defendants targeted her because her conscience did not align with
6    their ideology.



27   [9]  John F. Trent, *Star Wars And Lucasfilm Officially Support Calling All*
28   *White People Racist*, Bounding Into Comics (Jan. 22, 2021),
     http://tinyurl.com/3mm2m43m.

1       102.   On February 10, 2021, Carano made the following post in

2   light of the trending #FireGinaCarano to highlight the injustice of the

3   mob seeking to destroy someone simply because of their political beliefs.



103.  Carano made no mention of a political party or a particular point of view and compared no one or group of people to the Jewish people during the Holocaust.  Rather, she noted the danger that arises when one point of view is singled out for harassment.

104.  Nevertheless, the apoplectic response from some on social media has been well documented and shows a gross over-reaction and intentional smear campaign against Carano.  Indeed, one analysis of the social media events of February 10, 2021, concludes: "Carano's contested post can be fairly critiqued as heavy handed.  Still, evidence has not come forth that Carano in any way emitted an iota of the hate or vitriol that was projected onto her by the persecution mob."[10]

105.  Indeed, the Auschwitz Museum even notes that the persecution of the Jewish people began long before the concentration camps, a concept that Defendants refused to acknowledge even as they twisted and misrepresented Carano's post.



---

[10]  Jeremy Lee Quinn, *Retracing the Twitter Storm, This Is The Way, Fans Persecuted Gina Carano* (May 1, 2022), http://tinyurl.com/3v4udrek.

1
2
3
4

106.   Even Carano's male co-star, the late Carl Weathers posted the exact same message, but no action was taken against him.   Nor was Weathers accused by Defendants of denigrating people based on their cultural and religious identity.

5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT

107. Defendants' disparate treatment of Weathers further demonstrates their discrimination against Carano on the basis of her sex and/or political beliefs.  Indeed, when he made the same generic statement, Weathers' comments were interpreted to attack Republicans, so he was given a pass by Defendants.

108.  Yet Defendants, rather than come to Carano's defense, proved her point by joining the unhinged mob and not just terminating Carano for the views expressed in her posts, but accusing her of the very things she fought against – the denigration of other people.

109.  Contrary to Defendants' statement, at no point was Carano "denigrating people based on their cultural and religious identities," as Lucasfilm claimed.  Rather, she was doing just the opposite, opposing such denigration and targeting of people just because they hold different beliefs.

110.  In fact, Carano constantly called for respect and decency when speaking with people and for respect and decency to be shown, as she did, when discussing important public issues.  She has always held herself out as a person of integrity and those she worked with can attest to this. She always treated everyone she met with kindness and compassion as *The Mandalorian* staff can confirm.  Nothing could be more "inclusive" or representative of the values Chapek claims Defendants stand for.

111.  Defendants did not even have the courtesy to inform Carano of her termination in person before announcing it to the press.  Ironically, Carano first learned of her termination by reading about it on social media.

112.  As a result of Defendants' statement, Carano was inundated with stalkers and media hounding her at home.  It became so bad that she justifiably feared for her personal safety.

113. In addition to being terminated from her role on *The Mandalorian,* Defendants canceled production of *Rangers of the New Republic,* refusing to hire her even though she had been told the role was hers.

114. Further, prior to her termination, Carano had been told by Jon Favreau she was to be part of a series of new Star Wars movies based on the various Star Wars *Disney+* series to be released in theaters in the near future, a group of movies which includes the recently announced movie based on *The Mandalorian.*

115. To this day, when someone wishes to attack Carano's appearance at any event, they frequently cite Defendants' statement at the time of her termination and repeat the false accusation that Carano "denigrated people based on their cultural and religious identities."

116. Such decisions, including the harassment, targeting, termination, and post-termination smear campaign, were made with the knowledge and approval of those who qualified as "an officer, director, or managing agent" of each Defendant.  Cal. Civ. Code § 3294.

### Defendants' Post-Termination Smear Campaign

117.  By way of example of the post-termination smear campaign, prior to her termination, in November 2020, Carano filmed an episode of *Running Wild with Bear Grylls*, an adventure program that aired on NatGeo, owned by Disney.

118. Following her termination, Disney surreptitiously removed the episode of *Running Wild* that showcased Carano from the show's scheduled lineup—all in an effort to malign Carano and deny viewers the ability to see who she really is.

