DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
MOLLY M. LENS (S.B. #283867)
mlens@omm.com
KRISTIN MACDONNELL (S.B. #307124)
kmacdonnell@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:  +1 310 553 6700
Facsimile:   +1 310 246 6779

JONATHAN D. HACKER (*pro hac vice* pending)
jhacker@omm.com
JOSHUA REVESZ (*pro hac vice* pending)
jrevesz@omm.com
O'MELVENY & MYERS  LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  +1 202 383 5300
Facsimile:   +1 202 383 5414

*Attorneys for Defendants The Walt Disney Company, Lucasfilm Ltd. LLC, and Huckleberry Industries (US) Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA CARANO,<br><br>            Plaintiff,<br><br>    v.<br><br>THE WALT DISNEY COMPANY, LUCASFILM LTD. LLC, and HUCKLEBERRY INDUSTRIES (US) INC.,<br><br>            Defendants. | Case No. 2:24-cv-01009-SPG-SK<br><br>**DEFENDANTS THE WALT DISNEY COMPANY, LUCASFILM LTD. LLC, AND HUCKLEBERRY INDUSTRIES (US) INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:     June 12, 2024<br>Time:    1:30 p.m.<br>Judge:  Hon. Sherilyn Peace Garnett<br>Courtroom:  5C |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on June 12, 2024, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 5C of the above-entitled court, located at 350 West 1st Street, Los Angeles, California 90012, Defendants the Walt Disney Company, Lucasfilm Ltd. LLC, and Huckleberry Industries (US) Inc. (collectively "Disney"), by and through their counsel, will and hereby do move this Court for entry of an order dismissing the complaint of Plaintiff Gina Carano, pursuant to Federal Rule of Civil Procedure 12(b)(6) and the First Amendment to the United States Constitution.

Disney makes this motion on the grounds that Disney has a constitutional right not to associate its artistic expression with Carano's speech, such that the First Amendment provides a complete defense to Carano's claims.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on April 2, 2024, when the parties thoroughly discussed the substance and potential resolution of the filed motion by videoconference.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the pleadings and papers on file in this action, and such other evidence and argument as may be properly received by the Court.

Dated: April 9, 2024

**O'MELVENY & MYERS LLP**


By: */s/ Daniel M. Petrocelli*
Daniel M. Petrocelli
dpetrocelli@omm.com

*Attorney for Defendants The Walt Disney Company, Lucasfilm Ltd. LLC, and Huckleberry Industries (US) Inc.*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION.................................................................................1

RELEVANT ALLEGATIONS IN THE COMPLAINT .........................................4

LEGAL STANDARD ...........................................................................6

ARGUMENT ....................................................................................6

     DISNEY'S FIRST AMENDMENT RIGHT NOT TO ASSOCIATE ITS
SPEECH WITH CARANO'S IS A COMPLETE DEFENSE TO ALL OF
HER CLAIMS ................................................................................6

    A.    An Entity Engaged In Expression Has A First Amendment Right To
Select Who Will Convey Its Message And Exclude Those Who The
Entity Believes Will Impair Its Message .............................................7

    B.    The First Amendment Protects Disney's Decision To Disassociate
Carano And Her Controversial Speech From Its Own Protected Speech
In *The Mandalorian* .................................................................12

        1.    Disney's Television Shows Are Protected Speech...................12

        2.    The First Amendment Protects Disney's Right To Disassociate
Its Speech From Carano And Her Divisive Speech .................13

    C.    The First Amendment Bars All Of Carano's Claims...........................17

CONCLUSION ................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ........................................................................... 12

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) ....................................................................*passim*

*Claybrooks v. American Broad. Cos.*,
  898 F. Supp. 2d 986 (M.D. Tenn. 2012) ...................................... 10, 13

*Democratic Party of United States v. Wisconsin ex rel. La Follette*,
  450 U.S. 107 (1981) ........................................................................ 8, 15

*Green v. Miss United States of America, LLC*,
  52 F.4th 773 (9th Cir. 2022) ........................................................... 9, 13

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*,
  515 U.S. 557 (1995) ....................................................................*passim*

*Jones v. Bock*,
  549 U.S. 199 (2007) ............................................................................. 6

*McDermott v. Ampersand Publishing, LLC*,
  593 F.3d 950 (9th Cir. 2010) .......................................................... 9, 14

*Moore v. Hadestown Broadway Ltd. Liability Co.*,
  __ F. Supp. 3d __, 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024)................... 10, 13

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
  475 U.S. 1 (1986) ................................................................................. 7

*Redgrave v. Boston Symphony Orchestra, Inc.*,
  855 F.2d 888 (1st Cir. 1988) ....................................................... 9, 10, 15

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ........................................................................... 12

*Sams v. Yahoo! Inc.*,
  713 F.3d 1175 (9th Cir. 2013) .............................................................. 6

*Schad v. Mount Ephraim*,
  452 U.S. 61 (1981) ............................................................................. 12

