DONALD M. FALK, Cal. Bar #150256
Schaerr | Jaffe LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 562-4942
Fax: (202) 776-0136
dfalk@schaerr-jaffe.com

EUGENE VOLOKH, Cal. Bar #194464
evolokh@schaerr-jaffe.com
Schaerr | Jaffe LLP
385 Charles East Young Dr. East
Los Angeles, CA 90095
Tel: (310) 206-3926

GENE C. SCHAERR (*pro hac vice*)
EDWARD H. TRENT (*pro hac vice*)
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Tel: (202) 787-1060
gschaerr@schaerr-jaffe.com
etrent@schaerr-jaffe.com
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA CARANO, <br><br> Plaintiff, <br><br> v. <br><br> THE WALT DISNEY COMPANY, LUCASFILM LTD, LLC, and HUCKLEBERRY INDUSTRIES (US) <br><br> Defendants. | Case No.: **2:24-cv-01009-SPG-SK** <br><br> **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM: MEMORANDUM OF POINTS AND AUTHORITIES [ECF NO. 33]** <br><br> Date: June 12, 2024 <br> Time: 1:30 p.m. <br> Judge: Hon. Sherilyn Peace Garnett <br> Courtroom: 5C |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................ 1

LEGAL STANDARD .......................................................................... 1

DEFENDANTS MISSTATE THE RELEVANT ALLEGATIONS IN
   THE COMPLAINT .......................................................................... 2

ARGUMENT ....................................................................................... 4

   A.   Defendants Do Not have a First Amendment Right to
       Discriminate Against Carano Simply Because They
       Disagree with her Speech. ........................................................ 5

       1.   Laws of general applicability, including those that
           prohibit discrimination, apply to "expressive
           employers." ................................................................. 6

       2.   Under the allegations of the Complaint, Defendants'
           termination of Carano was not done for any First
           Amendment protected purpose. ........................................ 8

       3.   Even ignoring the current procedural posture,
           Defendants are unable to establish a substantial
           burden to any right to speak or engage in expressive
           association ................................................................. 12

   B.   The First Amendment Does Not Protect Defendants'
       Decision to Terminate and Retaliate Against Carano for
       her Protected Speech. ................................................................ 17

       1.   The Fact that Television Shows are Protected Speech
           is Irrelevant to the Allegations in Carano's
           Complaint. ................................................................. 17

2.	The First Amendment Does Not Protect Defendants'
Decision to Retaliate Against Carano for her Speech. ...... 18

C.	The First Amendment Does Not Protect Defendants From
Liability for Their Rank Sex Discrimination. ............................. 20

CONCLUSION ........................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ali v. L.A. Focus Publ'n,*
  112 Cal.App.4th 1477, 1488 (2003) ...................................................... 16

*Associated Press v. NLRB,*
  301 U.S. 103 (1937) ................................................................. *passim*

*Baghikian v. Providence Health & Servs.,*
  No. CV 23-9082-JFW(JPRX), 2024 WL 487769
   (C.D. Cal. Feb. 6, 2024) ....................................................... 2, 18

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ................................................................. *passim*

*Claybrooks v. Am. Broad. Cos., Inc.,*
  898 F.Supp.2d 986 (M.D. Tenn. 2012) .................................. 9, 17, 21

*Cohen v. Cowles Media Co.,*
  501 U.S. 663 (1991) ........................................................................ 6

*Fernandez v. Wynn Oil Co.,*
  653 F.2d 1273 (9th Cir. 1981) ................................................... 16

*Green v. Miss United States of Am., LLC,*
  52 F.4th 773 (9th Cir. 2022) ................................................ *passim*

*Hishon v. King & Spalding,*
  467 U.S. 69 (1984) ................................................................ 7, 13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995) ........................................................ 5, 8, 21

*McDermott v. Ampersand Publ'g, LLC,*
  593 F.3d 950 (9th Cir. 2010) ........................................................ 7

*Moore v. Hadestown Broadway Ltd. Liab. Co.,*
  -- F. Supp. 3d --, No. 23-cv-4837 (LAP),
  2024 WL 989843 (S.D.N.Y. Mar. 7, 2024) .................................. *passim*

iii

*Passaic Daily News v. NLRB*,
   736 F.2d 1543 (D.C. Cir. 1984) ................................................. 7, 8, 21

*Redgrave v. Boston Symphony Orchestra, Inc.*,
   855 F.2d 888 (1st Cir. 1988) ............................................................ 14

*Reynaga v. Roseburg Forest Prods.*,
   847 F.3d 678, 691 (9th Cir. 2017) ................................................... 20

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ........................................................................... 7

*Rowell v. Sony Pictures Television Inc.*,
   No. LA CV15-02442 JAK, 2016 WL 10644537
   (C.D. Cal. June 24, 2016) ....................................................... 11, 18, 21

*U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*,
   931 F.3d 966 (9th Cir. 2019) .............................................................. 2

**Statutes**

California Labor Code § 1101 ..................................................... 15, 21

California Labor Code § 1102 ..................................................... 15, 21

