# EXHIBIT A



# SHOULD THE LAW LIMIT PRIVATE-EMPLOYER-IMPOSED SPEECH RESTRICTIONS?

*Eugene Volokh* [*]

Introduction ........................................................................................... 2

I.   Arguments for Protecting Private Employee Speech ...................... 3

    A.   Democratic Self-Government ................................................... 3

    B.   Search for Truth ....................................................................... 5

    C.   Self-Expression and Autonomy ............................................... 6

    D.   Negative Theories .................................................................... 8

II.  Reasons Not to Restrict Private Employers ................................... 9

---

[*] Gary T. Schwartz Professor of Law, UCLA School of Law (volokh@law.ucla.edu); many thanks to Kevin Gerson, Rachel Green, Jenny Lentz, Lynn McClelland, Vivek Ramaswamy, and James Weinstein for their help. This article is a normative follow-up to the more descriptive and taxonomic Eugene Volokh, *Private Employees' Speech and Political Activity: Statutory Protection Against Employer Retaliation*, 16 TEX. REV. L. & POL. 295 (2012). To the list of statutes in that article should be added UTAH CODE § 34A-5-112 (Westlaw current through 2022 Spec. Sess.) (protecting a broad range of speech); ANN ARBOR (MICH.). CODE OF ORDINANCES §§ 9:151, :154 (2022) (likewise); FT. LAUDERDALE (FLA.) CODE OF ORDINANCES §§ 29-1, -12(1)(c) (2022) (protecting "political affiliation"); LANSING (MICH.) CODE OF ORDINANCES §§ 297.02, .03 (2022) (protecting "political affiliation or belief," without detailed definition); WAYNE COUNTY (MICH.) Ordinance No. 2020-586 (Oct. 1, 2020) ("political affiliation"); HARFORD COUNTY (MD.) CODE OF ORDINANCES §§ 95-3, -5 (2022), https://ecode360.com/HA0904 ("political opinion," defined as "The opinion of persons relating to government or the conduct of government or related to political parties authorized to participate in primary elections in the state"); PRINCE GEORGE'S COUNTY (MD.) CODE OF ORDINANCES §§ 2-186(a)(6), (23), -222 (2022) (likewise); HOWARD COUNTY (MD.) CODE OF ORDINANCES § 12.208 (2022), https://library.municode.com/md/howard_county/codes/code_of_ordinances ("political opinion"); SHREVEPORT (LA.) CODE OF ORDINANCES §§ 39-1, -2 (2022), https://library.municode.com/la/shreveport/codes/code_of_ordinances ("political . . . affiliations"); MIAMI BEACH (FLA.) CODE OF ORDINANCES § 62-31, -86 (2022) ("political affiliation," defined to cover support or opposition of organizations that support or oppose candidates or that lobby legislators).

EX. A1

2                          *Journal of Free Speech Law*                          [2022

| | A. | Constitutional Right Not to Associate ...................................................... 9 |
| | B. | Freedom of Symbolic Expression ........................................................... 10 |
| | C. | Freedom of Speech .................................................................................. 12 |
| | D. | Non-Constitutional Right Not to Associate ........................................... 14 |
| | E. | Avoiding Unduly Deterring Non-Speech-Based Employment Actions.................................................................................................... 17 |
| | F. | Avoiding Employees' Being Net Losses for Employers ....................... 18 |
| III. | | How Should Any Protections Be Crafted? ....................................................... 19 |
| | A. | Protecting at Least Political Speech Generally,  Not Just Campaign-Related Speech ........................................................................ 19 |
| | B. | Protecting Speech More Generally, Not Just Political Speech.............. 20 |
| | C. | Criminal Liability, Civil Liability, or Both? ........................................... 21 |
| | D. | Coverage for Existing Employees or Also for Applicants? ................... 21 |
| | E. | Off-the-Job Speech or All Speech? ........................................................ 22 |
| | F. | No Employee Right to Choose What One Says on the Employer's Behalf...................................................................................................... 22 |
| | G. | Exceptions for Speech and Political Activity That Sufficiently Undermines Employer Interests ............................................................. 23 |
| | | 1.  Vague multipurpose exceptions.................................................... 23 |
| | | 2.  Specific narrow exceptions ......................................................... 27 |
| Conclusion ........................................................................................................ 29 |

INTRODUCTION

About half of Americans live in jurisdictions that protect some private employee speech or political activity from employer retaliation. Of course, that means about half don't. Which jurisdictions are correct? And, if private employers should generally be barred from firing, disciplining, or perhaps even declining to hire workers based on their speech, which sorts of speech should be protected?

**EX. A2**



**Existing private employee speech protection statutes**
**(the darker the shading, the more protection)**

## I.   ARGUMENTS FOR PROTECTING PRIVATE EMPLOYEE SPEECH

### A.   *Democratic Self-Government*

To begin with, the threat of losing one's job is a powerful deterrent to most speakers. If the ability to speak freely, and without distortion by the threat of governmental punishment—or even the threat of loss of government benefits—is a necessary precondition of democratic self-government,[1] then legislatures ought to be concerned about the democratic process being distorted by private employers as well. This is likely why nearly all states forbid discrimination based on how a person has voted:[2] Private economic power ought not be used to interfere, through threat

---

[1] *See* Robert Post, *Participatory Democracy and Free Speech*, 97 VA. L. REV. 477 (2011); James Weinstein, *Participatory Democracy as the Central Value of American Free Speech Doctrine*, 97 VA. L. REV. 491 (2011). My argument here applies whether one thinks democratic self-government is important because it is a means for society to democratically deliberate, or as a means for each citizen to be able to participate freely and equally in the democratic process.

[2] *See* Volokh, *supra* note *, at 336. These laws were first enacted in a time when voting was

**EX. A3**

of coercion of employees, with the political process. But American law has long recognized that for voting to be meaningful, the public also needs to freely discuss candidates and issues before voting on them,[3] and to speak out in ways that influence representatives between elections. This suggests that private employer sanctions against employee free speech interfere with democratic self-government almost as much as sanctions based on voting.

And this deterrent effect of restrictions imposed by private employers is likely far greater than with many other private restrictions. If a shopping mall expels leafleters, the leafleters likely could easily find other places, or switch to other media (such as the Internet). If a newspaper refuses to publish some articles (as it has the First Amendment right to do[4]), the speakers might find it harder to reach the same audience, but they won't be frightened into not expressing that view at all. The threat of the loss of one's livelihood is a far more powerful deterrent than mere ejection from a mall or rejection by a publisher.[5]

To be sure, if you're being threatened with jail for your speech, all you can do to avoid jail is shut up. If you're being threatened with being fired, you can find a new job. But new jobs are often not easy to come by. That's particularly true in times of economic difficulty and unemployment (when people might be especially interested in critiquing the existing order). It may also be true when your work skills are useful to only a limited set of employers, especially in your geographical area. Even if you can get a new job, that may mean sacrificing part of your retirement benefits and other benefits related to seniority. And of course finding a new job

---

public, *see* Burson v. Freeman, 504 U.S. 191, 202–04 (1992) (plurality opin.) (reporting that the secret ballot was mostly adopted in the U.S. in 1888–96); Volokh, *supra* note *, at 299–300 (discussing early bans on employment discrimination in voting, in 1839–81), but they continue to be relevant even with the secret ballot: Sometimes employees will mention how they voted, or might tell the truth when asked how they voted.

[3] *See, e.g.*, New York Times Co. v. Sullivan, 376 U.S. 254, 269–70 (1964).

[4] Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241 (1974).

[5] The same argument would apply to Vince Blasi's "pathological perspective" theory of the First Amendment: If we want free speech law that protects against periods in which "certain dynamics"—whether national or local—"radically increase the likelihood that people who hold unorthodox views will be punished for what they say or believe," Vincent A. Blasi, *The Pathological Perspective and the First Amendment*, 85 COLUM. L. REV. 449, 450 (1985), we would likely want to protect against the prospect that such dynamics would promote private employer repression of speech and not just government repression.

**EX. A4**

takes time, time during which you might be unable to keep up on your house pay-
ments, your rent, your car payments, and the like. Far safer just to remain quiet.

