DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
MOLLY M. LENS (S.B. #283867)
mlens@omm.com
KRISTIN MACDONNELL (S.B. #307124)
kmacdonnell@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:  +1 310 553 6700
Facsimile:    +1 310 246 6779

JONATHAN D. HACKER (*pro hac vice*)
jhacker@omm.com
JOSHUA REVESZ (*pro hac vice*)
jrevesz@omm.com
O'MELVENY & MYERS  LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:  +1 202 383 5300
Facsimile:    +1 202 383 5414

*Attorneys for Defendants*
*The Walt Disney Company, Lucasfilm Ltd.*
*LLC, and Huckleberry Industries (US) Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA CARANO,<br><br>Plaintiff,<br><br>v.<br><br>THE WALT DISNEY COMPANY, LUCASFILM LTD. LLC, and HUCKLEBERRY INDUSTRIES (US) INC.,<br><br>Defendants. | Case No. 2:24-cv-01009-SPG-SK<br><br>**DEFENDANTS THE WALT DISNEY COMPANY, LUCASFILM LTD. LLC, AND HUCKLEBERRY INDUSTRIES (US) INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date:    June 12, 2024<br>Time:   1:30 p.m.<br>Judge:  Hon. Sherilyn Peace Garnett<br>Courtroom:  5C |

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

THE FIRST AMENDMENT PROTECTS DISNEY'S RIGHT TO
DISASSOCIATE ITS CREATIVE SPEECH WITH CARANO AND HER
PUBLICLY EXPRESSED VIEWS ............................................................... 2

A. The First Amendment Protects Artistic Choices, Including Choices
About Which Messengers To Express The Art ...................................... 3

    1. Carano Fails To Distinguish The Speaker's-Autonomy Cases ... 5

    2. Carano's Cases Do Not Aid Her Arguments ............................. 6

    3. The First Amendment Applies To All Artistic Decisions, Not
    Just Those Based On "Appearance" ............................................. 7

    4. The Speaker's-Autonomy Principle Does Not Give Carte
    Blanche To Expressive Entities ................................................. 10

B. The Complaint Establishes That Carano's Speech Impaired Disney's
Artistic Message ................................................................................... 11

    1. Carano Alleges Her Speech Conflicts With Disney's Values ... 11

    2. Disney Need Not Prove Empirically That Carano's Comments
    Impaired Its Art .......................................................................... 13

C. The First Amendment Is A Complete Defense To Liability ............... 15

CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ...................................................................... 7

*Ali v. L.A. Focus Publication*,
  112 Cal. App. 4th 1477 (2003) ..................................................... 7

*Associated Press v. NLRB*,
  301 U.S. 103 (1937) .................................................................. 6, 7

*Baghikian v. Providence Health & Servs.*,
  __ F. Supp. __, 2024 WL 487769 (C.D. Cal. Feb. 6, 2024) ............... 12

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) ............................................................. *passim*

*Democratic Party of United States v. Wisconsin ex rel. La Follette*,
  450 U.S. 107 (1981) .................................................................. 14

*Fernandez v. Wynn Oil Co.*,
  653 F.2d 1273 (9th Cir. 1981) ..................................................... 7

*Green v. Miss United States of America, LLC*,
  52 F.4th 773 (9th Cir. 2022) ................................................. *passim*

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984) ...................................................................... 7

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ............................................................. *passim*

*McDermott v. Ampersand Publishing, LLC.*,
  593 F.3d 950 (9th Cir. 2010) ............................................. 4, 6, 7, 13

*Moore v. Hadestown Broadway Limited Liability Co.*,
  __ F. Supp. 3d __, 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024) ....... 12, 13

*Our Lady of Guadalupe School v. Morrisey-Beru*,
  140 S. Ct. 2049 (2020) .............................................................. 10

*Passaic Daily News v. NLRB*,
  736 F.2d 1543 (D.C. Cir. 1984) ................................................... 7

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Redgrave v. Boston Symphony Orchestra*,
    855 F.2d 888 (1st Cir. 1988) .................................................................. 9

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ............................................................................... 7

*Rowell v. Sony Pictures Television, Inc.*,
    2016 WL 10644537 (C.D. Cal. June 24, 2016) ..................................... 13