119. After protests from fans and intervention by Bear Grylls to have the episode run as scheduled, Disney did show the episode with Carano on May 10, 2021.

120. However, even though Disney ultimately aired the *Running Wild* episode with Carano, they removed all mention of her name or likeness in any promotional material or even listings of the episode.[11]

***The Aftermath of Defendants' Actions***

121. Based on Defendants' termination of Carano and their public statements regarding her, Carano's agent, United Artists, and her entertainment attorney, dropped her as a client. Neither provided her any explanation. Discovery may reveal that this occurred at the express or implicit direction of Defendants.

122. The numerous opportunities Carano had because of her role on *The Mandalorian*, including invitations to read for new movies, invitations to attend high profile events, and even opportunities to promote her work immediately stopped after Defendants' public statements regarding her.

123. Even so, in October 2021, one of Carano's co-stars, Giancarlo Esposito was asked, "In *The Mandalorian* who is your favorite co-worker to work with?" to which he replied, "My goodness. Okay so you're asking

---

[11] Drunk3PO, *Disney Refuses to Use Gina Carano's Name in Bear Grylls Running Wild Episode*, YouTube (May 5, 2021), http://tinyurl.com/2aca7pck.

me for one. Yeah. I have to say and this may be… Well, okay, I'll say it without hesitation. Gina Carano."[12]

124.   In September 2021, another co-star, Emily Swallow, described Carano as follows: "All I can say is that Gina, and working with her personally, what impressed me about her from the beginning is that she is so interested in other peoples' opinions, and is so welcoming of other peoples' opinions. She wants to have a genuine dialogue. She's just like that in her day-to-day life. On set, she's more curious about other people. She's very giving, she's very gracious."[13]

125.   Another of Carano's co-stars, Bill Burr, came to her defense after her termination, saying the following: "She was an absolute sweetheart. Super nice … person."[14]

126.   Even *Forbes* found Defendants' justification for Carano's termination baffling and unjustified, noting that 72% of people surveyed disapproved of Carano's termination when they saw the actual post that apparently prompted Defendants' decision—because her post noted the dangers of targeting people for their beliefs.[15]

---

[12] John F. Trent, *Giancarlo Esposito Says His Favorite The Mandalorian Co-Star To Work With Is Gina Carano*, Bounding Into Comics (Nov. 1, 2021), http://tinyurl.com/2p828ssy.

[13] Liam Crowley, *The Mandalorian's Emily Swallow Speaks Out on Gina Carano's Firing,* The Direct (Sep. 6, 2021), http://tinyurl.com/mumpm3yt.

[14] Anthony D'Alessandro, *The Mandalorian's Bill Burr Defends Gina Carano In Wake Of Her Controversial Statements: "She Was An Absolute Sweetheart,"* Deadline (Mar. 2, 2021), http://tinyurl.com/hm8mz5ue.

[15] Gene Del Vecchio, *Disney's Firing Of Gina Carano Is Confusing And Hypocritical – Lacking Sound Management*, Forbes (Mar. 11, 2021), http://tinyurl.com/5dma48z6.

*Social Media Posts from Carano's Co-Stars*

127.  Carano respects the rights of her co-stars to express their views on social media, even if they differ from her own, and she remains personally fond of each of them.   However, Defendants' treatment of Carano stands in stark contrast to Defendants' embrace of her male co-stars and other male employees, so the following examples are provided to demonstrate the discriminatory treatment Carano endured at the hands of Defendants.

128.  One of Carano's co-stars was Pedro Pascal, a male actor who played the role of the Mandalorian.

129.  Pascal was active on social media, often expressing his view on the Black Lives Matter movement, LGBTQ+ rights, protests for abortion rights, and the 2020 election.

130.  For example, on September 28, 2015, Pascal made the following post drawing a clear distinction between himself and "conservatives":

 **Pedro Pascal**  PedroPascal1 · Sep 28
Conservatives used gossip columns and "headlines" to manipulate city politics in the 40s. And it worked. Let's be better than them.
3:53 PM - 28 Sep 2015 · Details

1   131. On August 16, 2017, Pascal made the following post,
2   comparing President Donald Trump to Hitler:



17  132. The 2017 post was not the only time Pascal compared
18  President Trump and those who voted for him to Nazis.