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Tamkin v. CBS Broad., Inc.*,
   193 Cal. App. 4th 133 (2011).................................................................12

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ...............................................................................7

**Statutes**

Cal. Gov. Code § 12940 ..............................................................................6

Cal. Lab. Code § 1101 .................................................................................6

Cal. Lab. Code § 1102 .................................................................................6

Cal. Lab. Code § 98.6 ..................................................................................6

**Other Authorities**

Eugene Volokh, *Private Employees' Speech and Political Activity:*
   *Statutory Protection Against Employer Retaliation*,
   16 Tex. Rev. L. & Pol. 295 (2012).................................................3, 11

Eugene Volokh, *Reasons Not to Limit Private-Employer-Imposed*
   *Speech Restrictions: The Employer's Own Free Speech Rights?*,
   Volokh Conspiracy (Aug. 5, 2022) ............................................*passim*

*'The Mandalorian': Why Gina Carano Has Been Fired as Cara Dune*,
   Newsweek (Feb. 11, 2021).....................................................................4

**Rules**

Fed. R. Civ. P. 12(b)(6) ..............................................................................6

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants The Walt Disney Company and its affiliates Lucasfilm Ltd. LLC ("Lucasfilm"), and Huckleberry Industries (US) Inc. ("Huckleberry") respectfully submit this Memorandum of Points and Authorities in support of their Motion To Dismiss Plaintiff Gina Carano's Complaint (ECF No. 1).

### INTRODUCTION

The First Amendment to the U.S. Constitution generally forbids the government from dictating to artistic creators how they may develop and express their own artistic messages.  This principle applies fully to enterprises that employ others to perform artistic messages through song, dance, or acting: for such artistic expressions, the performer *is* the performance, no less than the words written on the script or lyric sheet.  For this reason, just as a newspaper is entitled to broad deference in choosing which writers to employ to express its editorial positions, a creative production enterprise is entitled to broad deference in deciding which performers to employ to express its artistic messages.

Defendants The Walt Disney Company and its affiliates Lucasfilm and Huckleberry (collectively "Disney") are enterprises that produce and disseminate artistic performances through film, television, and digital media.  One of those productions is *The Mandalorian*, a television show set in the *Star Wars* universe. Disney engaged plaintiff Gina Carano ("Carano") as a guest actor in various episodes of the first two seasons of *The Mandalorian*.  She played bounty hunter Cara Dune, a character who became popular with fans during Carano's time on the show.

As Carano's own fame rose with her character's, Carano began engaging with show fans and the public in a manner that, in Disney's view, came to distract from and undermine Disney's own expressive efforts.  As her complaint alleges, Carano made public declarations blaming pandemic-related closure orders and vaccine mandates for causing widespread suicides and murders, attacking the

legitimacy of the 2020 Presidential election, and mocking people who identify their pronouns to show support for transgender rights.  The coup de grace came in February 2021, when Carano admittedly reposted on Instagram a post comparing criticism of politically conservative viewpoints to the Holocaust in Nazi Germany.  As Carano told the world:  "Jews were beaten in the streets, not by Nazi soldiers but by their neighbors…even by children.  🙁  'Because history is edited, most people today don't realize that to get to the point where Nazi soldiers could easily round up thousands of Jews, the government first made their own neighbors hate them simply for being Jews.  How is that any different from hating someone for their political views?'"  ECF No. 1 (Compl.) ¶ 102.

Carano's decision to publicly trivialize the Holocaust by comparing criticism of political conservatives to the annihilation of millions of Jewish people—notably, not "thousands"—was the final straw for Disney.  As Carano alleges, Lucasfilm that same day denounced her statements and observed that it had "no plans" to employ her in the future.  Compl. ¶ 31.  Disney's then-CEO also observed that Carano's statements "didn't align with Company values," including its "values of respect, values of decency, values of integrity, and values of inclusion."  *Id.* ¶ 34.  She alleges that given her public statements, Disney chose not to include her Cara Dune character in season three of *The Mandalorian* and other potential *Star Wars* storylines.  *Id.* ¶ 39.

More than two years later, Carano filed suit, alleging that by disassociating its artistic performances from Carano and the high-profile controversy she provoked, Disney violated California labor laws prohibiting employers from taking adverse employment actions on the basis of an employee's political activity.

Carano's claims are all barred by the First Amendment.  As the Supreme Court held in *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557 (1995), the First Amendment embodies a core principle of "speaker's autonomy" that bars the state from dictating to expressive enterprises

what to say, how to say it, and whom to say it through.  *Id.* at 573-75.  As the Court further held in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), that principle means that a state cannot force an employer engaged in speech to speak through an employee whose own views or public profile could compromise the employer's own message, even if the employee does not express her views on the job.  *Id.* at 650-53.  To quote Carano's own counsel, "requiring an artistic organization to hire as its speakers people who are associated with [a controversial political] position will undermine its ability to send the particular aesthetic or artistic message that it wants to send," because "hearing even neutral artistic material from someone who has become well-known for political views may make that material seem ideologically laden, or at least may significantly distract from the artistic message." Eugene Volokh, *Reasons Not to Limit Private-Employer-Imposed Speech Restrictions: The Employer's Own Free Speech Rights?*, Volokh Conspiracy (Aug. 5, 2022), https://reason.com/volokh/2022/08/05/reasons-not-to-limit-private-employer-imposed-speech-restrictions-the-employers-own-free-speech-rights ("*Employer's Own Free Speech Rights?*").