**Other Authorities**

Jon Del Arroz,
   *Disney World Turns Park Into Drag Show for Kids
   With Transgender Snow White Character*, PJ Media
   (Apr. 23, 2024) .................................................................................. 10

Eugene Volokh,
   *Reasons Not to Limit Private-Employer-Imposed Speech
   Restrictions: The Employer's Own Free Speech Rights?*,
   Volokh Conspiracy (Aug. 5, 2022) ............................................ 5, 15, 16

**INTRODUCTION**

After admitting that they discriminated against Carano for her *personal* political beliefs and subjected her to disparate treatment from her similarly situated male co-stars, The Walt Disney Company, Lucasfilm LTD, and Huckleberry Industries (collectively, "Defendants") assert that the First Amendment to the U.S. Constitution gives them absolute immunity. Defendants are incorrect. Neither the First Amendment itself nor the few cases applying the First Amendment in the context of casting give employers the right to control or punish the *personal* speech of employees. None of Carano's comments reference Defendants, *Star Wars,* or *The Mandalorian*, or had anything to do with Defendants. Carano's claims do not seek to impose any message on Defendants or to change Defendants' speech in any fashion. Rather, Carano seeks relief for Defendants' violation of laws of general applicability that do not, as applied here, inhibit or affect *Defendants*' speech. Defendants' Motion to Dismiss [Doc. 33] should be denied.

As shown below, there are no facts in the Complaint to suggest that Carano's claims implicate, let alone clearly establish, the First Amendment interests Defendants assert. And Defendants do not challenge the sufficiency of the allegations in the Complaint [Doc. 1] to support the asserted violations of California law (Mot. at 7 n. 2). Rather, they only assert that they have absolute First Amendment immunity to terminate any actor for any reason they see fit. The law does not support their claim.

**LEGAL STANDARD**

"In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party." *Baghikian v. Providence*

1

1   *Health & Servs.*, No. CV 23-9082-JFW(JPRX), 2024 WL 487769, at *2

2   (C.D. Cal. Feb. 6, 2024) (citing *See, e.g., Wyler Summit P'ship v. Turner*

3   *Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998)).   When it comes to

4   asserting an affirmative defense as grounds for dismissal under Rule

5   12(b)(6), as Defendants do here, the Ninth Circuit has made it clear that

6   "Rule 8 does not require plaintiffs to plead around affirmative defenses.

7   *See Jones v. Bock*, 549 U.S. 199, 216 127 S.Ct. 910, 166 L.Ed.2d 798

8   (2007).   And '[o]rdinarily, affirmative defenses ... may not be raised on a

9   motion to dismiss.' *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 n.6

10  (9th Cir. 2018)."   *U.S. Commodity Futures Trading Comm'n v. Monex*

11  *Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019).   Accordingly, "[a]n

12  affirmative defense is grounds for dismissal at the pleading stage only if

13  'the plaintiff pleads itself out of court—that is, admits all the ingredients

14  of an impenetrable defense ....'" *Baghikian*, 2024 WL 487769, at *2

15  (quoting *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir.

16  2018) (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899,

17  901 (7th Cir. 2004))).   As explained in more detail below, that is obviously

18  not true of the allegations here.

19  ## DEFENDANTS MISSTATE THE RELEVANT ALLEGATIONS

20  ## IN THE COMPLAINT

21  But first it is necessary to address Defendants' attempt to

22  mischaracterize those allegations.   Defendants admit they terminated

23  Carano for her personal speech (Mot. at 13), confirming that her pleaded

24  claims are valid.   But the Motion then reaches outside the complaint

25  while simultaneously misrepresenting Carano's comments in an attempt

26  to justify her termination.

27  For example, Defendants represent that Carano's personal views

28  conflict with "Disney values" (Mot. 1-2, 5), while those of the other Disney

employees referenced in the Complaint apparently do not.[1]  Defendants then claim that Carano's comments "would detract from [Defendants'] ability to convey its own chosen message" (Mot. at 12). But there are no allegations in the Complaint to support such a claim.  The only claims set out on the face of the Complaint are that Defendants violated Carano's rights under California law, facts Defendants do not and cannot dispute at this stage of the case.

As to the specifics of Carano's Complaint, and contrary to Defendants' assertion, Carano did not disparage anyone, and she certainly did not "publicly trivialize the Holocaust," let alone "grotesquely" do so (Mot. 2, 5).  Indeed, the Auschwitz Museum made the same point as the one contained in Carano's February 10, 2021 post (Comp. ¶ 105).  Defendants claim Carano's February 10, 2021 post was "comparing criticism of political conservative viewpoints to the Holocaust in Nazi Germany" (Mot. at 2) but the post—which they quote—does not refer to "conservative viewpoints" at all (Mot. at 2; Comp. ¶ 102).