Moreover, in times of political tension, certain kinds of speech may lead to
pressure on many employers (or at least many in an employee's professional field)
to forbid the speech, especially by employees who enjoy some public prominence:
Consider Communist speech and even some non-Communist left-wing speech in
the 1950s, or allegedly racist or sexist or antigay speech today. And the growth of
social media has made public pressure campaigns especially easy. An employee
who is contemplating making a controversial political statement might thus worry
not just about being fired by his current employer, but also about not being hired
by future prospective employers. In the words of the Restatement of Employment
Law, which urges private employee speech protections as a common-law matter,
"There is a public interest in employees' personal autonomy because it is critical to
engagement in civic life. Employees must be free to express their own ideas and
concerns in order for the public sphere to flourish."[6]

Now maybe despite that, private employees should have no right to continue
drawing a paycheck after they have said something that damages their employer's
business (whether because it criticizes the employer, creates tension with cowork-
ers, alienates customers, or otherwise draws public hostility to the employer). I'll
discuss that a bit more below. But for now, my point is simply that, from society's
perspective, if we value free speech as a tool for democratic self-government, we
should recognize that the threat of private employer retaliation does interfere with
such self-government.

### B.        *Search for Truth*

The same largely applies to free speech as a tool for searching for truth, or for

---

[6] RESTATEMENT OF EMPLOYMENT LAW § 7.08 Rep. Notes; *id.* § 7.08(a)(2) (concluding that em-
ployers should be liable for firing an employee for "adhering to political, moral, ethical, religious, or
other personal beliefs or expressing such beliefs outside of the locations, hours, and responsibilities
of employment in a manner that does not refer to or otherwise involve the employer or its business,"
unless the employer "can prove that it had a reasonable and good-faith belief that the employee's
exercise of an autonomy interest interfered with the employer's legitimate business interests, in-
cluding its orderly operations and reputation in the marketplace").

**EX. A5**

promoting the marketplace of ideas.[7] The analysis is not quite identical: For instance, while we may resist the use of coercive economic power as a means of influencing democratic processes, we might not have the same reaction to it as a tool for influencing debates about other matters. But in practice, most facts and ideas that fall within the rubric of "the marketplace of ideas"—or for which we want there to be a "search for truth"—are closely connected to political debates, whether the facts and ideas relate to morality, religion, science, history, or even art, music, and literature. And, again, so long as we think governmental restrictions on speech undermine, simply by their practical deterrent effect, the search for truth and the marketplace of ideas, we should recognize that private employer restrictions can undermine those values as much.[8]

### C.    *Self-Expression and Autonomy*

The same applies to free speech as self-expression[9] and as a tool for growth as autonomous citizens:[10] The threat of losing one's livelihood can certainly sharply interfere with these values as well.

---

[7] *See, e.g.*, William P. Marshall, *In Defense of the Search for Truth as a First Amendment Justification*, 30 GA. L. REV. 1 (1995); Eugene Volokh, *In Defense of the Marketplace of Ideas / Search for Truth as a Theory of Free Speech Protection*, 97 VA. L. REV. 595 (2011).

[8] Naturally, one can imagine particular private employer restrictions—or governmental restrictions—that we might see as promoting the search for truth, because they deter speech that we think is false (e.g., misinformation about history or science or what have you) or even just that we think is misleading. But the Court's general view has been that, as a rule-utilitarian matter, the search for truth is more advanced by generally protecting most speech (with some exceptions, as for libel) rather than by allowing the government the discretion to decide which historical or scientific claims are false or misleading and should be banned: "The point is not that there is no such thing as truth or falsity in these areas [philosophy, religion, history, the social sciences, the arts, and other matters of public concern] or that the truth is always impossible to ascertain, but rather that it is perilous to permit the state to be the arbiter of truth." United States v. Alvarez, 567 U.S. 709, 751–52 (2012) (Alito, J., dissenting); *see also id.* at 731–32 (Breyer, J., concurring in the judgment) (generally endorsing Justice Alito's argument); *see generally* Eugene Volokh, *When Are Lies Constitutionally Protected?*, KNIGHT FOUND. PAPER SERIES (forthcoming 2022). The same argument can be made with regard to employers' being the arbiter of truth as to their employees' own speech (said on the employees' own behalf, and not on behalf of the employer).

[9] *See, e.g.*, C. Edwin Baker, *Scope of the First Amendment Freedom of Speech*, 25 UCLA L. REV. 964, 994 (1978).

[10] *See, e.g.*, Seana Valentine Shiffrin, *A Thinker-Based Approach to Freedom of Speech*, 27 CONST. COMMENT. 283 (2011).

**EX. A6**

The bans on religious discrimination in employment offer a helpful analogy, I think. Those laws promote people's ability to exercise their religions without the fear of economic disaster if those religions prove unpopular. Likewise, bans on employer retaliation based on employee speech do the same for people's ability to express themselves politically or philosophically rather than religiously.

Indeed, Title VII's "religious accommodation" requirement already protects religiously motivated speech, as part of its protection for religiously motivated practice. An employer may not dismiss an employee for religiously motivated speech, even if the speech violates a generally applicable work rule, unless it can show that tolerating the speech would cause an "undue hardship," meaning a "more than *de minimis* cost."[11] Thus, for instance, courts have concluded that employers might have to allow employees to sign their e-mails with "In Christ,"[12] or to say "God bless you" and "Praise the Lord" at work;[13] might not be allowed to force employees to wear rainbow insignia that they and others perceive as supporting gay rights;[14] and might not be allowed to force employees to certify that they "value the differences among all of us."[15]

The same would even more clearly apply if, for instance, the employer fired an employee for engaging in a religious protest outside an abortion clinic or military recruitment office, under some sort of "no controversial off-duty speech" policy. To be sure, having to tolerate some speech, especially on-the-job speech, may indeed be seen as "undue hardship."[16] But Title VII does provide at least some protection for religious speech, though not unlimited protection.

---

[11] Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84 (1977).

[12] Mail v. Foxhoven, 305 F. Supp. 3d 984, 993 (N.D. Iowa 2018).

[13] Banks v. Serv. Am. Corp., 952 F. Supp. 703 (D. Kan. 1996).

[14] EEOC v. Kroger Ltd. P'ship I, No. 4:20-CV-1099-LPR, 2022 WL 2276835 (E.D. Ark. June 23, 2022).

[15] Buonanno v. AT&T Broadband, LLC, 313 F. Supp. 2d 1069, 1082 (D. Colo. 2004).

[16] *See, e.g.*, Berry v. Dep't of Soc. Servs., 447 F.3d 642, 655 (9th Cir. 2006) (undue hardship to force an employer to allow discussion of religion with clients or display religious items in cubicle where employee interviewed clients); Knight v. Connecticut Dep't of Pub. Health, 275 F.3d 156, 168 (2d Cir. 2001) (undue hardship to force employer to allow evangelizing with clients); Peterson v. Hewlett-Packard Co., 358 F.3d 599, 607-08 (9th Cir. 2004) (undue hardship to force an employer to allow anti-gay religious postings at work); Anderson v. U.S.F. Logistics (IMC), Inc., 274 F.3d 470, 477 (7th Cir. 2001) (undue hardship to force an employer to let an employee say "Have a Blessed

**EX. A7**

Protection for employees' speech generally would simply extend this protection to nonreligious speech as well (though many of the existing employee speech protection statutes would set a higher bar for the employer than just having to show "undue hardship"). It would avoid what would otherwise be potentially unequal treatment for religiously motivated speech and comparable non-religiously-motivated speech: Why shouldn't someone who engages in a nonreligious protest outside an abortion clinic or military recruitment office be as protected as someone who engages in a religious protest?[17] And to the extent that Title VII has already been read as applying to "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views,"[18] protecting speech more broadly would avoid having to evaluate the strength of the moral or ethical beliefs motivating the speech.[19]

### D.    *Negative Theories*

The strongest basis for sharply distinguishing private employers' speech restrictions from governmental speech restrictions—as a policy matter, and not just as a matter of interpreting the First and Fourteenth Amendments—likely lies in "negative theories" of the First Amendment. Under these theories, "justifications for the freedom of speech focus not on any special value of free speech, but on the special dangers presented by government regulation of that right."[20] If this is so,

---

Day" to "customers and vendors," though the court noted that the employer did allow the employee to use this phrase to others).