**Other Authorities**

Eugene Volokh, *Reasons Not to Limit Private-Employer-Imposed
    Speech Restrictions: The Employer's Own Free Speech Rights?*,
    Volokh Conspiracy (Aug. 5, 2022),
    https://reason.com/volokh/2022/08/05/reasons-not-to-limit-private-
    employer-imposed-speech-restrictions-the-employers-own-free-
    speech-rights ............................................................................... 8, 9, 10

**INTRODUCTION**

As shown by her complaint and confirmed by her opposition to the motion to dismiss, plaintiff Gina Carano seriously misunderstands the scope of the First Amendment and the protections it affords to speech by private persons and entities. As her own complaint alleges, Carano made multiple public comments that Disney did not want associated with its speech because it considered them contrary to its values. The First Amendment certainly protects her right to make statements free from *state* regulation. But the First Amendment just as certainly protects *Disney's* right to control its own speech free from state regulation. This case implicates only the latter principle. The sole government restriction at issue is the liability Carano seeks to impose on Disney because it did not want to associate its own artistic expression with Carano and her offensive comments.

The First Amendment prohibits the imposition of such liability. Multiple Supreme Court and Ninth Circuit precedents have held that under the core First Amendment principle of "speaker's autonomy," an expressive entity has the right to control its own message, which includes the right to exclude outside speakers who, *in the entity's view*, would impair its message. That principle protects Disney's right to create the art it chooses, including the right to avoid speaking through actors whose on-screen presence Disney believes undermine its artistic values.

Carano's opposition fails to explain how liability can be imposed on Disney in these circumstances without directly overriding Disney's First Amendment right to control how its art is created, presented, and disseminated. She instead concocts an unsupported and crabbed version of the First Amendment—one that would allow states to compel news outlets and other expressive entities to speak through employees whose publicly-stated viewpoints contradict their employers' messages, so long as their comments are made off the job. Conservative newspapers thus could be forced to hire outspoken liberal writers. Feminist book publishers could be forced to hire loudly misogynistic editors. And film and theater producers could

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

be forced to hire proudly racist or anti-Semitic or anti-Muslim or anti-Christian actors and directors.  Under Carano's view, the First Amendment would protect only the right to employ actors based on their *physical appearance*—if an actor publicly slanders an entire race or religion off screen, the production company would have no constitutional right to protect its art from association with the actor's off-screen statements.  That position finds no support in the controlling authorities, which is why Carano is forced to misconstrue those authorities and rely on other precedents with no bearing on the First Amendment issues implicated here.

Carano also misconstrues the allegations in her own complaint.  Her opposition gives the impression that Disney invented, for litigation purposes, the conflict between Carano's public comments and Disney's artistic values.  But Carano's complaint relies on that very conflict, charging that Disney cut ties with her because her statements did not "align" with Disney's "values of respect, values of decency, values of integrity, and values of inclusion" and because Disney saw her speech as "abhorrent and unacceptable."  Carano says her statements were inoffensive and did not impair Disney's art.  But for purposes of this lawsuit, that judgment is not hers to make.  As the Supreme Court has explicitly held, litigants and courts must defer to an expressive entity's own view of what associations may impair its speech.  Carano's suit should be dismissed.

## ARGUMENT

### THE FIRST AMENDMENT PROTECTS DISNEY'S RIGHT TO DISASSOCIATE ITS CREATIVE SPEECH WITH CARANO AND HER PUBLICLY EXPRESSED VIEWS

As Disney's motion explained, the First Amendment protects the right of an expressive entity to control its own speech, including by excluding from its speech other speakers who, in the entity's view, would impair its ability to convey its message.  That "core principle of speaker's autonomy," *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557, 575 (1995), applies with full force here, where, as alleged in the complaint, Carano advanced messages

contrary to Disney's values.  The First Amendment does not permit the state to sanction a private speaker for choosing to keep its speech separate from messages it deems objectionable.  And it requires litigants and courts to defer to an expressive entity's own views about whether its speech would be impaired by association with another speaker.  The right to control one's own speech means just that—no individual or entity can second-guess a speaker's judgment about how its message should be conveyed.

Carano's opposition provides no meaningful response to these bedrock principles.  She instead distorts the case law and ignores critical allegations in her complaint.[1]  The Court should reject her efforts to rewrite the law and allegations that govern Disney's motion.