42

133. On June 20, 2018, Pascal compared the United States response to those entering the country illegally to the concentration camps of Nazi Germany in the following post:



43

134.  And again on November 7, 2020, Pascal made the following post, only to delete it shortly thereafter:



135.  Defendants did not comment on, let alone condemn Pascal's social media comments.

136.   On June 27, 2020, Pascal posted two Disney-owned Muppet characters, Bert and Ernie, as activists waving a transgender and LGBTQ+ pride flag and promoting "Black Lives Matter" and "Defund the Police."



137.   Upon information and belief, Pascal was not disciplined, required to review documentaries on any of these topics or speak to individuals with contrary points of view, or pressured to apologize for any of his posts.  His employment was not terminated, and Defendants made no public statements about his social media posts, much less refer to them as "abhorrent."

45

138.  Likewise, Star Wars star Mark Hamill posted his comparison of Americans who support President Trump with Nazis in a September 18, 2022 post:



COMPLAINT

139.  This, of course, is nothing new for Hamill, who from 2016 described Donald Trump as Valdimir Putin's puppet and the KKK's candidate.



140.  Hamill has gone so far as to compare President Trump to The Third Reich without a word of protest from Defendants.



141.  Defendants did not comment on, let alone publicly condemn Hamill's social media comments.

142.  And unlike Carano, when Hamill was accused of "liking" a "transphobic" tweet, his explanation was accepted by Defendants without question.



143.  No action was taken against Hamill.  On the contrary, he was allowed an appearance in the closing episode of the second season of *The Mandalorian*.

144.  Defendants even rehired "Guardians of the Galaxy" director James Gunn, a male, in 2019 after terminating him in 2018 for social media posts years earlier such as "I like when little boys touch me in my

silly place," and "The best thing about being raped is when you're done being raped and it's like 'whew this feels great, not being raped!'" and "The Expendables was so manly I f–ked the sh*t out of the little pussy boy next to me! The boys ARE back in town!"[16]

<div align="center">

**FIRST CLAIM FOR RELIEF:**

**WRONGFUL DISCHARGE**

**California Labor Code §§ 1101 *et seq.***

</div>

145.  Carano re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

146.  Section 1101 of the California Labor Code provides:

> No employer shall make, adopt, or enforce any rule, regulation, or policy:
>
> (a) Forbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office.
>
> (b) Controlling or directing, or tending to control or direct the political activities or affiliations of employees.

Cal. Lab. Code § 1101.

147.  In violation of Section 1101(a) of the Labor Code, Defendants terminated Carano's employment based on her Posts, thereby unlawfully forbidding or preventing Carano from engaging or participating in politics.

148.  In violation of Section 1101(b) of the Labor Code, Defendants terminated Carano's employment and refused to hire her for other

---

[16]  Joseph A. Wulfsohn, *James Gunn likes tweet bashing Gina Carano after Disney fires 'Mandalorian' actress*, Fox News (Feb. 11, 2021), http://tinyurl.com/3auye3s6.

promised roles based on her Posts, thereby unlawfully controlling, directing, or tending to control or direct Carano's political activities or affiliations.

149. Section 1102 of the California Labor Code provides:

No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.

150. In violation of Section 1102, Defendants coerced, influenced, and/or attempted to coerce and influence Carano because of her Posts by means of a threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity; and Defendants actually carried out that threat of discharge or loss of employment.

151. The termination of Carano's employment and the refusal to hire her for other promised roles was substantially motivated by Defendants' disagreement with Carano's political beliefs and their actions and related defamatory statements caused Carano harm.

152. Defendants' attempt to curtail Carano's political activities outside of the workplace and control her political expression standing alone implies an employer policy in violation of Sections 1101 & 1102. *See Smedley v. Capps, Staples, Ward, Hastings & Dodson*, 820 F. Supp. 1227, 1230 (N.D. Cal. 1993) ("Similarly, if plaintiff had been instructed to curtail her gay-oriented political activities outside the office, this would constitute a violation of § 1101."); *Ross v. Indep. Living Res. of Contra Costa Cnty.*, No. C08-00854 TEH, 2010 WL 1266497, at *6 (N.D.