        To be clear, the First Amendment protection at issue here, while fundamental, is circumscribed in scope.  Carano's own counsel has acknowledged that "organizations that create speech products may be free to refuse to include speakers whose outside speech undermines the organization's message," Eugene Volokh, *Private Employees' Speech and Political Activity: Statutory Protection Against Employer Retaliation*, 16 Tex. Rev. L. & Pol. 295, 334 (2012), and he correctly recognizes that the principle does not extend to employers or employees *not* engaged in creating speech products.  After all, "the great majority of all private employees don't speak on the employer's behalf: they are engineers, accountants, secretaries, janitors, and more."  Volokh, *Employer's Own Free Speech Rights?*, *supra*.  For those employees, and for non-expressive employers in general, state law

MEMORANDUM OF POINTS AND AUTHORITIES
2:24-CV-01009-SPG-SK

can protect employee political activity "without violating the employer's free speech rights." *Id.*

What state law cannot do, however, is force entities that *do* create speech products to speak through writers or singers or actors whose own speech and public profile could, in the employer's view, compromise the employer's ability to express itself in its own chosen manner. Carano's suit contravenes that rule. It is an impermissible effort to invoke state power to override a private entity's decisions about what to say in its own art and how to say it. The complaint should be dismissed.

## RELEVANT ALLEGATIONS IN THE COMPLAINT

Carano alleges that she appeared as a guest actor on the first two seasons of *The Mandalorian*, a television show set in the *Star Wars* universe airing on Disney+. Compl. ¶¶ 21, 23, 114. She played the bounty hunter Cara Dune and was paid $25,000 for each episode in which she appeared. *Id.* ¶¶ 21, 24. The first season of *The Mandalorian* aired in 2019, and the second season aired in 2020. *See id.* ¶¶ 21-22, 26. Carano was not under contract to appear on the third season of *The Mandalorian* or on any other Disney production. *Id.* ¶ 24.

Carano alleges that, beginning in 2020, she chose to engage on a variety of controversial issues on Instagram and the social-media website now known as X.[1] Compl. ¶¶ 43-45. For example, on September 5, 2020, Carano publicly criticized COVID-19 lockdowns and vaccination mandates, stating "[e]nough already,"

---

[1] Carano's Complaint does not include a full accounting of her social-media posts during this time period. It omits, for example, a December 23, 2020 post featuring "a group of men playing Monopoly on the backs of a group of naked men, with the caption 'All We Have To Do is Stand Up and Their Little Game is Over'"—a "widely-shared meme that espouses the anti-semitic consp[i]racy theory that a cabal of rich Jews run the world." *'The Mandalorian': Why Gina Carano Has Been Fired as Cara Dune*, Newsweek (Feb. 11, 2021), https://www.newsweek.com/gina-carano-tweets-fired-mandalorian-star-wars-lucasfilm-1568538.

"[p]eople are dropping like flies from depression and suicide, overdoses, MURDER" as a result.  *Id.* ¶ 57.  In addition, Carano sparred with social-media users over what the complaint describes as "her refusal to endorse the BLM [Black Lives Matter] movement."  *Id.* ¶ 53.  And two days after the 2020 presidential election, she publicly attacked the legitimacy of the election, declaring without any evidence that the election was marred by "voter fraud" and that the incumbent administration needed to "[i]nvestigate every state" and "[f]lush out the fake votes." *id.* ¶ 88.  During this time, Carano also frequently posted on the topic of transgender rights, not only announcing her refusal to "put pronouns in [her] bio to show [her] support for trans lives," *id.* ¶ 69, but openly mocking those with different views by describing her pronouns as "boop/bop/beep," *id.* ¶ 65.

Throughout this public airing of her views, Carano directly interacted with numerous anonymous social-media accounts.  Sometimes, as in her exchanges with users @thatthuglife and @0xWitch, she thanked the users for their support of her views.  Compl. ¶¶ 55, 74.  Other times, she opted to criticize their positions, as in her exchange with user @chanelkenobi, who Carano claimed was aligned with "cowards and bullies." *Id.* ¶ 52; *see id.* ¶ 70 (exchange with user @CassPereyra).