Likewise, Carano did not "mock[] people who identify their pronouns to show support for transgender rights" (compare Mot. at 2 with Comp. ¶¶ 69-73).  And of note, several of the accounts that hounded Carano for not putting pronouns in her X header did not have pronouns

---

[1] Defendants suggest that Pedro Pascal and Mark Hamill "did not send multiple controversial posts in a compressed timespan" (Mot. at 16) attempting to distinguish the examples of their posts calling supports of former President Trump Nazis (Comp. [Doc. 1] ¶¶ 131-132, 134, 138-140), comparing U.S. immigration policy to the Holocaust (Comp. ¶ 133), and turning Muppet characters into transgender activists who support the Black Lives Matter movement (Comp. ¶ 136).  Defendants' attempt to downplay these posts and the others cited in the Complaint they ignore (e.g., Comp. ¶¶ 100, 144) suggests that these comments are apparently consistent with whatever message Defendants wish to communicate.

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
2:24-CV-01009-SPG-SK

in their own.   Comp. ¶¶ 63-64.   Yet, as set out in the Complaint, Defendants harassed Carano over pronoun issues, enforcing their own view of orthodox speech outside the workplace.  Comp. ¶¶ 75-86.

Indeed, as set out in the Complaint, none of Carano's posts referenced Defendants, *The Mandalorian*, or any of Defendants' programs.   And they have nothing to do with *Defendants'* speech. Because nothing in the Complaint pleads that Carano's speech had any impact on Defendants or their message, there is no basis on the face of the Complaint to support the asserted First Amendment defense. Defendants' Motion should therefore be denied.

## ARGUMENT

The core of Defendants' argument is the legal proposition that, "[u]nder the First Amendment, an entity engaged in expressive communication may choose to exclude from its own communications other speakers who, in the expressive entity's view, would impair its ability to convey its own preferred message" (Mot. at 6-7)  Yet no court has held that media employers have an absolute right to "exclude" actors because of their viewpoints--religious, political, or otherwise.   While Defendants suggest that the scholarly work of Plaintiff's counsel supports their position (Mot. 3, 11-12), Defendants do not accurately represent the work they cite.  Indeed, in his scholarly article, Professor Volokh noted that, while some assert the arguments Defendants make here, the courts have *not* adopted those arguments: "Some have argued that employers have a constitutional right to refuse to associate with people whose political beliefs they reject.  But the [Supreme] Court has never extended the right not to associate that far."  Eugene Volokh, *Reasons Not to Limit Private-Employer-Imposed Speech Restrictions: The Employer's Own Free Speech Rights?*, at 9, Volokh Conspiracy (Aug. 5,

2022) (emphasis added), https://tinyurl.com/yesbyhm3 (cited at Mot. 3, 11-12) (a copy is attached as Ex. A).  Indeed, discrimination laws in place for decades limit private employers that create expressive content from discriminating against employees for their off-duty speech and their sex as alleged in the Complaint.  Defendants' Motion to Dismiss based on "speaker's autonomy" (Mot. at 7) should be denied.

**A.    Defendants Do Not have a First Amendment Right to Discriminate Against Carano Simply Because They Disagree with her Speech.**

Defendants claim they have an absolute right to terminate Carano under a concept they dub "speaker's autonomy" (Mot. at 7).  Defendants rely (Mot. at 7-8) on *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995), but *Hurley* does not help them here.

In *Hurley*, the plaintiff, GLIB, sought to march in the Boston St. Patrick's Day parade "carrying its own banner," 515 U.S. at 572, for the purpose of "express[ing] pride in their Irish heritage as openly gay, lesbian, and bisexual individuals."  *Id.* at 561.  It was this message that the parade organizers did not wish to express as part of the parade.  *Id.* at 572.  The Court noted that the parade organizers were only excluding a group from "carrying its own banner" in the parade, and that "[the organizers] disclaim any intent to exclude homosexuals as such, and no individual member of GLIB claims to have been excluded from parading as a member of any group that the Council has approved to march."  *Id.* As the Court made clear, it was the attempted *insertion* of the plaintiff's message into the defendant's parade that was objectionable, a circumstance not present here.

Nothing in the Complaint suggests that Carano is seeking to modify Defendants' speech, or the message Defendants desire to express in their

movies.   Carano did not make any effort to alter the message of *The Mandalorian* and Defendants do not explain how Carano's personal, off-the-job social media comments affected *Defendants'* speech.   They simply assert that it does.   Yet, the Supreme Court has made it clear "that an expressive association" cannot "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message."   *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 653 (2000).   If Defendants have evidence for their assertions, they may offer it later in the case, but they cannot sidestep the Complaint simply by asserting what they cannot prove at the pleading stage.

> ### 1. Laws of general applicability, including those that prohibit discrimination, apply to "expressive employers."

Rather than provide the blanket immunity Defendants claim, "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news," *Cohen v. Cowles Media Co.,* 501 U.S. 663, 669 (1991), or, in this case, on Defendants' ability to create entertainment. The media, for instance, "must obey the National Labor Relations Act," *id.* (citing *Associated Press v. NLRB*, 301 U.S. 103 (1937) ("*AP*")), and publishers thus have no "absolute and unrestricted freedom to employ and to discharge" editors. *AP*, 301 U.S. at 131. Instead, the Supreme Court held that an antidiscrimination law—in *AP*, a prohibition on firing people based on union membership and union activities—could constitutionally be applied to the media:

> The business of the Associated Press is not immune from
> regulation because it is an agency of the press. The publisher

of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.