[17] *Cf.* Micah Schwartzman, *What If Religion Is Not Special?*, 79 U. CHI. L. REV. 1351, 1419–21 (2012) (arguing for equal protection of conscientious belief, whether religious or not, though not focusing on employment).

[18] See 29 C.F.R. § 1605.1; Protos v. Volkswagen of Am., Inc., 797 F.2d 129, 137 n.4 (3d Cir. 1986); Nottelson v. Smith Steel Workers, 643 F.2d 445, 454 n.12 (7th Cir. 1981); Redmond v. GAF Corp., 574 F.2d 897, 901 n.12 (7th Cir. 1978); Ali v. Southeast Neighborhood House, 519 F. Supp. 489, 490 (D.D.C. 1981); Wondzell v. Alaska Wood Prods., Inc., 583 P.2d 860, 866 n.12 (Alaska 1978); Kolodziej v. Smith, 682 N.E.2d 604, 607 (Mass. 1997). *But see* Seshadri v. Kasraian, 130 F.3d 798, 800 (7th Cir. 1997) (Posner, J.) (concluding that Title VII doesn't apply when "the plaintiff's belief, however deep-seated, is not religious").

[19] For an argument that this broad reading of "religion" for Title VII purposes already protects a wide range of speech, see Vivek Ramaswamy, *Save America's Workers from the Church of Wokeness*, NEWSWEEK, Mar. 4, 2021, https://perma.cc/Z3VZ-3RWZ.

[20] Keith Werhan, *The Liberalization of Freedom of Speech on a Conservative Court*, 80 IOWA L.

then one might be untroubled by nongovernmental regulations.

Yet even then one might argue that employer restrictions also present "special dangers," such as domination of debate by an ideological orthodoxy (conservative, liberal, or otherwise) that has captured much of the employer class, even if not domination of debate by government officials. And even if we endorse negative theories in some measure, for instance highlighting the impropriety of the government choosing which viewpoints can be expressed, we might still also view speech as positively valuable as well. If so, private employer restrictions may also improperly undermine freedom of speech, even if not as much as governmental restrictions do.

## II.   REASONS NOT TO RESTRICT PRIVATE EMPLOYERS

### A.   *Constitutional Right Not to Associate*

Some have argued that employers have a constitutional right to refuse to associate with people whose political beliefs they reject.[21] But the Court has never extended the right not to associate that far.

The Court has held that the Constitution prohibits government action that substantially burdens "expressive association" by interfering with groups' ability to speak, including by choosing who speaks for them (more on this shortly).[22] It has held that the Constitution prohibits government action that substantially burdens "intimate association," so people would likely have a constitutional right to discriminate based on politics—as well as religion, sex, race, and other factors—in choice of spouses, adopted children, close friends, or roommates.[23]

But, in the words of Justice O'Connor's concurrence in the judgment in *Roberts v. U.S. Jaycees*, "there is only minimal constitutional protection of the freedom of

---

REV. 51, 87 (1994). *See also, e.g.,* Frederick Schauer, *The Role of the People in First Amendment Theory*, 74 CALIF. L. REV. 761, 782 (1986).

[21] Martin Redish & Christopher R. McFadden, *HUAC, the Hollywood Ten, and the First Amendment Right of Non-Association*, 85 MINN. L. REV. 1669, 1703-19 (2001).

[22] *See, e.g.,* Roberts v. U.S. Jaycees, 468 U.S. 609, 622–63 (1984).

[23] *See, e.g., id.* at 619–20 (spouses); Wilson v. Taylor, 733 F.2d 1539 (11th Cir. 1984), *abrogated on other grounds, see* Scala v. City of Winter Park, 116 F.3d 1396, 1402 n.4 (11th Cir. 1997); Fair Housing Council of San Fernando Valley v. Roommate.cm, LLC, 666 F.3d 1216, 1221–22 (9th Cir. 2012) (roommates).

*commercial* association";[24] she said this about membership decision by the Jaycees and similar nationwide organizations, but that even more clearly applies to employment. During the *Lochner* era, employers' right not to associate with people who engage in conduct of which they disapprove was indeed seen as protected by substantive due process[25]—but that time is long gone.[26]

And, of course, we see this in the courts' acceptance of employment discrimination laws generally, including of bans on employment discrimination based on religion. Employers lack the constitutional right not to associate with, say, Catholics or atheists or Satanists; they likewise lack the constitutional right not to associate with Republicans or Democrats or even Communists or Nazis. (Note that bans on employment discrimination aren't upheld on the grounds that they burden associational rights but nonetheless pass strict scrutiny; they are upheld on the grounds that they don't burden associational rights at all.[27])

### B.        Freedom of Symbolic Expression

Nor can employers argue that firing employees based on their speech, or refusing to hire them, is symbolic expression protected by the First Amendment. In *Rumsfeld v. FAIR*, the Court rejected law schools' argument that excluding military recruiters from their on-campus recruiting programs was constitutionally protected symbolic expression. Such exclusion "is not inherently expressive," since "[a]n observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the

---

[24] 468 U.S. at 634 (O'Connor, J., concurring in part and concurring in the judgment).

[25] *See* Coppage v. Kansas, 236 U.S. 1, 19–20 (1915) ("Can it be doubted that a labor organization—a voluntary association of working men—has the inherent and constitutional right to deny membership to any man who will not agree that during such membership he will not accept or retain employment in company with non-union men? Or that a union man has the constitutional right to decline proffered employment unless the employer will agree not to employ any non-union man? . . . And can there be one rule of liberty for the labor organization and its members, and a different and more restrictive rule for employers? . . . [T]he employer has the same inherent right to prescribe the terms upon which he will consent to the relationship, and to have them fairly understood and expressed in advance.").

[26] *See* Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 187 (1941) (recognizing that *Coppage* has been overruled, because the government has "the power . . . to deny an employer the freedom to discriminate in discharging").

[27] *See, e.g.*, Hishon v. King & Spalding, 467 U.S. 69, 78 (1984).

**EX. A10**

military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." And when "[t]he expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it," those actions are "not so inherently expressive that [they] warrant[] protection under *O'Brien*." "[I]f an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes," the court need not "apply *O'Brien* to determine whether the Tax Code violates the First Amendment."[28]

The same would apply here. By itself, the firing of an employee (or the refusal to hire the employee) doesn't convey a message. An observer who learns of it "has no way of knowing whether the [employer] is expressing its disapproval of [the employee's speech, religion, race, sexual orientation, or the like]" or has instead found that this employee or applicant hasn't been doing a good job. "The expressive component of [the employer's] actions is not created by the conduct itself but by the speech that accompanies it." Indeed, that's why job discrimination based on other criteria, such as religion or race, isn't treated as constitutionally protected symbolic expression.

And even if firing someone is viewed as "inherently expressive," that would only subject the ban on discrimination based on speech to *O'Brien* scrutiny. That is generally a deferential test, which requires "narrow tailoring" (and not in the strong sense that term carries under strict scrutiny) to a "substantial government interest."[29] The interests in protecting political expression are likely to qualify as important enough, for the reasons given in Part I. And the law is likely to be narrowly tailored for the same reason that the ban on public accommodations discrimination in *Roberts* is narrowly tailored: Because employment discrimination "produce[s] special harms distinct from [its] communicative impact," an antidiscrimination law "'responds precisely to the substantive problem which legitimately concerns' the State and abridges no more" symbolic expression "than is necessary to accomplish that purpose."[30]

---

[28] 547 U.S. 47, 66 (2006). This question had been unsettled earlier, *see, e.g.*, Clark v. Community for Creative Non-Violence, 466 U.S. 288, 293 (1984) ("[w]e assume for present purposes, but do not decide," whether "overnight sleeping in connection with [a] demonstration is expressive conduct protected to some extent by the First Amendment"), but *FAIR* appears to have settled it.