### A.     The First Amendment Protects Artistic Choices, Including Choices About Which Messengers To Express The Art

According to the U.S. Supreme Court, the principle that "a speaker has the autonomy to choose the content of his own message" is "the fundamental rule of protection under the First Amendment."  *Hurley*, 515 U.S. at 573.  Carano's attempt to hand-wave away that foundational principle as mere Disney rhetorical flourish, Opp. 5 (asserting that defendants seek dismissal "under a concept they dub 'speaker's autonomy'"), belies her inability to reconcile it with her effort to impose government control over Disney's artistic messages.

As the Supreme Court has explained, the First Amendment protects the right of an entity engaged in expression to exclude a speaker whose "presence" would "interfere with the . . . choice not to propound a point of view contrary to its

---

[1] She also mischaracterizes Disney's filing, asserting that Disney "admit[s] that [it] discriminated against Carano . . . and subjected her to disparate treatment." Opp. 1.  In fact, Disney made clear that it accepts Carano's allegations as true solely for purposes of the motion to dismiss. Mot. 7 n.2.

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

beliefs." *Boy Scouts of America v. Dale*, 530 U.S. 640, 653-54 (2000).  Under that rule, the Supreme Court and Ninth Circuit have held that:

- a parade organizer may exclude a marching group with whose message the group did not wish to associate, *Hurley*, 515 U.S. at 574;

- a scouting organization could exclude a scoutmaster whose expressed off-the-job viewpoints ran contrary to the organization's then-held values, *Dale*, 530 U.S. at 650;

- a newspaper could exclude writers whose presence "affects the expressive content of its newspaper," *McDermott v. Ampersand Publishing, LLC.*, 593 F.3d 950, 962 (9th Cir. 2010); and

- a pageant organizer could exclude transgender participants where the organizer's "expressive message was inescapably interwoven with its casting decisions," *Green v. Miss United States of America, LLC*, 52 F.4th 773, 782 (9th Cir. 2022).

Consistent with her dismissive attitude toward the idea of protecting the right to control one's own speech, Carano's opposition misconstrues the precedents enforcing that right and relies on cases that do *not* involve state control over private speech.  Opp. 5-8.  She likewise leans heavily on an untenable distinction between impermissible state interference with casting choices based on "appearance" and supposedly permissible state interference with casting choices made for other reasons.  *Id.* at 8-9.  And she conjures a parade of horribles that rests on a false premise about the breadth of the First Amendment rule invoked by Disney.  *Id.* at 6-8, 16-17.  Dismissing her action would not immunize non-expressive entities from employment liability, nor would it protect all the employment actions of expressive entities.  But *failing* to dismiss her action *would* authorize state intervention into artistic and press hiring decisions essential to the production of art, news, and other expressive content.  The First Amendment unambiguously forbids the kind of state regulation of private speech Carano advocates.

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

1                 **1.**     *Carano Fails To Distinguish The Speaker's-Autonomy Cases*

2       Carano first argues that the speaker's-autonomy principle is categorically

3  inapplicable to an expressive entity's efforts to dissociate its speech from an

4  employee's off-the-job speech.  That argument is foreclosed by precedent.

5  Carano's opposition begins by correctly summarizing the principle recognized in

6  *Hurley*:  "[I]t was the attempted *insertion* of the plaintiff's message into the

7  defendant's parade that was objectionable."  Opp. 5.  According to Carano, that

8  principle does not apply here because unlike the *Hurley* marching group, Carano

9  spoke on her own time and thus did not "seek[] to modify [Disney's] speech."  *Id*.

10  That distinction was flatly rejected in *Dale*, which held that it was irrelevant

11  whether Dale would "disseminat[e] views on sexual issues" while on the job.  530

12  U.S. at 655.  The Supreme Court instead held that the Boy Scouts had the right to

13  avoid the "presence of" an individual who was "on record as disagreeing with Boy

14  Scouts policy" while speaking in his personal capacity.  *Id.* at 656; *see id.* at 645

15  (recounting Dale's "interview[s]" with media).