Cal. Apr. 1, 2010) ("The allegation that Ross was terminated as a result of his political activity is sufficient to plausibly suggest the existence of such a policy.").

153. The termination of Carano's employment and the refusal to hire her for other promised roles served as an implicit warning and message to Defendants' other employees that the expression of views departing from liberal perspectives on the Black Lives Matter movement, the coronavirus, transgender issues, and political polarization would not be tolerated. *See Napear v. Bonneville Int'l Corp.*, No. 2:21-CV-01956-DAD-DB, 2023 WL 4747623, at \*10 (E.D. Cal. July 25, 2023) (holding such implicit messages constituted an employer policy under Sections 1101 & 1102).

154. Defendants' actions were done with the knowledge, approval and even at the direction of individuals who served as officers, directors, or managing agents of each Defendant. Cal. Civ. Code § 3294.

155. Section 1105 of the California Labor Code provides:

> Nothing in this chapter shall prevent the injured employee from recovering damages from his employer for injury suffered through a violation of this chapter.

156. These Sections provide employees with a private right of action against employers. *See* Cal. Lab. Code § 1105 (providing for the availability of money damages); *Gay L. Students Assn. v. Pac. Tel. & Tel. Co.*, 595 P.2d 592, 611 (1979) ("Thus, since the allegations of the complaint do allege that PT&T has engaged in conduct which violates these statutory provisions, the complaint also states a cause of action against PT&T on this ground."); *Ross*, 2010 WL 1266497, at \*5 ("It is not necessary for [Plaintiff] to plead the elements of breach of contract in order to bring a section 1101 claim.").

157.  Defendants' actions damaged Carano, not only in the loss of her role on *The Mandalorian* but the role promised her and already approved by Disney in *Rangers of the New Republic* and the movies to be based on these series.

158.  Defendants' actions further damaged Carano by causing others to stop doing business with her and lost future employment opportunities.

159.  Carano has suffered emotional distress because of Defendants' actions.

160.  Defendants' harassment and termination of Plaintiff and refusal to hire her for other promised roles were (1) intended to cause injury to Carano; (2) amounted to despicable conduct undertaken with willful and conscious disregard of Plaintiff's rights under California law; and (3) amounted to despicable conduct that subjected Carano to cruel and unjust hardship in conscious disregard of her rights, thus supporting punitive damages.

## SECOND CLAIM FOR RELIEF:
## WRONGFUL DISCHARGE AND REFUSAL TO HIRE
### California Labor Code § 98.6

161.  Carano re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

162.  Section 98.6 of the California Labor Code provides in pertinent part:

> (a) A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter, including the

conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, … or because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her.

(b)(1) Any employee who is discharged, threatened with discharge, demoted, suspended, retaliated against, subjected to an adverse action, or in any other manner discriminated against in the terms and conditions of his or her employment because the employee engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, … shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer.

163.  In violation of Section 1101(a) of the Labor Code, Defendants terminated Carano's employment and refused to hire her for other promised roles based on her Posts, thereby unlawfully forbidding or preventing Carano from engaging or participating in politics.

164.  In violation of Section 1101(b) of the Labor Code, Defendants terminated Carano's employment and refused to hire her for other promised roles based on her Posts, thereby unlawfully controlling, directing, or tending to control or direct Carano's political activities or affiliations.

165.  In violation of Section 1102, Defendants coerced, influenced, and/or attempted to coerce and influence Carano because of her Posts by

means of a threat of discharge or loss of employment, including the refusal to renew her role in Season 3 of *The Mandalorian* and cast her in the promised role in *Rangers of the New Republic*. Defendants' threats and harassment were in an effort to force Carano to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity; and Defendants actually carried out that threat of discharge or loss of employment.

166. The termination of Carano's employment and the refusal to hire her for other promised roles was done with the knowledge, approval and even at the direction of individuals who served as officers, directors, or managing agents of each Defendant. Cal. Civ. Code § 3294.

167. Based on those violations, Defendants also violated Section 98.6(a) of the Labor Code by retaliating against Carano for conduct protected by Section 1101 & 1102 of the Labor Code.

168. Defendants' actions damaged Carano, not only in the loss of her role on *The Mandalorian* but also in the loss of the role promised her and already approved by Disney in *Rangers of the New Republic* and in movies to be based on these series.