Carano's social-media usage sunk to its nadir on February 10, 2021.  On that day, she reposted an Instagram post from user warriorpriestgympodcast.  Compl. ¶ 102.  The post read:  "Jews were beaten in the streets, not by Nazi soldiers but by their neighbors…even by children.  ☹  'Because history is edited, most people today don't realize that to get to the point where Nazi soldiers could easily round up thousands of Jews, the government first made their own neighbors hate them simply for being Jews.  How is that any different from hating someone for their political views?'" *Id.*

Disney had enough.  The same day Carano grotesquely trivialized the Holocaust as comparable to sharp political disagreements, Lucasfilm announced that "Gina Carano is not currently employed by Lucasfilm and there are no plans

1   for her to be in the future.  Nevertheless, her social media posts denigrating people
2   based on their cultural and religious identities are abhorrent and unacceptable."
3   Compl. ¶ 31.  A month later, Disney's former CEO explained that Carano's views
4   "didn't align with Company values," including its "values of respect, values of
5   decency, values of integrity, and values of inclusion."  *Id.* ¶ 34.

6          Carano filed this complaint in February 2024.  Count I alleges that Disney
7   violated California Labor Code provisions prohibiting employers from directing
8   employees' political activity.  Cal. Lab. Code §§ 1101-1102; *see* Compl. ¶¶ 145-60.
9   Count II repackages Count I, alleging that Disney violated related California Labor
10  Code provisions that prohibit taking adverse actions against employees or
11  "applicant[s] for employment" on the basis of their protected activity.  Cal. Lab.
12  Code § 98.6; *see* Compl. ¶¶ 161-71.  And Count III charges that Disney
13  discriminated against Carano on the basis of her sex, theorizing that Carano is
14  comparably situated to male actors who made very different social-media
15  statements.  Compl. ¶¶ 172-82; *see* Cal. Gov. Code § 12940.

16                               **LEGAL STANDARD**

17         To prevail on a motion to dismiss, the moving party must show that the
18  allegations contained in the complaint, taken as true, are insufficient as a matter of
19  law to state a claim for relief.  *See* Fed. R. Civ. P. 12(b)(6).  The "assertion of an
20  affirmative defense may be considered properly on a motion to dismiss where the
21  allegations in the complaint suffice to establish the defense." *Sams v. Yahoo! Inc.*,
22  713 F.3d 1175, 1179 (9th Cir. 2013) (internal quotation marks omitted) (quoting
23  *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

24                                  **ARGUMENT**
25  **DISNEY'S FIRST AMENDMENT RIGHT NOT TO ASSOCIATE ITS
    SPEECH WITH CARANO'S IS A COMPLETE DEFENSE TO ALL OF HER
26  CLAIMS**

27         Under the First Amendment, an entity engaged in expressive communication
28  may choose to exclude from its own communications other speakers who, in the

expressive entity's view, would impair its ability to convey its own preferred message.  That principle disposes of this case.  The First Amendment protects Disney's right to protect its own speech from association with Carano's high-profile, controversial speech.  Because the state cannot impose liability on Disney for making that decision, Carano's claims should be dismissed.[2]

### A. An Entity Engaged In Expression Has A First Amendment Right To Select Who Will Convey Its Message And Exclude Those Who The Entity Believes Will Impair Its Message

The First Amendment right to speak freely without government coercion includes the right "not to propound a particular point of view."  *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557, 575 (1995).  Thus, the government cannot compel private individuals and entities to express messages they do not want to express.  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  And because "*all* speech inherently involves choices of what to say and what to leave unsaid," *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (plurality op.), the First Amendment's right to free speech bars the government from forcing a person to address topics that "the speaker would rather avoid," *Hurley*, 515 U.S. at 573.

The fundamental First Amendment rule of "speaker's autonomy," *id.* at 578, applies with equal force when an entity speaks in association with others.  In *Hurley*, the Supreme Court unanimously held that the organizer of a parade had a constitutional right to exclude from the parade a group seeking to "impart[] a message the organizers do not wish to convey" on then-contentious issues surrounding gay rights.  *Id.* at 559.  The parade organizer, the Court explained, "selects the expressive units of the parade from potential participants, and . . .  each contingent's expression in the [organizer's] eyes comports with what merits celebration on that day." *Id.* at 574.  And its choice to "exclude a message it did not

---

[2] For purposes of this motion, Disney assumes (without conceding) that Carano's allegations state claims under California law.

like from the communication it chose to make" fell within its "right as a private

speaker to shape its expression by speaking on one subject by remaining silent on

another." *Id.*

Five years later, the Supreme Court extended this principle to hold that

entities engaged in expression have a First Amendment right to select the

employees who channel that expression—even where those employment choices

would otherwise violate state antidiscrimination law.  In *Boy Scouts of America v.