*Id.* at 132-33; *see also Passaic Daily News v. NLRB*, 736 F.2d 1543, 1555-56 (D.C. Cir. 1984) (applying these principles to conclude that a newspaper lacked a First Amendment right to fire a columnist based on his off-duty union-related speech).[2] As another Supreme Court decision put it, "[t]he right to associate for expressive purposes is not … absolute," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 626 (1984), and thus is not violated by discrimination laws that may require a business club to accept woman members, *id.* at 623, 626 (club failed to show "serious burdens" on expressive association), or a law firm to make a woman partner, *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (firm failed to show impact on ability to fulfil mission or convey speech).

Defendants are thus mistaken in asserting that the law cannot ever "force entities that *do* create speech products to speak through writers or

---

[2] Defendants rely on *McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950, 953 (9th Cir. 2010), to suggest "that a newspaper could not be forced to hire editors who expressed viewpoints on union-related topics with which the newspaper disagreed" (Mot. at 9). But that is not what *McDermott* stands for at all. Rather, the issue was whether a newspaper must recognize a union seeking editorial control, something the First Amendment leaves to news organizations. *McDermott,* 593 F.3d at 962. The court drew a clear distinction between "government interference with a newspaper's exercise of control over its content" and union activity related "to the more usual concern of employees for wages and hours." *Id.* at 959 & n. 6. In doing so, the Ninth Circuit made clear that "Newspapers are not entitled to blanket immunity from general regulations, and the NLRA's prohibition on deterring union activity is no exception." *Id.* at 959 (citing *Associated Press v. NLRB*, 301 U.S. 103 (1937)).

singers or actors whose own speech and public profile could, in the employer's view, compromise the employer's ability to express itself in its own chosen manner." (Mot. at 4). To the contrary, *AP* and *Passaic Daily News* expressly held that the law can require news organizations to speak through editors and columnists who belonged to or support unions through their speech, even when the employer believed that such union membership interfered with the employer's ability to express itself as it wanted. Entertainment producers such as Defendants have no greater First Amendment rights than news organizations.

Defendants are thus also mistaken in their view that, under *Hurley*, "the First Amendment embodies a core principle of 'speaker's autonomy' that bars the state from dictating to expressive enterprises … whom to [speak] through" (Mot. at 2-3). *AP* makes clear that "expressive enterprises" do not have complete autonomy to choose whom to hire, whether as editors, writers, or actors, and that they are not "solely entitled to decide … what associations might impair [their] efforts" (Mot. at 15). They do not have carte blanche authority, for instance, to fire Jewish, Muslim, or Catholic writers based on their religious beliefs or expression; to fire union members based on their union association; or to fire actors based on their off-camera political expression.  The applicable laws here are similar to those in *AP*; they merely "forbid[] discharge for what has been found to be the real motive of the [employer]," 301 U.S. at 132: in *AP*, union activity, and here, protected political speech.

## 2. Under the allegations of the Complaint, Defendants' termination of Carano was not done for any First Amendment protected purpose.

To be sure, a visual medium relies on the physical appearance of actors. This is why television and theater producers have the right to

select actors based on race, color, or other aspects of *appearance*.  That was the issue in *Claybrooks v. American Broadcast Companies, Inc.*, 898 F.Supp.2d 986 (M.D. Tenn. 2012), and, in part *Moore v. Hadestown Broadway Limited Liability Co.,* -- F. Supp. 3d --, No. 23-cv-4837 (LAP), 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024). Under the facts alleged in the Complaint, nothing like that is at issue here.

For example, in *Claybrooks,* the plaintiffs claimed that the producer did not cast them because of their race in an effort to express a message "that only all-white relationships are desirable and worthy of national attention."  898 F. Supp. 2d at 999.  Accordingly, as the district court explained: "[Plaintiffs'] [c]omplaint … 'explicitly takes issue with and seeks to alter the *messaging* of *The Bachelor* and *The Bachelorette.*'" *Id.* (emphasis in original).  Carano takes no issue with Defendants' messaging in *The Mandalorian*, nor—under the Complaint's allegations—did her presence in the cast affect the program's message.

In noting the limits of the First Amendment defense recognized in *Claybrooks*, the district court in *Moore* explained the difference between First Amendment protected conduct, specifically, selecting cast members based on race to further an artistic message, and conduct that is not entitled to First Amendment protection, that is, terminating a cast member for complaining of discrimination on set.  Accordingly, the court held that the defendant was protected from claims of race discrimination when selecting people for the "Workers Chorus" because the racial make-up of those cast members was important to the message.  *Moore,* 2024 WL 989843, at *19-20.  In contrast, the termination of those who complained that the decision was racially discriminatory was not

protected conduct.[3]  As the court explained:

> [While] Defendant's casting decisions are protected by the First Amendment, that protection applies only insofar as Defendant made such casting decisions to tailor the Musical's message.  Defendant's casting decisions can only be "inherently expressive," such that they warrant First Amendment protection if Defendant made them specifically to change the story the Musical conveyed on stage.