[29] United States v. O'Brien, 391 U.S. 367, 377 (1968).

[30] Roberts v. U.S. Jaycees, 468 U.S. 609, 628–29 (1983).

**EX. A11**

### C.        *Freedom of Speech*

To be sure, sometimes having to hire an employee who visibly holds particular views might undermine an employer's ability to express its chosen message, just as having to allow a gay rights activist to be an assistant scoutmaster was seen as undermining the Boy Scouts' ability to express its chosen message.[31]

Thus, for instance, the Washington Supreme Court held (albeit 5-4) that newspapers have the First Amendment right to bar their reporters from engaging in any political activity, notwithstanding the Washington statute that generally protects private employees from such restrictions.[32] Because "the government absolutely may not regulate the content of a newspaper," the newspaper was entitled to "implement[] a code of ethics which it designed in good faith to foster the newspaper's integrity and credibility," including by barring political activity by its reporters.[33] Likewise, a performing arts organization would likely be allowed to refuse to hire a narrator or actor whose past political activity is likely to distract the audience from the organization's artistic (or ideological) message.[34]

And this fits well with *Dale*, which reasoned that "the forced inclusion of Dale would significantly affect [the Boy Scouts'] expression" and was thus unconstitutional,[35] because

1. Dale sought to be an assistant scoutmaster, whose job it is to speak on behalf of the Boy Scouts—to "inculcate [youth members] with the Boy Scouts' values," "both expressly and by example";[36] and

2. "the forced inclusion of Dale as an assistant scoutmaster would signifi-

---

[31] Boy Scouts of Am. v. Dale, 530 U.S. 640 (2000).

[32] Nelson v. McClatchy Newspapers, Inc., 936 P.2d 1123, 1127 (Wash. 1997)

[33] *Id.* at 1131, 1133.

[34] Redgrave v. Boston Symphony Orchestra, Inc., 855 F.2d 888, 894, 904–06 (1st Cir. 1988) (suggesting that symphony might well have a First Amendment right to refuse to let plaintiff narrate a performance, even if the reason for the refusal stemmed from plaintiff's past speech and would therefore presumptively violate the Massachusetts Civil Rights Act); *see also* Cotto v. United Techs. Corp., 738 A.2d 623, 627 n.5 (Conn. 1999) (acknowledging that in some circumstances, the Connecticut statute "may conflict with the employer's own free expression rights").

[35] 530 U.S. at 656-57.

[36] *Id.* at 649–50.

cantly affect the Boy Scouts' ability to advocate public or private viewpoints," because "Dale was the copresident of a gay and lesbian organization at college and remains a gay rights activist," and having Dale be an assistant scoutmaster "would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior."[37]

Likewise, when an advocacy group hires people to promote particular ideas, requiring it to hire as its speakers people who have publicly opposed those ideas— or said things inconsistent with those ideas—would "significantly affect the [group's] ability to advocate . . . [its] viewpoints." Requiring a newspaper to hire as its speakers people who are prominently associated with a particular political position would significantly affect its ability to credibly communicate information in a way that appears balanced and nonpolitical. And requiring an artistic organization to hire as its speakers people who are associated with such a position will undermine its ability to send the particular aesthetic or artistic message that it wants to send: The messenger is part of the message, and hearing even neutral artistic material from someone who has become well-known for political views may make that material seem ideologically laden, or at least may significantly distract from the artistic message.[38]

The matter isn't open and shut: In *Associated Press v. NLRB* (1937), the Court rejected (5-4) the AP's argument that it had a First Amendment right to bar its editors from "union activity or agitation for collective bargaining with employees."[39] Likewise, the California Court of Appeal has rejected the claim that a newspaper "has the unfettered right to terminate an employee for any [outside-the-newspa-

---

[37] *Id.* at 653.

[38] Query whether this should apply even when the spokespeople, actors, or other such speakers aren't public about their views, but have private views that the organization worries might become public and might thus undermine the organization's message.

Of course, the Religion Clauses would give a religious institution the right to select clergy, teachers of religion, and other employees who speak on the institution's behalf based on the employees' politics, just as the employer is free to select those employees based on race, religion, sex, sexual orientation, and so on. *See, e.g.* Our Lady of Guadalupe School v. Morrissey-Berru, 140 S. Ct. 2049 (2020).

[39] Associated Press v. NLRB, 301 U.S. 103, 131–32 (1937).

**EX. A13**

per] speech or conduct that is inconsistent with the newspaper's editorial poli-
cies."[40]

Nonetheless, it seems to me that there's a strong argument—as a First Amend-
ment matter but even more so as a policy matter—in favor of some such limits on
the political speech protection laws, when it comes to employees who speak on the
employer's behalf to the public or to clients. Employers that speak must necessarily
speak through their employees; and when an employee or prospective employee
says things, even off the job, that would undermine the employer's message, the
employer must be able to distance itself from the employee.

That is particularly true for employees such as broadcasting and print reporters,
opinion columnists, actors, and the like. It should also be true for employers' com-
mercial spokespeople, who are supposed to be the public face of the employer.
Though commercial speech is less protected than other speech, it is still protected
to a considerable extent; and the ability to convey a commercial message through a
spokesperson may be sharply undermined by public consciousness of the spokes-
person's outside speech. (One interesting question would be whether it applies to
ordinary salespeople.)

At the same time, the great majority of all private employees don't speak on the
employer's behalf: they are engineers, accountants, secretaries, janitors, and more.
The statutes can apply to those employees without violating the employer's free
speech rights.

### D.        *Non-Constitutional Right Not to Associate*

Even in the absence of a constitutional right not to associate, of course, all of us
have an interest in choosing whom we deal with, whether as friends, fellow club
members, business partners, or employees. We may not want to deal with Nazis or
Communists or Klansmen or supporters of terrorist movements. We may feel this
particularly strongly because of our personal experiences: The child of refugees
from Cuba may not want to deal with people who praise Che Guevara; the widow
of a police officer who was killed in the line of duty may not want to deal with people
who praise attacks on police, or call police officers "pigs"; a black or Jewish em-
ployer might especially not want to deal with Klansmen. Likewise, a business owner
might want to cut off relations with someone because the business's other employ-
ees or customers don't want to associate with the person.

---

[40] *Ali v. L.A. Focus Publ'n*, 112 Cal. App. 4th 1477, 1488 (2003).

**EX. A14**

But when it comes to employment, our legal system has long generally rejected such claims. An employer might not want to employ union leaders, whose organizing, bargaining, and strike-threatening behavior he sees as jeopardizing the business he has spent a lifetime building up. An employer may not want to employ someone who made discrimination complaints against the employer in the past, perhaps on grounds that the employer views as ill-founded.

A Catholic employer may not want to hire Jehovah's Witnesses, whose beliefs sharply condemn Catholics.[41] A gay employer may not want to hire people who belong to religious groups that condemn homosexuality (especially ones that the employer views as historically responsible for discrimination or even violence against gays). A Palestinian-American employer who views his nation as being at war with Israel may not want to hire Israeli Jews.[42] Yet the employers are barred from refusing to hire employees on these grounds.

One could respond to these analogies this way: When it comes to constitutionally protected discrimination—for instance, a church's right to choose its clergy, or a person's right to choose a spouse, or a person's right to choose a roommate—the Constitution protects the right not to associate regardless of whether judges or legislators approve of the reason for the discrimination.[43] But when it comes to economic association, the law should be solicitous of reasonable bases for refusals to deal but not of bigoted or unreasonable ones.

Not wanting to deal with people because of their skin color or nationality or sexual orientation or beliefs about the Trinity is unreasonable and hateful, the argument would go. But not wanting to deal with people because of their political speech or beliefs is reasonable often enough (even if not always), and we should accommodate employers' desire to do that, even if the Constitution would let us

---

[41] *Cf.* Catnwell v. Connecticut, 310 U.S. 296, 301 (1940).

[42] *Cf.* Espinoza v. Farah Mfg., 414 U.S. 86, 88 (1973) (concluding that "national origin" in Title VII "refers to the country where a person was born," as well as "the country from which his or her ancestors came"); Minn. Stats. § 363A.03 subd. 25 (defining "national origin" as "the place of birth of an individual or any of the individual's lineal ancestors"), *quoted favorably* in *id.* at 88 n.2 (citing earlier version of statute).