16       Precedent also refutes Carano's contention that speakers may receive First

17  Amendment protection only if they "identify what message of theirs" is undermined

18  by association with other speech.  Opp. 12.  *Hurley* could not be clearer in this

19  respect.  Because the First Amendment safeguards the right "not to propound a

20  particular point of view," 515 U.S. at 575, a speaker may choose to exclude "a

21  message it did not like from the communication it chose to make," *even if* the

22  speaker itself did "not produce a particularized message," *id.* at 574.  *Dale*

23  reinforced this holding, noting that speakers need not have "the 'purpose' of

24  disseminating a certain message in order to be entitled to the protections of the First

25  Amendment."  530 U.S. at 655.  And *Green* confirms the rule, emphasizing that the

26  *Hurley* Court "did not insist on knowing the exact reason why the parade organizers

27  wished to exclude the parade float."  52 F.4th at 786.

28

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

1   Finally, precedent forecloses Carano's contention that Disney cannot invoke

2 First Amendment protection because, in her view, Disney did not apply its values

3 consistently to all statements by all actors.  Opp. 20-21.  Even as alleged by Carano,

4 the statements by other talent differ significantly.  But more fundamentally, *Dale*

5 expressly holds that it is "not the role of the courts to reject a group's expressed

6 values because they . . . find them internally inconsistent."  530 U.S. at 651.  It is

7 thus irrelevant that Carano believes her statements are not so different than other

8 actors'.  Disney was entitled to decide for itself whether and how statements by

9 other actors affected Disney's message, as well as how best to address the

10 articulation of Disney's message through its art.

11    2. *Carano's Cases Do Not Aid Her Arguments*

12   Carano separately argues that this case is governed not by *Hurley* and *Dale*,

13 but by *Associated Press v. NLRB*, 301 U.S. 103 (1937).  Opp. 6-8.  Carano is

14 incorrect.  As the Ninth Circuit has recognized, *Associated Press* does not apply to

15 government acts that would impair a speaker's autonomy.

16   The question in *Associated Press* was whether the news organization was

17 categorically exempt from labor laws.  The answer was no:  "The publisher of a

18 newspaper has no special immunity from the application of general laws."  301

19 U.S. at 132.  In reaching that holding, the Supreme Court acknowledged that in

20 some circumstances applying labor laws to publishers *could* "circumscribe[] the full

21 freedom and liberty of the petitioner to publish the news as it desires," such that the

22 Constitution might well displace a given *application* of the statute.  *Id.* at 133.  The

23 particular order at issue there, however, did not raise such concerns.  *Id.*

24   As the Ninth Circuit later explained in *McDermott*, *Associated Press*

25 "signaled that application of regulations that restricted . . . press liberties could be

26 constitutionally problematic."  593 F.3d at 959.  Such regulations would violate the

27 First Amendment, *McDermott* holds, if they "affect[] the expressive content of the

28 newspaper"—for example, if they require the hiring of "newsroom staff" whose

presence was "bound to affect what gets published." *Id.* at 962 (citing *Hurley*, 515 U.S. at 572-73). Carano has nothing to say about this language in *McDermott*—she barely even acknowledges the case, Opp. 7 n.2—but it confirms that generally applicable employment statutes yield to the First Amendment when applied to hiring decisions that affect an expressive entity's effort to convey its message "as it desires." *Associated Press*, 301 U.S. at 133. *Associated Press* itself makes the point clear enough, and *Hurley*, *Dale*, and their progeny drive it home.

Carano's remaining cases are even less helpful to her. The D.C. Circuit's opinion in *Passaic Daily News v. NLRB*, 736 F.2d 1543 (D.C. Cir. 1984), actually supports Disney. Opp. 7. The court there held that the First Amendment prohibited the reinstatement of a newspaper columnist—a remedy identical to what Carano seeks here, *see* Compl. at 57—because "the remedy mandating resumption of [the] column must yield to the Company's First Amendment interest in retaining control over prospective editorial decisions." 736 F.2d at 1559. And the cases Carano cites addressing non-speech association rights are irrelevant. Opp. 7 (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); and *Hishon v. King & Spalding*, 467 U.S. 69 (1984)). As the Supreme Court recently held in response to an invocation of those precise cases, "different considerations come into play" when it comes to entities that "speak[] . . . on matters of significance." *303 Creative LLC v. Elenis*, 600 U.S. 570, 600 n.6 (2023).[2]

        3.    <u>The First Amendment Applies To All Artistic Decisions, Not Just Those Based On "Appearance"</u>

Carano further undermines her case by conceding that "television and theater

---

    [2] Carano cites two other irrelevant cases. Opp. 16. *Ali v. L.A. Focus Publication*, 112 Cal. App. 4th 1477 (2003), does not address an employer's First Amendment *defense* to an employment action—it analyzes the distinct situation where a writer charged that his firing *violated* the First Amendment. *Id.* at 1488. And *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273 (9th Cir. 1981), is a statutory case that does not discuss any constitutional defense.

     DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

producers have the right to select actors based on race, color, or other aspects of *appearance*," while denying that creative producers may make casting decisions based on the actor's stated viewpoint.  Opp. 8-9.

Nothing in the law supports that distinction.  The First Amendment question is whether the individual's participation in the expressive conduct would impair the "right [of] a private speaker to shape its expression."  *Hurley*, 515 U.S. at 574.  Sometimes that impairment arises from an actor's appearance.  As noted in *Green*, the Broadway show *Hamilton* had a message that was "inescapably interwoven with its casting decisions" based on actors' races.  52 F.4th at 782.  But other times—as in *Dale* and *McDermott*—appearance has nothing to do with it.  The employees in those cases were not fired because of the way they *looked*.  They were fired because their expressive-entity employers thought their off-the-job statements would impair the entities' own messages.  *See supra* at 5-7.

Carano's myopic focus on appearance fundamentally misunderstands how art is understood and received.  According to Carano, an actor's appearance is the only factor that matters because "a visual medium relies on the physical appearance of actors."  Opp. 8.  But Carano's own counsel has elsewhere correctly observed—in a passage Carano neither acknowledges nor rebuts—the "messenger *is* part of the message," and when actors publicly assert a controversial position, "requiring an artistic organization to hire as its speakers people who are associated with such a position will undermine its ability to send the particular aesthetic or artistic message that it wants to send."  Eugene Volokh, *Reasons Not to Limit Private-Employer-Imposed Speech Restrictions: The Employer's Own Free Speech Rights?*, Volokh Conspiracy (Aug. 5, 2022), https://reason.com/volokh/2022/08/05/reasons-not-to-limit-private-employer-imposed-speech-restrictions-the-employers-own-free-speech-rights (emphasis added).[3]

---

[3] As Carano notes, her counsel has acknowledged that the matter "isn't open and shut."  *Id.*  But she omits to mention counsel's further statement that the

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

1    That statement is no isolated professorial musing.  As the Ninth Circuit

2 explained in *Green*, the "interdependent dynamic between medium and message is

3 well-established and well-protected in our caselaw." 52 F.4th at 780.  In other

4 words, there is often "no daylight between speech and speaker." *Id.* at 781.

5 Decisions about whom to speak through thus are constitutionally protected, the

6 court held, even when they go beyond appearance—even when, for example, a

7 beauty pageant "limit[s] contestants to only those who can affirm certain Christian

8 doctrines." *Id.* at 782.  The First Circuit's analysis in *Redgrave v. Boston*

9 *Symphony Orchestra*, 855 F.2d 888 (1st Cir. 1988) (en banc), similarly recognizes

10 the inherent correspondence between message and messenger, observing that an

11 artistic work could be "compromised or ineffective" if forced into association with

12 an actor who espoused controversial views. *Id.* at 905

13    A few examples drive this point home.  Consider a romance starring an actor

14 who made vitriolic comments about women.  Or a feel-good comedy featuring an

15 actor who made abhorrent racist remarks.  Or, as here, a science-fiction program

16 that included an actor who likened her social-media interactions to the annihilation

17 of Jews during the Holocaust.  In all of those cases, the artistic creator must be free

18 to decide for itself whether the actor's presence impairs the art, including because

19 viewers will be unlikely to suppress thoughts about the off-screen controversy and

20 appreciate the art on its own terms.  The First Amendment does not require artistic

21 creators to accept such "compromis[ing]" of their works. *Redgrave*, 855 F.2d at

22 905.  Nor does it permit litigants and courts to second-guess the creator's own

23 determination that its artistic message will be impaired by unwanted association

24 with someone else's speech:  "As we give deference to an association's assertions

25 regarding the nature of its expression, we must also give deference to an

26 association's view of what would impair its expression." *Dale*, 530 U.S. at 655.