169. Defendants' actions further damaged Carano by causing others to stop doing business with her and lost future employment opportunities.

170. Carano has suffered emotional distress because of Defendants' actions.

171. Defendants' harassment and termination of Plaintiff and refusal to hire her for other promised roles were (1) intended to cause injury to Carano; (2) amounted to despicable conduct undertaken with willful and conscious disregard of Plaintiff's rights under California law: and (3) amounted to despicable conduct that subjected Carano to cruel

and unjust hardship in conscious disregard of her rights, thus supporting punitive damages.

### THIRD CLAIM FOR RELIEF:
### SEX DISCRIMINATION
### California Gov't Code § 12940

172.  Carano re-alleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

173.  Section 12940 of the California Government Code provides: It is an unlawful employment practice . . .

> (a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, reproductive health decision making, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

174.  Defendants treated Carano differently than her similarly situated male co-workers.

175.  Carano was counseled, harassed, and forced to attend meetings with people who sought to have her fired due to her social media posts while her male co-workers posted similar social media posts but

were not counseled, harassed, or forced to attend meetings with people who sought to have them fired for their political beliefs.

176.  Carano was ultimately terminated because of her social media posts expressing her personal, political beliefs while her male co-workers who did the same were not terminated.

177.  Carano was defamed when Defendants publicly mischaracterized her social media posts and her character, resulting in the loss of her agent and attorney as well as future employment opportunities while Defendants said nothing about her male co-workers' social media posts.

178.  Defendants refused to hire Carano for other promised roles, including in *Rangers of the New Republic* but have not denied her similarly situated male co-stars other employment opportunities.

179.  Carano was treated differently than her male co-workers because of her sex (female).

180.  Carano has suffered compensatory damages and emotional distress as a result of Defendants' actions.

181.  Defendants' actions complained of herein were done with the knowledge, approval and even at the direction of individuals who served as officers, directors, or managing agents of each Defendant.  Cal. Civ. Code § 3294.

182.  Defendants' harassment, retaliation, and termination of Plaintiff and refusal to hire her for other promised roles were (1) intended to cause injury to Carano; (2) amounted to despicable conduct undertaken with willful and conscious disregard of Plaintiff's rights under California law: and (3) amounted to despicable conduct that subjected Carano to cruel and unjust hardship in conscious disregard of her rights, thus supporting punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Carano prays for relief as follows:

1. Preliminary and permanent injunctive relief requiring Defendants to reinstate Carano to her prior position with no loss of pay or benefits;

2. A judgment declaring that Defendants' termination of Carano's employment was unlawful and in violation of California law;

3. Compensatory damages, including but not limited to loss of pay from the date of termination to the date of reinstatement, in an amount to be determined at trial, but exceeding $75,000;

4. Compensatory damages for loss of future employment, including but not limited to the promised role in *Rangers of the New Republic*, in an amount to be determined at trial;

5. Emotional distress damages, in an amount to be determined at trial;

6. Punitive damages, in an amount to be determined at trial;

7. Reasonable attorneys' fees and costs; and

8. Such other and further relief as the Court may deem just and proper.

9. Carano demands a trial by jury.

Respectfully submitted,

*/s/ Donald M. Falk*
Donald M. Falk
Cal. Bar #150256
SCHAERR | JAFFE LLP
Four Embarcadero Center
Suite 1400
San Francisco, CA 94111
(415) 562-4942
dfalk@schaerr-jaffe.com

Gene C. Schaerr*
H. Christopher Bartolomucci*
Edward H. Trent*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
cbartolomucci@schaerr-jaffe.com
etrent@schaerr-jaffe.com

*Pro hac vice application
forthcoming

Counsel for Plaintiff

Dated:  February 6, 2024

COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in this case.

Dated:  February 6, 2024

/s/ Donald M. Falk
Donald M. Falk
Cal. Bar #150256
SCHAERR | JAFFE LLP
Four Embarcadero Center,
Suite 1400
San Francisco, CA 94111
(415) 562-4942
dfalk@schaerr-jaffe.com

Gene C. Schaerr*
H. Christopher Bartolomucci*
Edward H. Trent*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
cbartolomucci@schaerr-jaffe.com
etrent@schaerr-jaffe.com

*Pro hac vice* application
forthcoming

*Counsel for Plaintiff*