Dale*, 530 U.S. 640 (2000), the Court considered the Boy Scouts' decision to fire an

openly gay assistant scoutmaster because the organization at that time believed that

homosexuality was inconsistent with Scouting values.  *Id.* at 644.  The Court held

that this choice was protected by the First Amendment, and thus that the Boy

Scouts had a complete defense to a New Jersey antidiscrimination law that barred

employment decisions made on the basis of sexual orientation.  *See id.* at 645.  That

result followed, the Court explained, because the Boy Scouts "engage[d] in

expressive activity" in educating young men, and because "the forced inclusion of

Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability

to advocate" its views.  *Id.* at 650.  The Court held that it must "defer" to the Boy

Scouts' account of "what would impair its expression," because courts should not

second-guess an entity's expression "on the ground that they view a particular

expression as unwise or irrational."  *Id.* at 651, 653 (quoting *Democratic Party of

United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 124 (1981)).  And the

Court rejected the argument that the Boy Scouts undermined its defense by

dismissing Dale but not certain other scoutmasters who shared his views, noting

that just because the Boy Scouts "tolerates dissent within its ranks" does not "mean

that its views receive no First Amendment protection."  *Id.* at 656.

Together, *Dale* and *Hurley* establish that the state cannot force an employer

engaged in expressive activity to express its message through speakers who, in the

employer's view, would impair the employer's ability to convey its own preferred

1    message.  Decisions before and since have applied the same principle to reject

2    claims seeking to hold private expressive organizations liable for declining to

3    express themselves through employees the organizations did not want to associate

4    with their expressive messages.

5            In *McDermott v. Ampersand Publishing, LLC.*, 593 F.3d 950 (9th Cir. 2010),

6    for example, the Ninth Circuit held that a newspaper could not be forced to hire

7    editors who expressed viewpoints on union-related topics with which the

8    newspaper disagreed, *id.* at 953, explaining that "[t]o the extent that the publisher's

9    choice of writers affects the expressive content of its newspaper, the First

10   Amendment protects that choice," *id.* at 962.

11           The Ninth Circuit likewise held more recently that the First Amendment

12   protects a beauty pageant's right not to include transgender participants, because

13   the inclusion of such participants was "an expressive decision" that was the

14   pageant's own choice to make.  *Green v. Miss United States of America, LLC*, 52

15   F.4th 773, 786 (9th Cir. 2022).

16           Even before *Dale* and *Hurley* were decided, the en banc First Circuit

17   anticipated the principles they espouse.  In *Redgrave v. Boston Symphony*

18   *Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), the Boston Symphony Orchestra had

19   contracted with famed actor Vanessa Redgrave to narrate an upcoming opera, but

20   after she publicly expressed support for the Palestine Liberation Organization and

21   criticism of Israel, the orchestra cancelled her contract and its upcoming opera

22   performances.  *Id.* at 890-91.  Redgrave sued, asserting not only breach of contract,

23   but also a claim under a Massachusetts civil rights statute that she said prohibited

24   the orchestra from terminating their relationship based on her political speech.  The

25   First Circuit ultimately rejected the latter claim on state law grounds, *id.* at 912, but

26   its opinion convincingly detailed the First Amendment interests that would be

27   impinged *if* the state could force the orchestra to perform through Redgrave.

28

As the court recognized, "artistic expression in the performing arts enjoys substantial constitutional protection." *Id.* at 905.  And "[p]rotection for free expression in the arts should be particularly strong when asserted against a state effort to *compel* expression, for then the law's typical reluctance to force private citizens to act augments its constitutionally based concern for the integrity of the artist." *Id.* (citation omitted).  In the orchestra's view, the integrity of its performance would be "compromised or ineffective" if were forced to associate with Redgrave, *id.*, so "it chose cancellation" of her contract "simply to protect its own artistic expression," *id.* at 906.  And even to the extent that its acts were driven by "the potential for audience disruption," the orchestra remained entitled to "constitutional solicitude" in deciding whether and how audience reaction would affect the integrity of its performance. *Id.* at 905.[3]

Finally, in the specific context of casting theatrical and television productions, two district courts have held that production companies have a First Amendment right to cast actors of certain races based on the producer's view of the effect of casting on the artistic works' expressive content. *Moore v. Hadestown Broadway Ltd. Liability Co.*, __ F. Supp. 3d __, 2024 WL 989843, at *17 (S.D.N.Y. Mar. 7, 2024) ("Because . . . casting the performers who appear on stage comprised a significant component of [the production's] artistic decision, Hadestown's First Amendment protection extends to its decisions about casting."); *Claybrooks v. American Broad. Cos.*, 898 F. Supp. 2d 986, 993 (M.D. Tenn. 2012) ("[C]asting decisions are part and parcel of the creative process behind a television program . . . thereby meriting First Amendment protection against the application of anti-discrimination statutes to that process.").

---

[3] Although it rejected her civil rights claim, the First Circuit held that Redgrave should prevail on her breach-of-contract claim.  855 F.2d at 900.  It rejected the argument that the First Amendment shielded the orchestra's explicit breach of a validly formed contract. *Id.* at 894-95.