*Id.* at *20 (citing *Rumsfeld v. F. for Acad. & Inst'l Rts. Inc.*, 547 U.S. 47, 66 (2006)).  After finding the retaliatory discharge was not for "artistic storytelling," *id.*, the court concluded:

> without any allegation that Defendant retaliated against Plaintiff to further its creative expression or tailor the Musical's story, the First Amendment cannot provide Defendant with a defense to Plaintiff's four retaliation claims. Extending Defendant's First Amendment rights to Plaintiff's retaliation claims would impermissibly enable Defendant to terminate any employee who engaged in protected activity— such as complaining about working conditions—under the auspice of its "creative decisions."

*Id.* at *21.  Just as applying retaliation law to protect off-stage employee speech alleging discrimination was consistent with the First Amendment

---

[3] For example, Disney may have a protected interest in selecting a male to play the role of the Evil Queen from *Snow White* at a character meet-and-greet for families at its parks (Jon Del Arroz, *Disney World Turns Park Into Drag Show for Kids With Transgender Snow White Character, PJ Media* (Apr. 23, 2024), https://tinyurl.com/jfb42yyz), but it does not have a First Amendment protected interest in terminating Carano for her political speech.

in *Moore*, so here applying California political activity law to protect Carano's off-screen employee speech is likewise consistent with the First Amendment.

As set out in Carano's Complaint, the Defendants' decision to terminate her employment and take additional efforts to destroy her career had nothing to do with "artistic storytelling," a "creative decision," or "speaker's autonomy." Rather, it was solely for impermissible discriminatory and retaliatory reasons, specifically her speech. *See, e.g.*, Comp. ¶¶ 5-8, 30-40, 93-101, 107-111. In doing so, under the allegations in the Complaint, Defendants targeted Carano but turned a blind eye to her male co-stars' speech on the same topics, thus making her termination impermissible sex discrimination as well. Comp. ¶¶ 106-107, 127-144.

This is precisely why another court in this district rejected arguments similar to those proffered by Defendants here. In *Rowell v. Sony Pictures Television Inc.*, No. LA CV15-02442 JAK, 2016 WL 10644537 (C.D. Cal. June 24, 2016), the court held that not rehiring the plaintiff was not protected under the First Amendment because the alleged reason for the defendants' decision was the plaintiff's speech and not because of any "creative vision for their programs." *Id.* at *10. According to the Court, the complaint at issue there "alleges that the retaliation arose from disagreements with Plaintiff and her positions about hiring more African Americans, not ones about the appropriate racial diversity for characters on the programs. For these reasons, based on the present allegations of the [complaint], Defendants' rights to free speech would not be unduly impaired by the relief, if any, that could be granted should Plaintiff prevail on these claims." *Id.*

The same analysis defeats Defendants' claim of First Amendment immunity. The Complaint clearly establishes that Defendants' decision to terminate Carano was for her protected speech and not any reason connected with Defendants' messaging in its programs.  At the Motion to Dismiss stage, this ends the inquiry and Defendants' motion should be denied.

### 3. Even ignoring the current procedural posture, Defendants are unable to establish a substantial burden to any right to speak or engage in expressive association.

For these same reasons—and although a decision on the question is not yet ripe—Defendants are unable to make out a defense of expressive association (Mot. at 8-10) or establish that Carano's off-screen speech substantially burdens Defendants' on-screen message.[4] Ironically, Defendants never identify what message of theirs was undermined by Carano speaking her mind on important issues of the day. That failure will be fatal to their asserted defense and it is (in the alternative) fatal to their current motion.  Carano's situation is fundamentally different than that in *Boy Scouts of America v. Dale*, and *Green v. Miss United States of America, LLC*, 52 F.4th 773 (9th Cir. 2022), on which Defendants rely (Mot. at 8-9).  In *Dale*, the Court concluded that, under the facts of the case, retaining an openly gay man

---

[4] While Defendants assert that when "Carano began engaging with show fans and the public" she did so "in a matter that, in Disney's view, came to distract from and undermine Disney's own expressive efforts" (Mot. at 1), there is no evidence to support this assertion, either in the motion (which would be improper here) and certainly not in Carano's Complaint. As noted below, the Complaint disproves any such notion.

1   as an Assistant Scoutmaster would undermine the Boy Scouts' message

2   about sexual purity and "significantly affect [the Boy Scouts']

3   expression."  530 U.S. at 656.  But *Dale* was based on a fully developed

4   factual record (the interpretation of which divided the Court), not, as

5   here, a motion to dismiss at the pleading stage.  *Id.*

6         Similarly, in *Green*, the court was asked to decide whether a male

7   could be denied entrance into the Miss USA beauty pageant.  At issue

8   was the message expressed by the pageant.  The Ninth Circuit explained

9   that requiring participants to be "natural born female" was central to

10  how the pageant communicated its message.  *Green,* 52 F.4th at 782-83.

11  As the court made clear, forcing the pageant to accept a male contestant,

12  even one who had undergone hormone and surgical treatments to appear

13  female, *id.* at 778, would deny the pageant the ability to communicate its

14  message.  *Id.* at 782.  Yet here, there are no allegations in the Complaint

15  to suggest that Defendants were unable to communicate their message

16  because of Carano's off-screen speech.