[43] Some judges might, for instance, take the view that refusal to engage in interracial marriage is morally wrong (or at least is highly shallow, if it's based on preferences as to appearance rather than based on racial hostility), but people must have a categorical right to choose not to marry someone, even for bad reasons.

**EX. A15**

ban such discrimination.

But I don't think that's quite right. There's nothing inherently unreasonable or hateful in an employer's not wanting to employ union leaders, or employees who had made past complaints. There's nothing inherently unreasonable or hateful in an employer's not wanting to deal with employees whose religious beliefs don't just turn on theological questions but sharply condemn the employer's religion or sexual orientation or other actions or beliefs. There's nothing inherently unreasonable or hateful in an employer's not wanting to deal with employees who have voted for certain candidates.

The legal system bans such discrimination not just because it's somehow hateful or irrational (though some religious discrimination is indeed that), but in large part because it's valuable to promoting employee collective bargaining, or employee whistleblowing about illegal practices, or the freedom to vote or to openly worship. Likewise, for the reasons given in Part I, it's valuable to promote the freedom to openly speak and participate in politics beyond just voting.

One might also argue that antidiscrimination laws do burden people's (non-constitutional) freedom to choose whom to associate with, but we enact them because there's massive, society-wide discrimination on certain bases, which justifies a rare departure from a norm of unregulated employment decisionmaking. Antidiscrimination laws were needed to break broad patterns of refusing to hire blacks, Hispanics, women, Jews, Catholics, gays, union activists, whistleblowers, and the like. But for rarer forms of discrimination, however foolish they may be, it's enough to rely on the employment market, in which most employers will be reluctant to fire good employees, and most employees needn't fear being fired, especially since they could easily find other jobs.

And perhaps this does help explain why, for instance, many states haven't banned discrimination based on marital status, height, weight, off-duty smoking, having children, being a crime victim, and the like, though some states have.[44] No need to restrict employer freedom via employment discrimination law—especially given how expensive employment litigation can be, and how it can chill legitimate

---

[44] *See Discrimination—Employment Laws*, Nat'l Conf. of State Legislatures (July 27, 2015), https://www.ncsl.org/research/labor-and-employment/discrimination-employment.aspx. This list notes 19 states that have banned marital status discrimination, and only a few that have banned discrimination based on the other factors I note.

**EX. A16**

employer action (more on that below)—to deal with problems that are fairly rare, the argument would go. And maybe this should also apply to political discrimination, if one thinks it's rare enough.[45]

This, I think, is likely the strongest combination of arguments against the private employee speech protections I discuss here. The key questions, I suppose, are: (1) How often do employers discriminate (or expressly or implicitly threaten to discriminate) based on employee speech and political activity, especially in a time that is widely seen as more politically polarized than before, and a time in which social media has made it easier than ever to call for boycotts triggered by an employee's unpopular political views? (2) How much does this chill the free speech we want to see for the sake of self-government, the search for truth, and self-expression? And I don't have a confident answer to those questions.

### E.    *Avoiding Unduly Deterring Non-Speech-Based Employment Actions*

Employers can also worry that protecting employee speech would risk creating spurious lawsuits, as employees who were fired for (say) incompetence start to routinely sue, claiming that this was just a pretext and that the real reason for the firing was their controversial speech. Indeed, one can imagine an employee who thinks that he might get fired for a legitimate reason, and who therefore deliberately starts saying controversial things so that management becomes reluctant to fire him for fear that he'll sue for political discrimination.

This argument, though, has likewise been made as to many forms of employment discrimination law, and especially the law of retaliation: Punishing retaliatory firing might well encourage some people to bring spurious discrimination complaints just so the employer becomes worried that firing the employee will be mistaken for retaliation.[46] That, however, has not generally been seen as an adequate reason to limit such antidiscrimination rules.

Note also that, though private employee speech protection statutes have been present in some states for over a century,[47] I've seen no evidence that they have

_____

[45] More broadly, of course people who are skeptical of bans on private discrimination generally, and would either reject them all or limit them to just a very few most harmful forms of discrimination (as many libertarians would), might resist any attempt to add to such laws.

[46] *See, e.g.,* WALTER K. OLSON, THE EXCUSE FACTORY 220–21 (1997).

[47] *See* Volokh, *supra* note *.

**EX. A17**

proved to be serious burdens for employers. To be sure, perhaps they're just underenforced for various reasons: maybe they aren't well-known even to employment lawyers, and they also often don't include attorney fees (unlike, say, Title VII). Maybe if they are more broadly enacted, or enacted at the federal level, and more broadly publicized, they will be more often used. Nonetheless, there seems to be little concrete reason to think that they would substantially deter employers from properly discharging or disciplining incompetent employees, especially on top of the existing burdens that employment law already creates.

### F.    *Avoiding Employees' Being Net Losses for Employers*

Finally, employers can reasonably object that some employees' political speech makes the employees more trouble than they are worth. Employees are hired to advance the employer's business, not to undermine it. When an employee's speech or political activity sufficiently alienates coworkers, customers, or regulators, an employer may reasonably argue: "I'm paying the employee $50,000 per year expecting that I'll get $70,000 of value in return; but now that the employee is causing an extra $30,000 in expenses, lost revenue, and reduced morale, I shouldn't have to keep this net loss of a worker on the payroll."

This is a serious concern, but it too mirrors concerns that can be raised with regard to other antidiscrimination laws, but that are rejected. Especially shortly after Title VII was enacted, many a business might have plausibly argued that hiring black employees might alienate white customers or coworkers, or that customers wouldn't buy as much from female salespeople or coworkers wouldn't work as well for female managers.[48] I suspect there has been a good deal of undetected discrimination stemming precisely from such concerns. But when these arguments have come to court, courts have rejected them. For instance, it's well-settled that customer or coworker preference for employees of a particular sex—or hostility to employees of a particular sex—doesn't make sex into a bona fide occupational qualification.[49] Employers need to accept some such losses as part of the cost of doing

---

[48] *See, e.g.*, Michael Blake, *The Discriminating Shopper*, 43 SAN DIEGO L. REV. 1017, 1020–21 (2006); Alan Wertheimer, *Jobs, Qualifications, and Preferences*, 94 ETHICS 99, 100 (1983).

[49] *See, e.g.*, Fernandez v. Wynn Oil Co., 653 F.2d 1273, 1276-77 (9th Cir. 1981) (preference of clients in South America for dealing with males cannot make sex into a bona fide qualification); Diaz v. Pan Am. World Airways, Inc., 442 F.2d 385, 389 (5th Cir. 1971) (preference of airplane passengers for female flight attendants cannot make sex into a bona fide qualification); Ray v. University of Ark., 868 F. Supp. 1104, 1126-27 (E.D. Ark. 1994) (even if race could ever be a bona fide

**EX. A18**

business, and of the social cost of promoting the policies that the antidiscrimination law serves.[50]

Indeed, in at least some situations the existence of employee speech protection laws can help ease some of the public backlash against the employer. "Don't blame us that we haven't fired Joe Schmoe for his speech," the employer might say; "the law tells us we can't." Perhaps some customers might still stop dealing with the company because Schmoe remains employed there. But others might well reconcile themselves to the situation (especially if they're not among the likely small group who have to deal with Schmoe personally), and conclude that, though Schmoe may be a bad person, the employer isn't bad for keeping Schmoe on the payroll. And even customers or coworkers who do have to keep dealing with Schmoe might conclude that, the law being what it is, they might as well accept the legal reality.

### III.   How Should Any Protections Be Crafted?

Say that we do conclude that there should be some protection for private employee speech. Just what sort of protection should this be?