27

28 argument that "the employer must be able to distance itself from the employee"
holds "particularly true for employees such as . . . actors." *Id.*

1

> 4.    *The Speaker's-Autonomy Principle Does Not Give Carte Blanche To Expressive Entities*

2

3      Carano's hyperbole notwithstanding, the speaker's-autonomy principle does

4   not confer "blanket immunity" on expressive entities.  Opp. 6; *see id.* at 8, 16-17.

5      To the contrary, as Disney has explained, the "First Amendment protection at

6   issue here, while fundamental, is circumscribed in scope."  Mot. 3.  Enterprises that

7   do not engage in expression are not protected under *Hurley* and *Dale*.  And because

8   the overwhelming majority of Disney's employees do not create speech products,

9   their employment would not normally affect the company's art and thus would not

10  generally be subject to *Hurley* and *Dale*.

11     And even as to the small subset of employees for whom "the messenger is

12  part of the message," Volokh, *supra*, artistic enterprises do not have a constitutional

13  "carte blanche" over all employment decisions, Opp. 17.  By definition, the right to

14  control one's own speech under the First Amendment applies only to decisions

15  made to control one's own speech, such as avoiding associations that could

16  "impart[] a message" the speaker "do[es] not wish to convey."  *Hurley*, 515 U.S. at

17  559.  Under this principle, a decision made for reasons unrelated to the enterprise's

18  expressive conduct would not implicate the principle of speaker's autonomy.  Thus,

19  it would not be permissible to employ (or not employ) only "Jewish, Muslim, or

20  Catholic writers based on their religious beliefs," Opp. 8—*unless*, for example, the

21  employer sought to create religion-specific art and determined that members of a

22  particular faith were best suited to create that art effectively.  *Cf. Our Lady of

23  Guadalupe School v. Morrisey-Beru*, 140 S. Ct. 2049, 2055 (2020) (holding that

24  First Amendment bars discrimination claims brought against Catholic school).

25     Carano's position, by contrast, *is* startling in its breadth.  Ignoring

26  *McDermott*, Carano insists that a newspaper *can* be "forced to hire editors who

27  expressed viewpoints on union-related topics with which the newspaper disagreed."

28  Opp. 7 n.2.  And ignoring *Dale* and *Green*, she declares that a state can "force an

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

employer engaged in expressive activity to express its message" though employees "who, in the employer's view, would impair the employer's ability to convey its own preferred message." Opp. 14 n.5 (quoting Mot. 8-9). Thus, Carano's view is that a conservative media outlet could be forced—under the statutes she invokes—to hire an outspoken liberal as an on-air presenter. So too, on her account, the government could require a feminist theater company to cast a proud misogynist; a Christian television network to cast a vocal atheist; or an LGBT studio to cast an avowed homophobe. The Supreme Court and Ninth Circuit's cases show that Carano's view is not the law. *See supra* at 4-5.

## B.   The Complaint Establishes That Carano's Speech Impaired Disney's Artistic Message

As a fallback to her erroneous legal positions, Carano argues that the allegations in her complaint do not establish that her incendiary speech impaired Disney's art. But Carano herself alleges that Disney fired her because her comments were contrary to Disney's values. Nothing more is needed. The matter is therefore appropriate for resolution at the motion-to-dismiss stage.

### 1.   *Carano Alleges Her Speech Conflicts With Disney's Values*

Puzzlingly, Carano begins her brief by denying what is in her complaint. "Defendants represent," she observes, that "Carano's personal views conflict with 'Disney values'" and that her "comments would detract from [Disney's] ability to convey its own chosen message." Opp. 2-3 (internal quotation marks omitted). According to Carano, "there are no allegations in the Complaint to support" those representations. *Id.* at 3.

Yes, there are. Paragraph 34 states:

Disney's then-CEO Bob Chapek has been quoted as saying Carano was fired "because she didn't align with Company values." In doing so, Chapek said those company values are "values that are universal: values of respect, values of decency, values of integrity, and values of inclusion."

And Paragraph 31 quotes a Lucasfilm spokesperson as saying that Carano's "social media posts denigrating people based on their cultural and religious identities are abhorrent and unacceptable" to Disney.