MEMORANDUM OF POINTS AND AUTHORITIES
2:24-CV-01009-SPG-SK

Summarizing much of this case law, Carano's own counsel has recognized that "organizations that create speech products may be free to refuse to include speakers whose outside speech undermines the organization's message." Volokh, *Private Employees' Speech and Political Activity*, 16 Tex. Rev. L. & Pol. at 334. These First Amendment interests have special force, he has emphasized, where the employer creates artistic works, because "requiring an artistic organization to hire as its speakers people who are associated with such a position will undermine its ability to send the particular aesthetic or artistic message that it wants to send: The messenger is part of the message." Volokh, *Employer's Own Free Speech Rights?*, *supra*. The problem applies fully to so-called "neutral artistic material," because— even assuming art is ever "neutral"—seeing such art performed by "someone who has become well-known for political views may make that material seem ideologically laden, or at least may significantly distract from the artistic message." *Id.* For these reasons, "a performing arts organization would likely be allowed to refuse to hire a narrator or actor whose past political activity is likely to distract the audience from the organization's artistic (or ideological) message." *Id.*

The speaker's autonomy principle applied in *Dale*, *Hurley*, and other precedents is a "fundamental rule of protection under the First Amendment," *Hurley*, 515 U.S. at 573, but it does not afford boundless constitutional immunity to all private employers seeking to limit employee political activity. Far from it. As Carano's counsel recognizes, the rule applies only to "[e]mployers that speak." Volokh, *Employer's Own Free Speech Rights?*, *supra*. Because such employers "must necessarily speak through their employees," when "an employee or prospective employee says things, even off the job, that would undermine the employer's message, the employer must be able to distance itself from the employee." *Id.* And while this principle is "particularly true for employees such as broadcasting and print reporters, opinion columnists, actors, and the like," it does not apply at all to employers or employees *not* engaged in creating speech products:

MEMORANDUM OF POINTS AND AUTHORITIES
2:24-CV-01009-SPG-SK

"At the same time, the great majority of all private employees don't speak on the employer's behalf: they are engineers, accountants, secretaries, janitors, and more. The statutes can apply to those employees without violating the employer's free speech rights." *Id.*

**B.    The First Amendment Protects Disney's Decision To Disassociate Carano And Her Controversial Speech From Its Own Protected Speech In *The Mandalorian***

Under *Hurley*, *Dale*, and the other cases discussed above, this is an easy case. The First Amendment rule of speaker's autonomy gives Disney, and Disney alone, the right to decide for itself exactly what messages to convey—or not to convey—to audiences through its creative programs and the actors it selects to perform them. That right includes the right to determine whether a given performer—here, Carano—would detract from its ability to convey its own chosen message.

### 1.    *Disney's Television Shows Are Protected Speech*

It is beyond dispute that, in creating and broadcasting *The Mandalorian*, Disney is engaged in expressive activity that warrants First Amendment protection. "[P]rograms broadcast by radio and television" are expressive works that "fall within the First Amendment guarantee." *Schad v. Mount Ephraim*, 452 U.S. 61, 65 (1981); *see Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 143 (2011) ("The creation of a television show is an exercise of free speech."). *The Mandalorian*, therefore, squarely qualifies as protected speech. And because speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023), Disney's right to develop and express its artistic message in its own preferred manner is not limited by the company's for-profit status, *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak.").

What is more, in a creative performance such as a song, play, or television program, the protected expression obviously is not limited to the words sung or spoken.  In the performing arts, the manner chosen for the performance—including the performers themselves—can be equally or even more crucial to the message being expressed and how the audience receives it.  *See Claybrooks*, 898 F. Supp. 2d at 999 ("casting decisions are a necessary component of any entertainment show's creative content" and thus "regulating the casting process necessarily regulates the end product"); *Moore*, 2024 WL 989843, at *20 ("Producers of live theater may be required to make regular casting decisions based on how the cast composition affects the story in future performances.").  Nobody can doubt, for example, how much casting decisions affected the artistic messages conveyed in such performances as *Hamilton*: for that show, the "expressive message was inescapably interwoven with its casting decisions—whom the musical decided to cast and whom the musical decided to exclude."  *Green*, 52 F.4th at 782.  As Carano's counsel has correctly explained, the "messenger is part of the message."  Volokh, *Employer's Own Free Speech Rights?*, *supra*; *see Green*, 52 F.4th at 781 ("[F]or certain expressive productions . . . there is no daylight between speech and speaker.").

### 2. <u>The First Amendment Protects Disney's Right To Disassociate Its Speech From Carano And Her Divisive Speech</u>

Carano's complaint makes clear that Disney declined to continue engaging Carano as an actor in the *Star Wars* franchise to avoid associating that artistic programming with Carano's controversial—indeed offensive, to Disney and many *Star Wars* fans—public comments.   As Lucasfilm explained, Disney found Carano's online statements to be "abhorrent and unacceptable."  Compl. ¶ 31.  And as Disney's then-CEO later elaborated, Carano's speech did not "align with Company values," including its "values of respect, values of decency, values of integrity, and values of inclusion."  *Id.* ¶ 34.  Indeed, Carano's complaint is single-

1  minded in claiming that Disney's decisions were motivated solely by her "exercise

2  of [her] speech rights." *Id.* ¶ 6.