17        Rather, the allegations in the Complaint demonstrate that there

18  was no impact on Defendants' ability to express whatever message it

19  believes it was communicating in *The Mandalorian.*   Indeed, by

20  November 2020, after all but the February 10, 2021 post had been made,

21  Defendants acknowledged that Carano was well received by fans when

22  her first Season 2 episode aired (Comp. ¶ 26) and announced that they

23  would be releasing a new series starring Carano in the role of her

24  character, Cara Dune (Comp. ¶¶ 27-28).   The Complaint shows no

25  impairment of *Defendants'* speech.

26        Likewise, Defendants' reliance (Mot. at 9-10) on *Redgrave v. Boston*

27

28

1   *Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), is misplaced.[5]

2   The court in *Redgrave* expressly declined "to discuss the existence or

3   content of a First Amendment right not to perform an artistic endeavor,"

4   *id.* at 911-12, and said that it "raise[d] these points" about the First

5   Amendment "not to resolve the constitutional questions, but to point out

6   how difficult those questions are to resolve." *Id.* at 906.   And it also

7   stressed that "[o]f course there are no" "absolute right[s] against any

8   infringement of its artistic expression," and that "[t]he BSO merely

9   alleges a constitutional right not to be penalized for failing to perform an

10  artistic work where the BSO believes that its expression will be

11  compromised or ineffective," in a situation where it concluded it needed

12  to entirely "cancel" the work.   *Id.* at 905.   Further, the dissent noted the

13  problem with the broad immunity defendants there asserted, describing

14  "potentially nightmarish consequences" if defendants' position on the

15  First Amendment was adopted, noting among other things that a First

16  Amendment right to political discrimination would equally extend to

17  discrimination based on an actor's "religion." *Id.* at 924-25 (Bownes, C.J.,

18  dissenting).

19  _____

20  [5] Defendants claim, "the state cannot force an employer engaged in

21  expressive activity to express its message through speakers who, in the
    employer's view, would impair the employer's ability to convey its own

22  preferred message" (Mot. at 8-9).   But that is not the law.   Indeed, after

23  rejecting the notion that a news media has carte blanche authority to
    terminate anyone it believes, in its sole discretion, would impair its

24  ability to report the news in an impartial manner, *AP*, 301 U.S. at 131,

25  the Supreme Court affirmed that where "the regulation here in question
    has no relation whatever to the impartial distribution of news," the law

26  applies to the press and does not violate the First Amendment.   The same

27  is true for Defendants.   They are not above laws of general applicability
    that have nothing to do with regulating what message they may

28  communicate in their programs.

14

Finally, the academic work of plaintiff's counsel, cited by Defendants (Mot. at 3, 11-12), is consistent with this position and the precedents cited above. That work does recognize that "there's a strong argument—as a First Amendment matter but even more so as a policy matter—in favor of *some* … limits on the political speech protection laws, when it comes to employees who speak on the employer's behalf to the public or to clients." Volokh, *supra,* at 14.  But the work also clearly notes that "[t]he matter isn't open and shut" when it comes to how far those limits must go.  *Id.* at 13 (citing *AP v. NLRB*).

Further, that same work recognized several justifications for laws that limit an employer's ability to terminate employees for their political speech.  Those justifications support the applicable California laws at issue here, including California Labor Code §§ 1101-02. For example, the work notes: "Private economic power ought not be used to interfere, through threat of coercion of employees, with the political process." Volokh, *supra,* at 3-4.  Further, "private employer sanctions against employee free speech interfere with democratic self-government almost as much as sanctions based on voting."  *Id.* at 4.  Indeed, "[t]he threat of the loss of one's livelihood is a far more powerful deterrent than mere ejection from a mall or rejection by a publisher."  *Id.*  And, "[i]n the words of the Restatement of Employment Law, which urges private employee speech protections as a common-law matter, 'There is a public interest in employees' personal autonomy because it is critical to engagement in civic life.  Employees must be free to express their own ideas and concerns in order for the public sphere to flourish.'"  *Id.* at 5 (quoting Restatement of Employment Law § 7.08 Rep. Notes).

And of course, as the cases cited above show, suggesting that there should be *some* limits on these laws does not equate to categorical

"autonomy" in choosing whom "expressive enterprises" hire (Mot. 2). Nor are those limits saved exclusively for "non-speakers" such as janitors (Mot. at 12). To the contrary, *AP* makes that clear (as the Volokh post cited above noted). 301 U.S. at 131. Likewise, the California Court of Appeal in *Ali v. L.A. Focus Publication*, 112 Cal.App.4th 1477, 1488 (2003), expressly rejected a newspaper's claim that "it has the unfettered right to terminate an employee"—there, an editor and columnist—"for any speech or conduct that is inconsistent with the newspaper's editorial policies" when that speech was "outside of the workplace" and not related to "the content of his articles" "in [the publisher's] own paper." *Id.*