#### A.   Protecting at Least Political Speech Generally, Not Just Campaign-Related Speech

Some of the existing statutes are limited to particular campaign-related activity, such as advocating for a candidate or ballot measure, or signing a ballot measure petition, or contributing to a campaign. Some other statutes include political speech more broadly.[51]

---

qualification, students' preference for police officers of their own race is insufficient); Levendos v. Stern Ent., Inc., 723 F. Supp. 1104, 1107 (W.D. Pa. 1989) (perception by employer that male waiters "present a better image" for the restaurant cannot make sex into a bona fide qualification), *rev'd on other grounds*, 909 F.2d 747 (3d Cir. 1990); Bollenbach v. Bd. of Educ. of Monroe-Woodbury Cent. Sch. Dist., 659 F. Supp. 1450, 1472 (S.D.N.Y. 1987) (preference of religious parents for male school bus drivers can't make sex into a bona fide qualification); Bohemian Club, v. Fair Emp. & Hous. Comm'n, 187 Cal. App. 3d 1, 21 (19860 (client preference for male service personnel, based upon the supposed "inhibiting effect women employees might have upon men" in a private club, cannot make sex into a bona fide qualification); 29 C.F.R. § 1604.2(a)(1)(iii) (2022) (customer/coworker preference can't make sex into a bona fide qualification); Cal. Code Regs. tit. 2, § 11031(a)(3) (2022).

[50] *See, e.g.*, Christine Jolls, *Antidiscrimination and Accommodation*, 115 Harv. L. Rev. 642, 686 (2001).

[51] *See* Volokh, *supra* note *, at 309–34.

**EX. A19**

It seems to me that the broader approach is correct, even if one views the laws as primarily promoting self-government. Why protect advocacy of (say) a pro-abortion-rights ballot measure, but not speech supporting abortion rights more broadly? Why protect opposition to a candidate because of his stance on immigration, but not opposition to a particular view on immigration more generally?

Elections, after all, are influenced not just by direct advocacy of candidates and measures, but also by issue advocacy more broadly. Indeed, they are often influenced by issue advocacy that had happened years before the election campaign formally began. Protecting such issue advocacy—whether involving speech, press, or assembly—is just as important as protecting advocacy that is more directly focused on the election.

Likewise, while contributing to a campaign is important to free speech, speaking about a campaign and its issues is of course at least as important. And while signing a petition supporting an initiative, referendum, recall, or candidate is important to self-government, arguing in favor of such a measure or candidate—or the issues related to such a measure or candidate—is as well.

###### B.    *Protecting Speech More Generally, Not Just Political Speech*

Some of the statutes are limited to "political activity," which appears to refer to advocacy of some "candidate or cause," including broad social movements (such as the gay rights movement[52]). Others include speech more broadly, or lawful off-duty activity more broadly.

Again, it seems to me that the broader definition is better, even if one views the laws as primarily promoting self-government. Speech about religion, morality, and science, for instance, can obviously bear on important political issues. Even speech about entertainers or athletes can do the same. Indeed, to the extent that speech might be controversial and offensive to some, and thus prompt employers to want to fire the speaker, that is likely precisely because it expresses some moral or ideological view.

A law might be crafted to protect only speech on matters of "public concern," as is the rule under the First Amendment for government employee speech.[53] But

---

[52] *See* Volokh, *supra* note *, at 313.

[53] Connick v. Myers, 461 U.S. 138, 143 (1983); *see also* Post, *supra* note 1 (endorsing generally limiting First Amendment protection to speech that's seen as part of "public discourse"); Weinstein, *supra* note 1 (likewise).

**EX. A20**

as I've argued elsewhere, that line has proved to be vague, malleable, and inconsistent.[54] Perhaps some such line has to be present if the law applies to on-the-job speech (see Part III.E below), since employers have to be able to control garden-variety rudeness and other speech-based conflicts at work. But any "public concern" limitation would probably be best avoided for off-the-job speech.

### C.   *Criminal Liability, Civil Liability, or Both?*

Some of the existing statutes expressly provide for civil liability, some for criminal liability, and some for both.[55] I'm inclined to say that criminal liability is going too far here, especially given the lack of criminal liability for other forms of employment discrimination claims.

### D.   *Coverage for Existing Employees or Also for Applicants?*

Some of the existing statutes expressly cover all employer decisions. Others only cover discharge or discipline of current employees rather than refusal to hire applicants.[56]

It seems to me that applying them to refusal to hire, again by analogy to most employment discrimination claims, is likely right. In practice, bans on hiring discrimination are much less likely to be enforced than bans on discrimination in dismissal or demotion.[57] But they still likely have some benefit, especially by signaling

---

[54] *See* Eugene Volokh, *The Trouble with "Public Discourse" as a Limitation on Free Speech Rights*, 97 VA. L. REV. 567 (2011); Eugene Volokh, *Overbroad Injunctions Against Speech (Especially in Libel and Harassment Cases)*, 45 HARV. J.L. & PUB. POL'Y 147, 196–208 (2022). *See also, e.g.*, Hernandez v. City of Phoenix, 432 F. Supp. 3d 1049, 1060 (D. Ariz. 2020) (concluding that "post which said the most common name for a convicted gang rapist in England is Mohammad," "meme post which recounts the story of a Muslim man being kicked out of a taxi after asking the taxi driver to turn off the music in the car as a religious accommodation," "post which listed controversial opinions by Muslim scholars and theologians," and "post[] of an article entitled 'Military Pensions Cut, Muslim Mortgages Paid by US!'" were not on matters of public concern); Heim v. Daniel, No. 1:18-cv-836, 2022 WL 1472878 (N.D.N.Y. May 10, 2022) (concluding that university economics instructor's "books and other writings" aren't on a matter of public concern because they "are written to a specific, narrow audience: policy wonks 'engaged in academic discussion of economics' and 'government officials engaged in economic forecasting'").

[55] Courts generally treat these sorts of criminal statutes as also generating a private right of action, either as a matter of statutory interpretation or as an application of the "wrongful discharge in violation of public policy" tort. *See* Volokh, *supra* note *, at 302.

[56] *See* Volokh, *supra* note *, at 302–03.

[57] *See, e.g.*, Scott A. Moss, *Women Choosing Diverse Workplaces: A Rational Preference with*

to large, bureaucratic employers that these are rules that the institution needs to follow. And precisely because they are less likely to be enforced, they also impose relatively little marginal deterrent to non-speech-based employer hiring decisions.

### E.    Off-the-Job Speech or All Speech?

Some statutes cover only off-the-job speech, while others have no such limitation.[58]

On-the-job speech can be a valuable part of public discourse. Most of us spend a third of our waking hours at work; for many, most of the people we see face-to-face each week are our colleagues. A conversation with a colleague in the lunchroom is more likely to persuade or inform us about some topic in the news than is the oration of a stranger on the street corner. And while social media has given people many more opportunities to talk to others—including to coworkers who are social media contacts—in-person conversations are often more influential for many people than text exchanges.

At the same time, on-the-job speech is also much more likely to disrupt the employer's workplace, and cause immediate tension with coworkers and customers. What's more, disputes about on-the-job personal insults and slights are commonplace, and may often call for some disciplinary measures, including dismissal—likely much more often, I think, than disputes about off-the-job speech. Restricting employer discretion with regard to employees' on-the-job speech is thus likely to be much more burdensome on employers. At the very least, such restrictions would have to be limited to "public concern" speech or some such, however imperfect such tests might be, and would likely need to have some provision for employers to deal with genuinely disruptive speech (more on that at Part III.G below).

### F.    No Employee Right to Choose What One Says on the Employer's Behalf

But even if on-the-job speech to coworkers in casual conversations is protected, that shouldn't extend to speech said as part of one's job. News sites must have the right to tell reporters and editors which articles they should post.[59] Private primary

---

*Disturbing Implications for Both Occupational Segregation and Economic Analysis of Law*, 27 HARV. WOMEN'S L.J. 1, 72 (2004).

[58] *See* Volokh, *supra* note *, at 304.

[59] Gombossy v. Hartford Courant Co., 2010 WL 3025512, *4 (Conn. Super. Ct. June 29, 2010)

**EX. A22**

and secondary schools must be able to tell their teachers what they must say, or must not say, in class.[60] Companies must be able to tell their salespeople that they have to give a particular pitch in a particular way, or that they can generally frame things as they like to prospective customers but can't say certain things or must say other things; likewise for technical support and all sorts of other jobs where the employee speaks on the employer's behalf.