Those allegations concede the key factual premise of Disney's First Amendment defense. Just as the *Dale* Court recognized that the Boy Scouts had a right to disassociate from an individual whose "conduct [was] inconsistent with the values it seeks to instill," 530 U.S. at 644, so too does Disney have a right to disassociate from someone whose public comments do not "align" with the "values" Disney stands for, Compl. ¶ 34. By including that allegation in her complaint (presumably in order to further her statutory claims), Carano has "admit[ted] all the ingredients of an impenetrable defense" under the First Amendment. Opp. 2 (quoting *Baghikian v. Providence Health & Servs.*, __ F. Supp. __, 2024 WL 487769, at *2 (C.D. Cal. Feb. 6, 2024)).

In this respect, this case is similar to the recent decision in *Moore v. Hadestown Broadway Limited Liability Co.*, __ F. Supp. 3d __, 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024). In *Hadestown*, an actor claimed that she was removed from her on-stage position because of her race. *Id.* at *8. But there, as here, her complaint contained allegations showing that the artistic enterprise made that decision to further its "creative decision[s]." *Id.* at *20. So the district court granted the enterprise's motion to dismiss the discrimination claims, finding that "Defendant's right to exercise such creative and artistic expression . . . is also apparent on the face of the [operative] Complaint." *Id.* at *16. The same result is warranted in this action.

Carano seeks to downplay *Moore*'s lead First Amendment holding, focusing instead on the court's ruling on the actor's retaliation claim. Opp. 9-11. But as the court there explained, the operative complaint did not allege facts indicating that the employer committed the retaliatory act—punishing the actor simply for lodging a complaint with human resources—to protect its own creative expression. 2024 WL

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

989843 at *20-21.[4]  Here, by contrast, Carano's own complaint makes clear that Disney sought to dissociate its art from public, high-profile, controversial speech that Disney deemed contrary to its expressed values.

2.    *Disney Need Not Prove Empirically That Carano's Comments Impaired Its Art*

Carano separately argues that Disney cannot prevail on its First Amendment defense without providing "actual evidence to prove that Carano's speech 'would significantly burden' [Disney's] speech."  Opp. 18 (quoting *Dale*, 530 U.S. at 653); *see* Opp. 6.  No such "evidence" is required.

The starting point is *Dale*.  The scouting association there sought to cut ties with an assistant scoutmaster because of the message it believed associating with Dale would send.  530 U.S. at 645.  As already noted, the Court held that it was required to give "deference to [the] association's view of what would impair its expression."  *Id.* at 653.  Thus—despite the lead dissent's protestation that more evidence should be required, *id.* at 684-85 (Stevens, J., dissenting)—the Court did *not* demand that the employer prove to a jury the real-world effects of maintaining ties with Dale.  The Court instead simply held that "Dale's presence . . . would, at the very least, force the organization to send a message."  *Id.* at 653.

The Ninth Circuit's subsequent decisions in *McDermott* and *Green* confirm that the First Amendment inquiry requires deference, not empirical scrutiny.  In *McDermott*, the court based its First Amendment holding on the "risk" that reinstating the editorial writers would "affect[] the expressive content of [the] newspaper."  593 F.3d at 962-63.  And in *Green*, the court did not demand evidence that "the inclusion of only a single participant" would "significantly affect the

---

[4] *Rowell v. Sony Pictures Television, Inc.*, 2016 WL 10644537 (C.D. Cal. June 24, 2016), is the same.  The court there rejected a First Amendment defense at the pleading stage because—unlike here—the plaintiff did "not allege that the decision not to hire her was related to Defendants' creative vision for their programs."  *Id.* at *10.

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

speaker's message."  52 F.4th at 786.  Rather, the court held that the "final say over the content of its message ultimately lies with the Pageant," not with the reviewing courts.  *Id.*  As a concurring opinion observed, the First Amendment "framework— by design and in practice—is highly protective of and deferential to associations" engaged in expression.  *Id.* at 803 (VanDyke, J., concurring).

To hold otherwise would erode the First Amendment's protections.  The Constitution protects the right of artistic enterprises to produce the art they wish to produce, free from governmental scrutiny.  "[A] state, or a court, may not constitutionally substitute its own judgment" about what art should be created.  *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 123-24 (1981).  Allowing a court or a jury to decide whether and to what extent Carano's speech affects Disney's art, Opp. 19 n.6, would contravene that fundamental rule.