3      The First Amendment fully protects Disney's decision to exclude Carano

4  from its own artistic speech to avoid associating that speech with views that Disney

5  considered offensive and disruptive of its efforts to spread its own message as it

6  deemed appropriate.  Under the First Amendment principle of speaker's autonomy,

7  Disney is entitled to "deference" both in developing its artistic message and in

8  determining whether its ability to convey that message would be impaired by its

9  association with certain other speakers.  *Dale*, 530 U.S. at 653.  As the Supreme

10  Court put it, courts must "give deference to an association's assertions regarding the

11  nature of its expression" and "must also give deference to an association's view of

12  what would impair its expression."  *Id.*  The question thus is not whether the court

13  may "disagree" with the expressive entity's "values or find them internally

14  inconsistent."  *Id.* at 651.  Rather, when an entity has "decided to exclude a message

15  it did not like from the communication it chose to make," that determination alone

16  "is enough to invoke its right as a private speaker to shape its expression."  *Hurley*,

17  515 U.S. at 574.

18      Disney thus was entitled to protect its creative speech in the *Star Wars* series

19  from association with views Disney and many viewers (and potential viewers)

20  considered offensive and contrary to Disney's values.  Just as the *Dale* plaintiff's

21  mere "presence as an assistant scoutmaster" was understood to "interfere with the

22  Boy Scouts' choice not to propound a view contrary to its beliefs," 530 U.S. at 653-

23  54, Carano's presence as a prominent actor on *The Mandalorian* interfered with

24  Disney's choice not to produce a show associated with her beliefs.  The same

25  principle of speaker's autonomy controlled in *Hurley*, where the parade organizer's

26  choice of marchers affected the "common theme" of the parade, 515 U.S. at 576; in

27  *McDermott*, where the choice of writers affected "the ability of the newspaper

28  owner and publisher to exercise control over the news pages," 593 F.3d at 962; and

MEMORANDUM OF POINTS AND AUTHORITIES
2:24-CV-01009-SPG-SK

in *Redgrave*, where the choice of opera narrator affected the orchestra's "own artistic expression," 855 F.2d at 905.

It is not relevant to the foregoing analysis that Carano believes her online conduct was less offensive than Disney does, Compl. ¶ 35, or that she interprets her statement trivializing the Holocaust as more benign than Disney considered it, *id*. ¶ 103. The rule of speaker's autonomy applied in *Dale* and *Hurley* means that Disney, not Carano (or the state), has the sole right to decide what artistic speech to produce and how to produce it. The rule also means that Disney, not Carano (or the state) is solely entitled to decide what messages it seeks to convey in its art and what associations might impair those efforts. *See supra* at 6-8. For these reasons, it hardly helps Carano's position to suggest that not all viewers watching *The Mandalorian* and considering her public statements might find them as offensive as Disney did. The rule of speaker's autonomy means that Disney should not be forced to have *its* creative speech diluted by viewers thinking about *her* speech at all. Disney has the constitutionally protected "choice not to propound a point of view contrary to its beliefs" through its casting decisions, *Dale*, 530 U.S. at 654, regardless whether Carano (or the state) would have made the same decisions. *See also La Follette*, 450 U.S. at 124.

Nor does it matter that Carano expressed herself through her own widely followed social-media account, rather than through a channel hosted by Disney. The Supreme Court in *Dale* considered and rejected an analogous argument, explaining that even if Dale never aired his views while on the job, his mere "presence" at work—regardless of what he said there—would interfere with the Boy Scouts' preferred messaging. 530 U.S. at 655-56. The same is true of Carano, particularly given her recognition that her *Star Wars* character "became one of the most recognized and popular characters in the series." Compl. ¶ 23.

Finally, Carano's extensive allegations that Disney treated other actors' speech differently than hers, Compl. ¶¶ 127-44, are immaterial for First

Amendment purposes.  As the Supreme Court explained in *Dale*, it is "irrelevant" whether an entity "choose[s] to send one message but not the other" by dissociating itself from only some speakers.  530 U.S. at 655-56.  The fact that an organization "tolerates dissent within its ranks[] does not mean that its views receive no First Amendment protection."  *Id.* at 656; *see Hurley*, 515 U.S. at 569-70 ("[A] private speaker does not forfeit constitutional protection simply by combining multifarious voices.").  Thus, Disney's choice to remain associated with other actors, including Pedro Pascal, the star of *The Mandalorian*, as well as Mark Hamill, the lead figure of the *Star Wars* franchise—despite their occasional social-media posts—does not undercut Disney's First Amendment defense.  Compl. ¶¶ 128-43.

In any event, to the extent that those individual actors' speech is of any relevance to this case, the allegations in the complaint demonstrate that their speech was quantitatively and qualitatively different than Carano's:  they aired different views on different issues, did not engage with anonymous accounts, and did not send multiple controversial posts in a compressed timespan.[4]  Hence—even setting aside that "it is not the role of the courts to reject [Disney's] expressed values because they . . . find them internally inconsistent," *Dale*, 530 U.S. at 651— Disney's choices here were neither irrational nor inconsistent.