Rather, as noted above, in each instance where the First Amendment was found an applicable defense, the question was whether the employees' speech sufficiently "undermine[s] the employer's message," Volokh, *supra,* at 14 (citing Mot. at 11). That is a question that turns on the facts of each case, as *AP* and *Ali* make clear, and cannot be based either on "simply ... asserting" a conflict, *Dale*, 530 U.S. at 653, or relying simply on potential public disapproval of an actor's beliefs. Otherwise, as noted above, any member of a "controversial" or supposedly "divisive" (Mot. at 13) religious or political group could be categorically excluded from Hollywood roles, contrary to well-established antidiscrimination statutes. Indeed, the Ninth Circuit has long recognized that antidiscrimination laws do not have an exception even to permit discrimination in response to customer preferences. *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276-77 (9th Cir. 1981) (finding that foreign client's preference for dealing with men did not permit discrimination against women employees or make sex a bona fide occupational qualification). Here, Defendants have not established that their decision was based on such concerns and, more to the point, that rationale for

1  their decision appears nowhere in the Complaint.

2      **B.**    **The First Amendment Does Not Protect Defendants'**
3      **Decision to Terminate and Retaliate Against Carano**
4      **for her Protected Speech.**

5      While Defendants further claim (Mot. at 12) they get to determine
6  what message they want to convey, the First Amendment does not give
7  Defendants the carte blanche authority to terminate Carano for
8  expressing her personal beliefs.  Under the allegations of the Complaint,
9  Defendants intentionally discriminated and retaliated against Carano
10  for her speech in clear violation of California law.  And again, especially
11  at the pleading stage, the First Amendment provides Defendants with no
12  relief here.

13      **1. The Fact that Television Shows are Protected Speech is**
14      **Irrelevant to the Allegations in Carano's Complaint.**

15      While casting decisions made for artistic reasons are provided some
16  level of First Amendment protection, as noted above, termination of cast
17  members is rightly prohibited when done for impermissible purposes.
18  Again, Defendants claim that "[i]n the performing arts, the manner
19  chosen for the performance – including the performers themselves – can
20  be equally or even more crucial to the message being expressed and how
21  the audience receives it" (Mot. at 13). But, as noted above, their reliance
22  on *Claybrooks*, *Moore*, and *Green* is misplaced under the allegations in
23  Carano's Complaint. Just as with the press, the First Amendment does
24  not give entertainment producers unlimited discretion to only hire and
25  retain those who only express the organization's values. So too here. The
26  fact that Defendants produce television shows, movies, and other forms
27  of entertainment does not permit them to terminate Carano just because
28  they did not care for comments she made outside of work. *See Moore*, 2024

WL 989843, at *20-21; *Rowell*, 2016 WL 10644537, at *10.  In short, the facts matter. And the facts in this case have not yet been fully developed.

**2. The First Amendment Does Not Protect Defendants' Decision to Retaliate Against Carano for her Speech.**

Defendants, moreover, do not even attempt to claim that the decision to terminate Carano or the steps they took in an effort to destroy her career were taken for artistic reasons.  Rather, Defendants claim Carano was terminated "to avoid associating [their] artistic programing with Carano's controversial – indeed offensive to Disney and many *Star Wars* fans – public comments" (Mot. at 13). Of course, there are no facts in the Complaint to support this allegation and certainly no facts that "admit[] all the ingredients of an impenetrable defense" based on the First Amendment. *Baghikian*, 2024 WL 487769, at * 2.  Because the facts set out in the Complaint clearly establish that Defendants' actions were in retaliation for Carano's engaging in protected speech and not for any artistic reasons, this case—at least at this stage—falls outside First Amendment protection.  *AP*, 301 U.S. at 132; *Moore*, 2024 WL 989843, at *20-21; *Rowell*, 2016 WL 10644537, at *10.

There is also no basis for Defendants' claim that "Carano's presence as a prominent actor on *The Mandalorian* interfered with Disney's choice not to produce a show associated with her beliefs" (Mot. at 14). To assert such a claim, Defendants would need actual evidence to prove that Carano's speech "would significantly burden" their speech.  *Dale*, 530 U.S. at 653; *see also*, *Green*, 52 F.4th at 785. Indeed, the Supreme Court made clear that Defendants simply asserting an impact on their message is insufficient under the First Amendment.  *Dale*, 530 U.S. at 653.  Yet assertions are all that Defendants have offered here.

By contrast, the facts set out in the Complaint establish that

Carano's speech had no impact on Defendants' ability to share its message.  Rather, Carano's presence was not only beneficial to Defendants, but one they wanted to promote even after all but one of her posts were made.  For example, other than her February 10, 2021 post, all of Carano's posts were prior to mid-November 2020.  Yet, it was then that the first episode of Season 2 of *The Mandalorian* aired.  Defendants' reaction was overwhelmingly positive because fan reaction was overwhelmingly positive.  Comp. ¶ 26.  Indeed, Defendants affirmed and benefited from the wild popularity of Carano's representation of Cara Dune in *The Mandalorian*, so much so that Jon Favreau (privately to Carano, Comp. ¶ 27) and Kathleen Kennedy (publicly to investors and the press, Comp. ¶ 28) touted a new series that would feature Carano as Cara Dune.  It thus lacks credibility that Defendants maligned and terminated Carano because she allegedly undermined their message in *The Mandalorian*.  Rather, what is clear is they impermissibly targeted Carano for her speech, for which the First Amendment does not give the blanket immunity Defendants claim.