The same should also extend to passive communications, for instance via message- or symbol-bearing pins, T-shirts, caps, ties, and the like, even when they are in context obviously the employee's own speech.[61] When an employer places employees in front of clients, the employee shouldn't be able to hijack that opportunity to convey its own message rather than the employer's. (The matter is different, I think, for ordinary coworker speech to each other: Coworkers normally speak to each other as part of workplace social interactions, and when that happens, it's reasonable to protect such speech against employer retaliation.)

### G.        *Exceptions for Speech and Political Activity That Sufficiently Undermines Employer Interests*

What, though, if an employee's speech does undermine employer interests? Should there be exceptions to any employee speech protection statutes?

### 1.  **Vague multipurpose exceptions**

One possible answer is that there should be such exceptions, written in general and necessarily vague terms, and potentially applicable to a wide range of ways in which speech can interfere with the employer's business.

One such approach, for instance, might be to borrow the "undue hardship" doctrine from Title VII's religious accommodation law. Under Title VII, religious objectors can get exemptions from generally applicable work rules, but only so long as the exceptions don't create an "undue hardship" to the employer, which is to say

---

(concluding that the First Amendment allowed a newspaper to fire someone based on his past articles for the newspaper); Epworth v. J. Reg. Co., 12 Conn. L. Rptr. 585 (1994) (likewise).

[60] Private universities should have the First Amendment right to do so as well, I think, though this would often be seen as violating professional academic freedom norms.

[61] Often this will indeed be clear from context. No one would think, for instance, that a necktie worn by a teacher or a lawyer is the employer's speech.

**EX. A23**

*Journal of Free Speech Law*                    [2022

so long as they impose only "*de minimis* costs."[62] An employee therefore could presumably wear religious headgear or insignia on the job, notwithstanding a policy that forbids headgear or jewelry. But if the headgear is likely to cause safety problems (for instance, because it might get caught in machinery) or the insignia are likely to cause undue controversy (presumably for reasons beyond just religious prejudice), the employer would be able to deny the accommodation.[63]

Another possibility might be to borrow the "bona fide occupational qualification" doctrine from Title VII's disparate treatment law.[64] Under Title VII, employers can discriminate based on religion, sex, and national origin when that's justified by such a "BFOQ." And some of the employee speech protection statutes likewise allow employee speech to be restricted if the restriction relates to a BFOQ,[65] if the restriction "is reasonably and rationally related to the employment activities and responsibilities of a particular employee or a particular group of employees, rather than to all employees of the employer,"[66] if the speech is "in direct conflict with the essential business-related interests of the employer,"[67] or if the speech creates "reasonable job-related grounds for an employee's dismissal."[68]

Finally, a third possibility might be to borrow the *Pickering* balance from government employee speech cases. Under that test, an employee's speech could be restricted if the "employee's speech interests are outweighed by the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[69]

The real question under all these tests, though, is whether the exceptions cover

---

[62] Trans World Airlines, Inc. v. Hardison, 432 US 63, 84 (1977).

[63] *See, e.g.*, EEOC v. Oak-Rite Mfg. Corp., No. 99-cv-1962-DFH, 2001 WL 1168156, at *10 (S.D. Ind. Aug. 27, 2001).

[64] 42 U.S.C. § 2000e-2.

[65] *E.g.*, Colo. Rev. Stat. Ann. § 24-34-402.5(1) (West, Westlaw through July 15, 2022 of the 2d Reg. Sess. 73d Gen. Assemb.); Minn. Stat. Ann. § 10A.36 (West, Westlaw through July 1, 2022 Reg. Sess.).

[66] *E.g.,* Colo. Rev. Stat. Ann. § 24-34-402.5(1) (West, Westlaw through July 15, 2022 of the 2d Reg. Sess. 73d Gen. Assemb.).

[67] N.D. Cent. Code Ann. § 14-02.4-03 (West, Westlaw through 2021 Reg. and Spec. Sess. 67th Legis. Assemb.).

[68] Mont. Code Ann. § 39-2-903(5) (West, Westlaw through 2021 Sess.).

[69] Kennedy v. Bremerton School Dist., 142 S. Ct. 2407, 2423-24 , (2022) (cleaned up).

**EX. A24**

speech that interferes with the employer's activities by leading customers or coworkers to dislike the employer—for instance, when the speech is critical of the employer, or when the speech offends some people. On one hand, the employer's argument for a right to fire an employee is especially strong when the employee is harming the employer's bottom line rather than helping it (see Part II.F).

But on the other hand, a right to speak only so long as the speech isn't too un-popular (which is what lower federal courts applying the *Pickering* balance have generally done) seems like a pretty poor sort of free speech right. And limiting the right this way would encourage a sort of analog to the heckler's veto—social media mobs pressuring the employer to fire the employee, stemming from their members' knowing that such pressure will indeed make it legal for the employee to be fired for his speech.

Unsurprisingly, the cases dealing with the existing employee speech protection statutes—usually under BFOQ-like exceptions—haven't reached a clear solution to the problem. Generally speaking, when the term "bona fide occupational quali-fication" is used with regard to sex discrimination or religious discrimination, cus-tomer or coworker hostility is *not* seen as sufficient to trigger the BFOQ exception. In the Equal Employment Opportunity Commission's words, "the preferences of coworkers, the employer, clients or customers" "do not warrant the application of the bona fide occupational qualification exception."[70] Thus, for instance, that some

---

[70] 29 C.F.R. § 1604.2(a)(1)(iii) (2022); *see also* Fernandez v. Wynn Oil Co., 653 F.2d 1273, 1276–77 (9th Cir. 1981) (preference of clients in South America for dealing with males cannot make sex into a BFOQ); Diaz v. Pan Am. World Airways, Inc., 442 F.2d 385, 389 (5th Cir. 1971) (preference of airplane passengers for female flight attendants cannot make sex into a BFOQ); Bohemian Club v. Fair Emp't & Hous. Comm'n, 231 Cal. Rptr. 769, 781 (Ct. App. 1986) (client preference for male service personnel, based upon the supposed "inhibiting effect women employees might have upon men" in a private club, cannot make sex into a BFOQ); Ray v. Univ. of Ark., 868 F. Supp. 1104, 1126–27 (E.D. Ark. 1994) (even if race could ever be a BFOQ, students' preference for police officers of their own race is insufficient); Bollenbach v. Bd. of Educ. of Monroe-Woodbury Cent. Sch. Dist., 659 F. Supp. 1450, 1472 (S.D.N.Y. 1987) (preference of religious parents for male school bus drivers doesn't make sex into a BFOQ); Kern v. Dynalectron Corp., 577 F. Supp. 1196, 1201 (N.D. Tex. 1983) ("mere customer preference of one religion over another is not enough to raise religious dis-crimination to the level of B.F.O.Q.," though Saudi law that imposes the death penalty for non-Muslims who go to Mecca does suffice to make religion a BFOQ for a job as helicopter pilot flying to Mecca). *But see* Brown v. F.L. Roberts & Co., Inc., 896 N.E.2d 1279, 1289 n.11 (Mass. 2008) ("We leave to another day whether or to what degree customer preference could allow an employer to discriminate based on religion. But see 804 Code Mass. Regs. § 3.00 (1995) (customer or coworker

people are offended or alienated by an employee's religion does not justify the employer in firing the employee. When laws that ban discrimination based on off-duty conduct (including speech), speech, or political affiliation use the same phrase, this suggests that employers likewise may not fire an employee just because his off-duty actions offend customers or coworkers.