Carano's opposition illustrates the problem.  Carano says her Holocaust post was inoffensive.  Opp. 3.  She claims she did not mock transgender people.  *Id.* at 3-4.  She insists other actors aired views worse than hers.  *Id.* at 19-21.  And she declares that her presence on *The Mandalorian*—at least prior to her Nazi-comparison post (and the antisemitic post she pointedly omits from her complaint, *see* Mot. 4 n.1)—made the show better.  *Id.* at 19.  Under the First Amendment, Carano has a right to express those views free from *government* sanction.  But Disney—a private entity—has the right to disagree with Carano, as well as the right to decide that her presence would impair its artistic message.  *See supra* at 4-5.

Whether Carano's presence on the show benefits or harms Disney's artistic values is not a question susceptible to empirical analysis.  Nor can it be measured simply by "fan reaction."  Opp. 19.  Controversial figures *often* garner outsized attention—indeed, getting attention is frequently the point of eliciting controversy.  But other speakers are not required to associate themselves with the controversy, despite its seeming (often fleeting) public appeal.  Rather, each speaker "has the

1   autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 573.

2   The empirical inquiry Carano demands would override that autonomy.

3         **C.**    **The First Amendment Is A Complete Defense To Liability**

4         If the First Amendment protects Disney's choice to dissociate its art from

5   Carano, all three of her statutory claims should be dismissed.  Carano does not

6   argue that any of these laws, if applied to impair Disney's right of speaker's

7   autonomy, would withstand First Amendment scrutiny.  *See Dale*, 530 U.S. at 658.

8   And she admits that—at least as to appearance-based decisions—the First

9   Amendment displaces the application of antidiscrimination laws.  Opp. 8-9.

10        Instead, Carano argues that her discrimination claim should survive because

11  her comments are "similarly situated" to those of male actors whom Disney treated

12  differently.  Opp. 20.  But even leaving aside the fact that the comments plainly

13  differed, her discrimination claim on its face fails because she admits that whereas

14  the male actors' comments were "apparently consistent with whatever message

15  Defendants wish to communicate," hers were not.  *Id.* at 3 n.1.  As shown above,

16  the First Amendment protects Disney's right to associate itself and its art with some

17  comments and not others, regardless of whether Carano or a jury might view

18  Disney's choices as irrational or internally inconsistent.  *See supra* at 6.  Disney

19  cannot be held liable for disassociating itself and its speech from Carano's

20  comments, even if—contrary to fact—it treated similar speech by others differently.

21  *See* Mot. 17-18.

22                          **CONCLUSION**

23        For the foregoing reasons, the complaint should be dismissed.

24

25

26

27

28

Dated: May 23, 2024

**O'MELVENY & MYERS LLP**


By:  */s/ Daniel M. Petrocelli*
_____
Daniel M. Petrocelli

Daniel M. Petrocelli
dpetrocelli@omm.com
Molly M. Lens
mlens@omm.com
Kristin MacDonnell
kmacdonnell@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:   +1 310 553 6700
Facsimile:   +1 310 246 6779

Jonathan D. Hacker (*pro hac vice*)
jhacker@omm.com
Joshua Revesz (*pro hac vice*)
jrevesz@omm.com
1625 Eye Street NW
Washington, DC 20006
Telephone:   +1 202 383 5300
Facsimile:   +1 202 383 5414

*Attorneys for Defendants The Walt Disney Company, Lucasfilm Ltd. LLC, and Huckleberry Industries (US) Inc.*

DEFENDANTS' REPLY ISO MOTION TO DISMISS
2:24-CV-01009-SPG-SK

1

**CERTIFICATE OF COMPLIANCE**

2

The undersigned, counsel of record for Defendants The Walt Disney

3

Company, Lucasfilm Ltd. LLC, and Huckleberry Industries (US) Inc., certifies that

4

this brief contains 4821 words, which complies with the word limit of Local Rule

5

11-6.1, and does not exceed fifteen pages, which complies with the page limit set

6

out in Section G.4 of the Court's standing order.

7

8

Dated: May 23, 2024                    **O'MELVENY & MYERS LLP**

9

10                                                      By:  */s/ Daniel M. Petrocelli*

11                                                      Daniel M. Petrocelli
                                                         dpetrocelli@omm.com

12

13                                                      *Attorney for Defendants The Walt Disney
                                                         Company, Lucasfilm Ltd. LLC, and*

14                                                      *Huckleberry Industries (US) Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' REPLY ISO MOTION TO DISMISS
                                                         2:24-CV-01009-SPG-SK