---

[4] The complaint focuses on four posts from Pedro Pascal—one in 2017, one in 2018, and two in 2020, one of which admittedly was immediately deleted. Compl. ¶¶ 128-37.  It notes three posts from Mark Hamill, from 2016, 2017, and 2022.  *Id.* ¶¶ 138-43.  In contrast, Carano's complaint features dozens of her own controversial posts within a single year, often jousting with anonymous accounts who appear to be fans of the *Star Wars* franchise.  *See, e.g.*, *id.* ¶ 52 (alleging a hostile interaction with user @chanelkenobi).  In addition, Pascal and Hamill are integral to the *Star Wars* franchise, while—as noted in the complaint—Carano never had any role beyond that of a "Guest Actor."  *Id.* ¶ 23; *see id.* ¶ 128 (noting that Pascal played "the Mandalorian"); *id.* ¶ 138 (describing Hamill as "Star Wars star").

1

**C.      The First Amendment Bars All Of Carano's Claims**

2

Disney's First Amendment right to disassociate its speech from Carano's

3

offensive viewpoints precludes all three of Carano's causes of action.

4

Counts I and II of Carano's complaint are plainly barred by the First

5

Amendment.  In those counts, Carano seeks to hold Disney liable for taking an

6

adverse action against her based on Disney's "disagreement with Carano's political

7

beliefs."  Compl. ¶ 151; *see id.* ¶¶ 163-65.  But as already explained, Disney had a

8

*constitutional right* to dissociate its own artistic message from Carano's outspoken

9

"political beliefs."  Because these claims aim to "require [Disney] to modify the

10

content of [its] expression," they cannot proceed.  *Hurley*, 515 U.S. at 578.

11

The analysis for Count III is no different.  That claim asserts a sex-

12

discrimination claim on the theory that Carano was "terminated because of her

13

social media posts expressing her personal, political beliefs while her male co-

14

workers who did the same were not terminated."  Compl. ¶ 176.  But Carano

15

expressly acknowledges that the male co-workers' statements "differ[ed] from her

16

own." *Id.* ¶ 127.  Indeed, the complaint on its face reveals a litany of differences

17

between Carano's statements and those of other actors.  *See supra* at 16 n.4.  As

18

explained above, *see supra* at 15-16, the First Amendment protects Disney's

19

decision to dissociate itself from some speech but not from other, different speech.

20

Carano evidently believes the other actors' statements were sufficiently similar to

21

hers to warrant identical concern from Disney, but under the rule of speaker's

22

autonomy, that determination is not for her—or a jury—to make.  Rather, the First

23

Amendment mandates deference to the speaker's own decisions about what speech

24

to associate with, even if others might consider those decisions "internally

25

inconsistent." *Dale*, 530 U.S. at 651.  Carano thus cannot stake out a

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES
2:24-CV-01009-SPG-SK

discrimination claim by alleging that Disney accorded different treatment to different statements by different actors.[5]

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

Dated: April 9, 2024

**O'MELVENY & MYERS LLP**

By: */s/ Daniel M. Petrocelli*

Daniel M. Petrocelli

Daniel M. Petrocelli
dpetrocelli@omm.com
Molly M. Lens
mlens@omm.com
Kristin MacDonnell
kmacdonnell@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:  +1 310 553 6700
Facsimile:   +1 310 246 6779

Jonathan D. Hacker (*pro hac vice pending*)
jhacker@omm.com
Joshua Revesz (*pro hac vice pending*)
jrevesz@omm.com
1625 Eye Street NW
Washington, DC 20006
Telephone:  +1 202 383 5300
Facsimile:   +1 202 383 5414

*Attorneys for Defendants The Walt Disney Company, Lucasfilm Ltd. LLC, and Huckleberry Industries (US) Inc.*

---

[5] This case does not present the question of whether an entity engaged in expression would have a viable First Amendment defense to a discrimination claim where the alleged comparators engaged in the *same* speech as the plaintiff but were treated differently.

MEMORANDUM OF POINTS AND AUTHORITIES
2:24-CV-01009-SPG-SK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants The Walt Disney Company, Lucasfilm Ltd. LLC, and Huckleberry Industries (US) Inc., certifies that this brief contains 5655 words, which complies with the word limit of Local Rule 11-6.1.

Dated: April 9, 2024                    **O'MELVENY & MYERS LLP**


By: */s/ Daniel M. Petrocelli*
Daniel M. Petrocelli
dpetrocelli@omm.com

*Attorney for Defendants The Walt Disney Company, Lucasfilm Ltd. LLC, and Huckleberry Industries (US) Inc.*

MEMORANDUM OF POINTS AND AUTHORITIES
2:24-CV-01009-SPG-SK