With no evidence that Defendants would "be forced to have [their] creative speech diluted by viewers thinking about [Carano's] speech" (Mot. at 15),[6] the First Amendment provides no sanctuary to Defendants—at least under the facts alleged in the Complaint.  As explained there, Defendants certainly were not concerned about viewers associating Pascal's or Hamill's speech with Defendants' creative speech. Comp. ¶¶ 128-43.  And Defendants' attempt in their motion to

---

[6] While Defendants may attempt to develop this theory at trial, they are unable to establish it based on the allegations in the Complaint.  And even then, none of the applicable cases remotely suggests that such a theory would give them a defense to Carano's claims.

distinguish Pascal's and Hamill's comments from Carano's (Mot. at 16) does not help them here.   Rather, it simply shows the duplicity of Defendants' actions and confirms their violation of California law.

## C.   The First Amendment Does Not Protect Defendants From Liability for Their Rank Sex Discrimination.

At the end of the day, Defendants simply do not have "a *constitutional right* to dissociate [their] own artistic message from Carano's outspoken 'political beliefs'" (Mot. at 17) by firing her.  There is nothing about Carano's allegations, moreover, that "aim[s] to 'require [Defendants] to modify the content of [their] expression" (Mot. at 17). Rather, Carano's Complaint says nothing about Defendants' creative message—only their illegal termination of her and extensive efforts to destroy her career because of her protected speech.   Such retaliatory behavior is not protected by the First Amendment as noted above.  Just as the Supreme Court held in *AP*, providing Carano relief as requested here would have no effect on Defendants' ability to communicate whatever message it wants through its programing.  301 U.S. at 133.

For similar reasons, Defendants' attempt to diminish Carano's claim of sex discrimination also fails.  They merely assert that "the male co-workers' statements "differ[ed] from her own" (Mot. at 17).   Yet, Pascal's and Hamill's comments on the same topics make them similarly situated, more than enough at the motion to dismiss stage to establish this cause of action.  *See Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2017) (finding comparator employee "similarly situated" even though situations were not identical).

Further, Defendants ignore that the late Carl Weathers made a comment nearly identical to Carano's about the political atmosphere in Germany prior to the Holocaust, yet he was not accused of making an

"abhorrent" comment, much less fired for his statement. *Compare* Comp. ¶ 102 *with* Comp. ¶ 106. At least at the pleading stage, the First Amendment is simply not a bar to any of Carano's claims—including her claim of sex discrimination.

### CONCLUSION

This is not a case where Carano is seeking to modify Defendants' speech as in *Claybrooks*. It is not a case where Carano sought to include her opinions in Defendants' production as in *Hurley*. It is not about a casting decision made for visual creative purposes as in *Moore*. Nor is this a case where, under the allegations of the Complaint, Carano's mere presence would undermine Defendants' ability to communicate its own message, as in *Dale* and *Green*. Rather, under the Complaint as pleaded, this is a case of clear discrimination and retaliation for Carano's protected speech, discrimination not protected by the First Amendment, as found in *AP*, *Passaic Daily News*, *Ali*, *Rowell*, and the retaliation portion of *Moore*.

Today's "Disney values" may well embrace Pedro Pascal and Mark Hamill comparing supporters of former President Trump to the Nazis while opposing the comments made by Carano. And no one disputes Defendants' ability to *express* their agreement with the former and their disagreement with the latter. But California Labor Code §§ 1101-1102 represent a bulwark against employers' *suppression* of disfavored ideas held by their employees. And, under the allegations of the Complaint, the First Amendment does not give Defendants license to violate those provisions by punishing Carano's off-the-job advocacy. Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

*/s/ Donald M. Falk*
Donald M. Falk, Cal. Bar #150256
SCHAERR | JAFFE LLP
Four Embarcadero Center
Suite 1400
San Francisco, CA 94111
Telephone: (415) 562-4942
Facsimile: (202) 776-0136
dfalk@schaerr-jaffe.com

Eugene Volokh, Cal. Bar #194464
SCHAERR | JAFFE LLP
385 Charles East Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 206-3926
evolokh@schaerr-jaffe.com

Gene C. Schaerr*
Edward H. Trent*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com
etrent@schaerr-jaffe.com

* Admitted *pro hac vice*

*Counsel for Plaintiff*

Dated:  May 9, 2024

1

## CERTIFICATE OF COMPLIANCE

2   The undersigned, counsel of record for Plaintiff Gina Carano,

3   certifies that this brief contains 6,111 words, which complies with the

4   established word limit of Local Rule 11-6.1.

5

6   Dated: May 9, 2024

7                                          */s/ Donald M. Falk*
                                           Donald M. Falk, Cal. Bar #150256
8                                          SCHAERR | JAFFE LLP
                                           Four Embarcadero Center
9                                          Suite 1400
                                           San Francisco, CA 94111
10                                         Telephone: (415) 562-4942
11                                         Facsimile: (202) 776-0136
                                           dfalk@schaerr-jaffe.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23