And some cases have found some speech to be protected even when it does injure the employer. A Connecticut case, for instance, held that an employee's report to a state agency of "allegedly wrongful or illegal conduct" by the employer's customer was protected notwithstanding the statutory exception for speech that "substantially or materially interfere[s] with the employee's bona fide job performance or the working relationship between the employee and the employer."[71] The employee, a worker for a home nursing company that sold services to nursing facilities, reported substandard care at one of the facilities.[72] The court acknowledged that the employee's speech may have harmed the employer's "business relationship with their customer,"[73] but concluded that such speech is "the exact kind of 'expression[] regarding public concerns that are motivated by an employee's desire to speak out as a citizen' to which . . . this statute applies."[74]

Another court refused to read a business-interests exception into Louisiana's facially categorical ban on firing for political activity. Even when "the 'business' justification for firing plaintiff in this case is a real one"—such as that plaintiff's political advocacy "would antagonize persons who could withdraw business from plaintiff's employer"—"the policy of the statute is unmistakable: the employer may not control political candidacy of his employees."[75] Similarly, a court concluded that public complaints about safety were protected by the Colorado statute, despite

---

preference is not bona fide occupational qualification).").

[71] Mendez v. Utopia Home Care, Inc., No. CV096006222, 2010 WL 4885347, at *3–*4 (Conn. Super. Ct. Nov. 5, 2010).

[72] *Id.*

[73] *Id.*

[74] *Id.* at *5 (quoting Cotto v. United Techs. Corp., 738 A.2d 623, 632 (Conn. 1999)).

[75] Davis v. La. Computing Corp., 394 So.2d 678, 679 (La. Ct. App. 1981). *But see* Smedley v. Capps, Staples, Ward, Hastings & Dodson, 820 F. Supp. 1227, 1230 n.3 (N.D. Cal. 1993) (taking the opposite approach as to the similarly categorical California statute, though I think with no real support in California caselaw).

**EX. A26**

its exception for restrictions that "relate[] to a bona fide occupational require-
ment," and despite the court's concluding that employee loyalty could be seen as a
bona fide occupational requirement.[76]

On the other hand, the same court held that an employee's letter to a newspaper
complaining about alleged mistreatment of employees and poor customer service
did breach the duty of loyalty, and thus wasn't protected by the Colorado statute.[77]
Yet employee relations and customer service can still be important to the public
(though not quite as important as safety), and complaints of safety are likely to
harm employer interests even more than complaints about worker relations or cus-
tomer service.

Likewise, a New York appellate court read an exception for activity that "cre-
ates a material conflict of interest related to the employer's trade secrets, proprie-
tary information or other proprietary or business interest" as allowing the German
National Tourist Office to fire an employee for becoming known as the translator
of some Holocaust revisionist articles.[78] Presumably the court's view was that the
activity could lead to public hostility to the office, and that this hostility created a
"conflict of interest" between the employee and the employer's "business interest."

### 2.  Specific narrow exceptions

Some statutes have, apparently without visibly bad results, eschewed such
vague exceptions, and focused on more specific categories of speech. New Hamp-
shire law has renounced the state's and local governments' powers to fire employ-
ees based on the *Pickering* balance, though in a statute addressed only to public
employers; instead, it created a special exception just for "confidential and privi-
leged records":

> 98-E:1 Freedom of Expression. . . . [A] public employee . . . shall have a full right
> to publicly discuss and give opinions as an individual on all matters concerning any
> government entity and its policies. It is the intention of this chapter to balance the
> rights of expression of the employee with the need of the employer to protect legiti-
> mate confidential records, communications, and proceedings. . . .

---

[76] Marsh v. Delta Air Lines, Inc., 952 F. Supp. 1458, 1461–62 (D. Colo. 1997).

[77] *Id.*

[78] Berg v. German Nat'l Tourist Office, 248 A.D.2d 297 (N.Y. App. Div. 1998); Paul Schwartz-
man, *It Just Isn't Write[;] German Axed Over Hate Mag Article*, DAILY NEWS (N.Y.), May 11, 1995,
at 6.

98-E:2 Interference Prohibited. No person shall interfere in any way with the right of freedom of speech, full criticism, or disclosure by any public employee.

98-E:3 Confidential Records. Nothing in this chapter shall suspend or affect any law relating to confidential and privileged records or communications. . . .[79]

This has apparently not caused major problems in New Hampshire, or at least sufficient problems to lead the Legislature to repeal the law or add some sort of balancing.[80]

Likewise, the Colorado statute, which covers not just speech but any lawful off-premises off-duty activity, has a special exception for conflicts of interest, which would presumably be read as dealing with financial conflicts (such as moonlighting for a competitor) and not just activities that create bad public relations for the employer.[81] The New York recreational activities statute, which may cover some off-duty speech, and the New York political activities statute, which covers political-campaign-related speech, include similar exceptions.[82] The New York statute also has a specific exception for professional journalists.[83]

One can also imagine other such exceptions: For instance, a statute may provide strong protection for off-the-job speech, but have an exception for speech communicated specifically to a coworker who has asked not to be contacted with such speech,[84] or even for public speech about a coworker who has asked not to be talked about that way. This sort of exception may particularly avoid tension that would reach back into the workplace, without materially interfering with people's ability to communicate with willing listeners, about any topic other than a coworker's perceived faults.

---

[79] N.H. REV. STATS. ANN. §§ 98-E:1 to -E:4 (West, Westlaw through ch. 143 2022 Reg. Sess.). The statute allows prevailing plaintiffs to get injunctions, damages, and reasonable attorney fees.

[80] *Cf.* Appeal of Booker, 139 N.H. 337, 341 (1995) ("We conclude that this section serves to free a State employee's speech rights from the limits imposed by the *Pickering* . . . balancing test.").

[81] COLO. REV. STAT. ANN. § 24-34-402.5(1) (West, Westlaw through July 15, 2022 of the 2d Reg. Sess., 73d Gen. Assemb.).

[82] N.Y. LAB. LAW. § 201-d(3)(a) (McKinney, Westlaw through L.2022).

[83] N.Y. LAB. LAW. § 201-d(2)(a) (McKinney, Westlaw through L.2022).

[84] *See, e.g.,* Eugene Volokh, *One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking,"* 107 NW. U. L. REV. 731 (2013) (discussing why some restrictions on such individually targeted speech may be less burdensome than restrictions on speech to the public at large, or to willing listeners).

**EX. A28**

This having been said, these exceptions couldn't be viewpoint-based, even if they could in some measure be content-based.[85] When the government is providing special benefits for private speech—such as trademark registration[86] or access to government property[87]—it must do so in a viewpoint-neutral way.[88] Likewise, I think, when the government is providing special statutory protections for private speakers, it likewise may not discriminate based on viewpoint. The law can't protect all speech except, say, racist speech or Socialist speech or unpatriotic speech.

CONCLUSION

As I hope I've made clear, private employee speech restrictions might be a cure that's worse than the disease. They might unduly interfere with employers' associational rights (though not generally in an unconstitutional way). They might unfairly require employers to keep paying employees who are more trouble than they are worth. They might make it harder for employers to dismiss employees even for eminently legitimate reasons unrelated to the employee speech. And of course, they might increase the amount of offensive and harmful speech by making it less expensive for the speakers (though the same can be said of free speech rights generally).

At the same time, private employer speech restrictions genuinely do threaten to undermine democratic self-government, the marketplace of ideas, self-expression, and the development of autonomous citizens, much like many governmental speech restrictions do. To take just one example, consider abortion, which the Supreme Court has now returned to the political process. It's much harder to have meaningful democratic debate about this subject if people know that they can be fired for signing an initiative or referendum petition, or contributing their money to a ballot measure campaign, or publicly endorsing a candidate—or for that matter just for expressing their views on the moral or practical impact of one or another position. And to the extent that religious association or expression on this subject

---

[85] To briefly summarize,

[86] Matal v. Tam, 137 S. Ct. 1744 (2017).

[87] Rosenberger v. Rector, 515 U.S. 819 (1995).

[88] I discuss this limitation on these sorts of protections against private speech restrictions at Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. FREE SPEECH L. 377, 445–48 (2021).

**EX. A29**

is protected by Title VII and state religious discrimination bans, nonreligious expression ought to be as well.

This threat to public discussion and to self-expression also seems likely to be increasing, as people find it easier than ever before to demand, in an organized way, the firing of other people whose speech they condemn. And the existence of such laws may actually take some of this public pressure off employers, by giving employers an answer to such demands: "We don't like the employee's speech, either, but we can't fire him, because the law has tied our hands." I'm not sure what the right answer is to these questions; but I hope what I've said above can help us think through them.

**EX. A30**