1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17

| | |
|---|---|
| GINA CARANO,<br><br>                Plaintiff,<br><br>      v.<br><br>THE WALT DISNEY COMPANY,<br>LUCASFILM LTD. LLC, and<br>HUCKLEBERRY INDUSTRIES (US)<br>INC.,<br><br>                Defendants. | Case No. 2:24-cv-01009-SPG-SK<br><br>**ORDER DENYING DEFENDANT'S<br>MOTION TO DISMISS [ECF NO. 33]** |

18
19
20
21
22
23
24

Before the Court is Defendants The Walt Disney Company ("Disney"), Lucasfilm Ltd. LLC ("Lucasfilm"), and Huckleberry Industries (US) Inc.'s ("Huckleberry," and, together with Disney and Lucasfilm, "Defendants") Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim. (ECF No. 33 ("Motion")). Having considered the parties' submissions, oral arguments, the relevant law, and the record in this case, the Court DENIES the Motion.

25

## I.     BACKGROUND

26

### A.     Factual Background

27
28

This case arises from Plaintiff Gina Carano's ("Plaintiff") termination from the Disney+ show *The Mandalorian* due to posts she made on various social media platforms,

-1-

including X, formerly known as Twitter, and Instagram.  (ECF No. 1 ("Complaint") ¶ 5, 21, 41–44).  Defendants chose Plaintiff to play the character Cara Dune in the *Star Wars* series, and her employment became effective on September 18, 2018.  (*Id.* ¶ 21).  On February 10, 2021, however, Defendants abruptly terminated Plaintiff's employment after she reposted content created by another social media user.  (*Id.* ¶ 103).  *See also* (Mot. at 10).  This lawsuit followed.

After hiring Plaintiff, Defendants prominently featured her in promotional materials for the show.  (*Id.* ¶ 22).  Plaintiff's contract for the first season designated her as a Guest Actor entitled to a minimum salary of $25,000 per episode in which she appeared.  (*Id.* ¶ 23).  Given the popularity of the Cara Dune character, Plaintiff's agent sought an increase in her pay for the second season, but Defendants refused, offering her a one-time bonus of $5,000 and the same $25,000 per episode minimum salary.  (*Id.* ¶¶ 23–24).

During the summer of 2020, Plaintiff began receiving frequent messages on social media "to support various causes, adopt various ideologies, and hold herself out in certain ways."  (*Id.* ¶ 45).  In particular, social media users urged Plaintiff to publicly support the Black Lives Matter movement, including by endorsing certain slogans associated with that movement, and to indicate her preferred pronouns in her social media profiles.  (*Id.* ¶¶ 47, 59).  When Plaintiff did not do so, members of the public accused her of being racist and levied various epithets at her, including one social media user who called her a "transphobic bitch."  (*Id.* ¶ 46).  Although one of Plaintiff's castmates supported her on social media, Defendants did not intervene on her behalf.  (*Id.* ¶ 54).

On September 5, 2020, Plaintiff criticized certain COVID-19 policies requiring businesses and churches to remain closed while allowing public protests.  (*Id.* ¶ 57).  Plaintiff alleges that she was attacked for these views and that Defendants made known their disapproval of Plaintiff's position.  (*Id.* ¶¶ 57–58).  One week later, on September 12, 2020, frustrated by social media users' continual comments and critiques regarding her choice not to include her preferred pronouns in her Twitter account biography, Plaintiff put the words "boop/bop/beep" in her profile, referencing "sounds a droid would make."  (*Id.*

¶ 65). Plaintiff deleted this material "a short time" after originally posting it and shared that she had spoken with her castmate Pedro Pascal ("Pascal") about why other individuals listed their pronouns in their biographies. (*Id.* ¶¶ 65–66).

At some point in time, Defendants began "demanding an explanation" from Plaintiff and criticized her for not "embracing" social media users' demands that she list her pronouns.[1] (*Id.* ¶ 75). Defendants engaged Plaintiff in "long phone calls," "constant meetings," and what Plaintiff refers to as a "'re-education' program." (*Id.*). As part of these communications, Defendants required Plaintiff to meet with representatives of the Gay & Lesbian Alliance Against Discrimination. (*Id.* ¶ 76). Plaintiff did so gladly, reviewed several documentaries that the representatives asked Plaintiff to watch, and the representatives provided positive feedback to Defendants. (*Id.*). Not satisfied, however, Defendants continued to demand that Plaintiff issue a public apology, including by asking Plaintiff's publicist to "force [Plaintiff] to issue a statement admitting to mocking or insulting an entire group of people." (*Id.* ¶ 77). Plaintiff refused to issue Defendants' proposed public statement, and Defendants rejected her alternative proposal. (*Id.* ¶ 78). Plaintiff alleges that Defendants "increased their harassment" of her after this point. (*Id.*).

Interested in showing her "good faith," Plaintiff sought to donate to a GoFundMe page purportedly created to support the transgender community. (*Id.* ¶ 79). Upon visiting the website, however, she read that the page had apparently been created by a Lucasfilm employee and described Plaintiff as "a 'bigoted' actress." (*Id.*). When Plaintiff brought this website to Lucasfilm's attention, Lucasfilm denied that any of its employees had created the GoFundMe account. (*Id.* ¶ 80). Shortly thereafter, the page was altered to instead describe Plaintiff as "ignorant" and its organizer was no longer identified as a

---

[1] This portion of the Complaint alleges that Defendants criticized Plaintiff "for not embracing what some see as mandatory solidarity with a vocal element of the transgender activist community," which, from the pleadings, appears to be the act of indicating her pronouns. (*Id.* ¶ 75).

Lucasfilm employee. (*Id.*). To Plaintiff's knowledge, no Lucasfilm employee was ever disciplined for this conduct. (*Id.*).

Defendants informed Plaintiff's publicist that they would require Plaintiff to participate in a videoconference with Lucasfilm President Kathleen Kennedy ("Kennedy") and 45 of Defendants' employees who identified as part of the LGBTQ+ community as a "litmus test." (*Id.* ¶ 81). Although several of these employees had contributed to the above-mentioned GoFundMe account, Defendants encouraged Plaintiff's publicist to describe them as "a friendly group." (*Id.* ¶ 82). Plaintiff alleges that, in Defendants' view, she "had to 'grow' and 'learn.'" (*Id.* ¶ 83). Until Defendants knew "where her mindset [was] currently" regarding pronouns, Defendants would not allow her to speak to the media and would not include her in promotional materials. (*Id.*). Plaintiff declined the proposed meeting but offered to take a smaller group of five or six employees to dinner for a face-to-face discussion, a counteroffer to which Defendants did not agree. (*Id.* ¶ 84). After Plaintiff suggested she might need legal assistance to resolve the dispute, Defendants instead required Plaintiff to undergo media training. (*Id.* ¶ 85).

Plaintiff also faced backlash over statements she made on social media regarding the 2020 election process. (*Id.* ¶¶ 88–89). As an example, Plaintiff's Complaint includes a November 5, 2020, social media post in which Plaintiff stated that "[w]e need to clean up the election process" and called for laws "that protect us against voter fraud," as well as for a voter identification requirement. (*Id.* ¶ 88). Plaintiff alleges that, instead of defending her, Defendants "express[ed] dismay that [Plaintiff's] political views did not match what they expected from their stars." (*Id.* ¶ 93).

All the while, Plaintiff continued to promote *The Mandalorian*, and by early November 2020, she was responsible for over half of the talent engagement on social media relating to the show's second season. (*Id.* ¶ 25). On November 21, 2020, after Plaintiff made her first appearance on the second season, Lucasfilm employee Lynne Hale ("Hale") emailed Plaintiff to congratulate her on the episode's success. (*Id.* ¶ 26). Around that time, in October or November 2020, *The Mandalorian*'s creator and Executive Producer Jon

Favreau ("Favreau") told Plaintiff that her "life [was] about to change." (*Id.* ¶ 27). Disney had approved a spinoff of the series to be entitled *Rangers of the New Republic*, and Plaintiff would be one of the lead characters. (*Id.*). As a lead character, Plaintiff would have been a series regular. (*Id.* ¶ 29). Series regulars in other *Star Wars* spinoffs received longer-term contracts with base compensation beginning at $150,000 to $250,000 per episode, a substantial increase from her then-current pay. (*Id.*). Favreau also represented that Plaintiff would be part of a series of *Star Wars* movies based off of Disney+ shows including *The Mandalorian*. (*Id.* ¶ 114). In December 2020, Kennedy confirmed the production of the *Rangers of the New Republic* spinoff series at Disney Investor Day. (*Id.* ¶ 28).

On January 8, 2021, Hale inadvertently sent Plaintiff an internal email containing Defendants' discussions of a hashtag calling on Disney to "#FireGinaCarano," social media activity which Defendants monitored. (*Id.* ¶ 95). The email thread first pertained to backlash to a statement that Disney Chief Executive Officer ("CEO") Bob Chapek ("Chapek") made after the January 6, 2021, insurrection. (*Id.* ¶ 96). Much of this criticism concerned Disney's business with China, but certain members of the public also called on Disney to fire Plaintiff. (*Id.* ¶¶ 96–97). In the email thread, Disney quickly focused on Plaintiff rather than its business dealings in China and began discussing preparing a report on Plaintiff. (*Id.* ¶ 97). Plaintiff alleges that Chapek intended to use Carano to deflect attention from "his failed leadership as Disney's CEO." (*Id.* ¶ 98). On January 12, 2021, Plaintiff posted an interview in which she discussed the controversy concerning her social media activity. (*Id.* ¶ 99). Around this time, on January 22, 2021, the official *Star Wars* Twitter account issued a statement of support for another employee who faced criticism for certain statements she made concerning racism. (*Id.* ¶ 100).[2]

On February 10, 2021, Plaintiff shared a social media post that questioned the difference between those who "hat[ed] someone for their political views" and citizens in

---

[2] The Court takes judicial notice of this account's publicly available post. Star Wars, X (January 22, 2021, 7:10 PM), https://x.com/starwars/status/1352815991521067008.

Nazi Germany who hated their neighbors "simply for being Jews." (*Id.* ¶ 102). As relevant to this action, Plaintiff's castmate Carl Weathers had previously shared similar messages on social media, although Plaintiff alleges that his posts "were interpreted to attack Republicans" and were accordingly acceptable to Defendants. (*Id.* ¶ 106–07). Additionally, Pascal, who plays the titular character in *The Mandalorian*, previously made statements on social media comparing former President Donald Trump, his administration, and his supporters to Nazis. (*Id.* ¶¶ 131–34). Pascal also posted an image of Disney-owned Muppet characters with a pride flag and the messages "Black Trans Lives Matter" and "Defund the Police." (*Id.* ¶ 136). Defendants did not comment on any of these posts, nor did they discipline Pascal, require him to review documentaries or attend meetings with individuals with contrary points of view, pressure him to apologize for these posts, or refer to his social media activity as "abhorrent." (*Id.* ¶¶ 135, 137). Similarly, *Star Wars* actor Mark Hamill ("Hamill") made various statements on social media drawing similarities between the Republican party under Trump and the Nazi party without objection from Defendants. (*Id.* ¶¶ 138, 140–41). Indeed, Hamill made a guest appearance during the final episode of *The Mandalorian*'s second season.[3] (*Id.* ¶ 143).

In response to Plaintiff's post, however, Defendants terminated Plaintiff that day. (*Id.* ¶ 30). Defendants released a statement characterizing her posts as "abhorrent and unacceptable" because they "denigrat[ed] people based on their cultural and religious identities." (*Id.* ¶ 31). Chapek further explained that Defendants fired Plaintiff "because she didn't align with Company values." (*Id.* ¶ 34). Defendants also canceled production of the *Rangers of the New Republic* series. (*Id.* ¶ 113). After her termination and Defendants' statement, members of the media as well as stalkers came to Plaintiff's home, causing her to fear for her personal safety. (*Id.* ¶ 112).

---

[3] As a final point of comparison, Plaintiff additionally highlights Defendants' decision to rehire director James Gunn one year after terminating him for social media posts about rape and child molestation. (*Id.* ¶ 144).

Plaintiff also alleges that Defendants engaged in a "smear campaign" against her following her termination. (*Id.* ¶ 117). For example, in November 2020, Plaintiff filmed an episode of *Running Wild with Bear Grylls* ("*Running Wild*"), a show that aired on Disney-owned NatGeo. (*Id.*). After terminating Plaintiff's employment, Disney removed this episode from *Running Wild*'s lineup. (*Id.* ¶ 118). After protests from fans and intervention by Bear Grylls, Disney reversed this decision but removed Plaintiff's name and likeness from promotional materials as well as the episode's listing. (*Id.* ¶¶ 119–20). Following her termination from *The Mandalorian* and Defendants' statement, Plaintiff's agent and entertainment attorney both dropped her as a client without explanation. (*Id.* ¶ 121). Plaintiff also immediately stopped receiving invitations to read for new movies, attend high-profile events, and promote her work. (*Id.* ¶ 122).

## B. Procedural History

Plaintiff filed suit in this Court on February 6, 2024, asserting claims for wrongful discharge under California Labor Code §§ 1101 *et seq.* and California Labor Code § 98.6, as well as a sex discrimination claim under California Government Code § 12940. (*Id.* ¶¶ 145–82). On April 9, 2024, Defendants moved to dismiss on the grounds that Plaintiff's claims are barred by Defendants' First Amendment rights. (Mot.). Plaintiff timely opposed, (ECF No. 37 ("Opposition")), and Defendants timely replied in support of their Motion, (ECF No. 38 ("Reply")).

## II. LEGAL STANDARD

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted).

When ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice," nor must it accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks and citation omitted).

Although a defendant may not ordinarily raise affirmative defenses  as a basis to dismiss a complaint, the Ninth Circuit recognizes an exception to this general rule where "the defense raises no disputed issues of fact." *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984).  "[A] complaint may be dismissed when the allegations of the complaint give rise to an affirmative defense that clearly appears on the face of the pleading." *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022).  Dismissal is appropriate, however, "[o]nly when the plaintiff pleads itself out of court" by "admit[ting] all the ingredients of an impenetrable defense." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 604 n.8 (9th Cir. 2018) (citation omitted).

Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects of the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

## III.    DISCUSSION

### A.    California's Laws Protecting Employees

California law provides robust protections for employees' political activity.  Under California law, employers may not "make, adopt, or enforce any rule, regulation, or policy" either (a) "[f]orbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office" or (b) "[c]ontrolling or directing, or tending to control or direct the political activities or affiliations of employees."  Cal. Lab. Code § 1101.  California law further provides that "[n]o employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."  Cal. Lab. Code § 1102.  Employees injured in violation of these provisions may sue for damages under California Labor Code § 1105.  Separately, California Labor Code § 98.6 provides that employers "shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee . . . because the employee . . . engaged in any conduct delineated in this chapter, including the conduct described in . . . Chapter 5 (commencing with Section 1101)."  Cal. Lab. Code § 98.6(a).  This provision also provides that an employee so treated "shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer."  Cal. Lab. Code § 98.6(b)(1).  Additionally, California's Fair Employment and Housing Act ("FEHA") provides that "[i]t is an unlawful employment practice" for an employer to "discharge" or "discriminate against [an employee] in compensation or in terms, conditions, or privileges of employment," based on the employee's sex, among other characteristics.  Cal. Gov't Code § 12940(a).

Here, Defendants assume, without conceding, that Plaintiff's Complaint adequately states claims for wrongful discharge motivated by her political activity and for unlawful sex discrimination under the laws described above.  (Mot. at 12 n.2).  Defendants assert, however, that Plaintiff's claims are "barred by the First Amendment."  (*Id.* at 7).  Although Defendants do not appear to contest the facial constitutionality of California Labor Code

§§ 98.6 and 1105 or of FEHA,[4] Defendants contend that, as "entities that *do* create speech products," they enjoy the right to make "decisions about what to say in [their] own art and how to say it," including by selecting the individuals who perform or otherwise create that art.  (*Id.* at 9 (emphasis in original)).  In these circumstances, Defendants argue, imposition of liability for wrongful discharge and sex discrimination would unconstitutionally burden Defendants' "right to protect [their] own speech from association with [Plaintiff's] high-profile, controversial speech."  (*Id.* at 12).

**B.    The First Amendment's Protection of Private Speech and Association**

The First Amendment of the United States Constitution, which applies to states under the Fourteenth Amendment's Due Process Clause, *Packingham v. North Carolina*, 582 U.S. 98, 101 (2017), provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press," U.S. Const. amend. I.  "[T]he First Amendment's protections apply equally to non-criminal and criminal proceedings," *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1065 (9th Cir. 1995), including where a state attempts to impose liability through civil law, *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).[5]  "[T]he guarantee[] of free speech . . . guard[s] only against encroachment by the government and erect[s] no shield against merely private conduct . . . ." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 566 (1995) (internal quotation marks, citation, and alteration in original omitted).

The First Amendment protects not only "political and ideological speech" but speech occurring in entertainment as well.  "[M]otion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee."  *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).

---

[4] *See* (*id.* at 8 (stating that these provisions may properly apply to "employers or employees not engaged in creating speech products.")).

[5] It is "well-established," however, that "generally applicable laws do not offend the First Amendment simply because their enforcement" have incidental effects on speakers' First Amendment rights.  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) (collecting cases).

Further, that various forms of media "are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

In addition to the First Amendment's explicit free speech guarantee, "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "Government actions that may unconstitutionally burden" associational freedom "may take many forms." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). A regulation that forces a group "to accept members it does not desire" is a clear example of the type of "intrusion into the internal structure or affairs of an association" that may burden that organization's constitutional freedom to associate. *Roberts*, 468 U.S. at 623. In *Dale*, for example, the Supreme Court held that applying a New Jersey public accommodation law in a way that required the Boy Scouts' to readmit as a member and assistant scoutmaster Dale, "a gay rights activist" who was "open and honest about [his] sexual orientation," violated the Boy Scouts' First Amendment freedom of expressive association because it placed a significant burden on the Boy Scouts' desire not to "promote homosexual conduct as a legitimate form of behavior" when the Boy Scouts had taken "the official position . . . that avowed that homosexuals were not to be Scout Leaders." *Id.* at 650-52, 59.

"The right to associate for expressive purposes is not, however, absolute." *Roberts*, 468 U.S. at 623. Where a facially viewpoint-neutral law is narrowly tailored to serve "compelling state interests," the state may be able to justify any derivative impact such a law has on a party's associational freedoms. *Id.* at 623–24, 26–27 (rejecting an organization's claim a Minnesota antidiscrimination law requiring the organization to accept women as full voting members "impose[d] any serious burdens on the male members' freedom of expressive association.").

Here, Defendants urge the Court to read *Dale* together with *Hurley*.  In *Hurley*, the Supreme Court held a state court's order requiring private organizers of a Boston Saint Patrick's Day parade to allow a group of marchers who wished to express their "pride in their Irish heritage as openly gay, lesbian, and bisexual individuals" to march in the parade "carrying [their] own banner" violated the First Amendment because the order "essentially requir[ed]" the private organizers "to alter the expressive content of their parade." *Hurley*, 515 U.S. at 560–61, 72-73, 76.  Defendants contend the two cases together "establish that the state cannot force an employer engaged in expressive activity to express its message through speakers who, in the employer's view, would impair the employer's ability to convey its own preferred message." (Mot. at 13–14).

As an initial matter, neither *Dale* nor *Hurley* arose in the employment context. Additionally, *Dale* and *Hurley* concern distinct First Amendment rights.  The Supreme Court in *Dale* evaluated the scope of the "freedom not to associate" recognized in *Roberts*, including the examination of "whether a group is protected by the First Amendment's expressive associational right" in the first instance.  *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623).  *Hurley*, in contrast, concerned the general "principle of autonomy to control one's own speech" free from government interference.  *Hurley*, 515 U.S. at 574. *See also, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (recognizing First Amendment protections for "pure speech" and "acts of expressive association").  The Court accordingly examines Defendants' claims under the framework set forth for each context, beginning with Defendants' right to expressive association.

       1.    <u>Whether Defendants' Expressive Association Rights Bar Plaintiff's Suit</u>

Where an organization claims protection under "the First Amendment's expressive associational right," a court "must determine whether the group engages in 'expressive association.'"  *Dale*, 530 U.S. at 648.  Although "[t]he First Amendment's protection of expressive association is not reserved for advocacy groups," a group seeking such protection must, by its associational choices, "engage in some form of expression, whether

it be public or private." *Id.* The court then evaluates whether the challenged government action "unconstitutionally infringe[s] upon" the organization's expressive associational rights. *Roberts*, 468 U.S. at 622. A party's claim that application of a generally applicable law "would infringe [its] constitutional rights of expression or association" must be supported by some showing that compliance with the law would somehow "inhibit[]" its expressive association. *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (concluding that a law firm failed to show that consideration of female lawyer for partnership, as required by Title VII, would inhibit the firm's ability to contribute to legal and societal developments).

In *Dale*, for example, the Supreme Court concluded that the Boy Scouts engaged in expressive activity because it sought to instill certain values in its youth members "by having its adult leaders spend time with" and instruct those members. *Dale*, 530 U.S. at 649. Two of the values the Boy Scouts claimed to champion were "the values represented by the terms 'morally straight' and 'clean'"; the Boy Scouts represented "that it 'teach[es] that homosexual conduct is not morally straight'" and took "the official position . . . that avowed homosexuals were not to be Scout leaders." *Id.* at 650–52 (citation omitted; alteration in original). The Supreme Court concluded that enforcing New Jersey antidiscrimination law and requiring the Boy Scouts to allow Dale, who was openly gay, to serve as an assistant scoutmaster would have forced the organization to send a message contrary to its values. *Id.* at 653.

In contrasts, in *Roberts*, the Supreme Court rejected the United States Jaycees' (the "Jaycees") claim that requiring the organization to accept female members under a Minnesota antidiscrimination law "impose[d] any serious burdens on the male members' freedom of expressive association." *Roberts*, 468 U.S. at 626. There, although "the national and local levels of the organization have taken public positions on a number of diverse issues," the Jaycees had failed to establish that admitting women "as full voting members [would] impede the organization's ability to engage in these protected activities or to disseminate its preferred views." *Id.* at 626–27. The Supreme Court further

concluded that, "even if enforcement of the Act causes some incidental abridgment of the Jaycees' protected speech, that effect is no greater than is necessary to accomplish the State's legitimate purposes." *Id.* at 628.

Here, although Defendants indisputably engage in expressive *activity*—including, but certainly not limited to, producing and disseminating *The Mandalorian*—they have failed to establish that they engage in expressive *association*. Furthermore, at this stage in the litigation, the Court cannot conclude, as Defendants urge it to, that Plaintiff's continued employment by Defendants would inhibit or intrude upon Defendants' rights to expressive association. As an initial matter, unlike the Boy Scouts or the Jaycees, Defendants are not members-only, nonprofit organizations. Instead, Defendants are for-profit corporations who, as relevant to this lawsuit, employ actors such as Plaintiff, as well as administrative staff, to create television series and films. (Mot. at 17). Speakers do not, of course, "shed their First Amendment protections by employing the corporate form to disseminate their speech." *303 Creative*, 600 U.S. at 594. But unlike in *Roberts* or *Dale*, Defendants have not identified any evidence—in the Complaint or otherwise—to substantiate a claim that they employ public-facing actors for the purpose of promoting the "values of respect," "decency," "integrity," or "inclusion." (Mot. at 11). Accordingly, Defendants' invocation of the supposedly detrimental effects of Plaintiff's "mere 'presence'" as one of Defendants' employees lacks constitutional import. (*Id.* at 20 (quoting *Dale*, 530 U.S. at 655–56)).

Furthermore, even if Defendants could demonstrate that their employment of actors is a form of expressive association, Plaintiff has plausibly alleged that Defendants terminated her employment to divert attention from criticisms of Defendants' business dealings and of Disney's CEO, not to fortify Defendants' supposed expressive association. (Compl. ¶¶ 97–98). Where, as here, "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Although Defendants claim that the Court must defer to Defendants' interpretation of whether their "message would be impaired by its association

-14-

with certain other speakers," (Mot. at 19), this is not the proper standard at a motion to dismiss stage. Instead, a "[p]laintiff's complaint may be dismissed only when [the] defendant's plausible alternative explanation is so convincing that [the] plaintiff's explanation is *im*plausible." *Starr*, 652 F.3d at 1216 (emphasis in original). As Defendants have not met this burden, dismissal based on Defendants' purported associational rights is inappropriate.

Finally, as in *Roberts*, it is unclear at this stage of the litigation whether Defendants could establish that enforcement of California's antidiscrimination law imposes burdens on their associational rights beyond those "necessary to accomplish the State's legitimate purposes." *Roberts*, 468 U.S. at 628. California Labor Code §§ 1101 and 1102 "reinforce the substantial public interest in protecting the 'fundamental right' of employees to engage in political activity without interference or threat of retaliation from employers." *Ali v. L.A. Focus Publ'n*, 112 Cal. App. 4th 1477, 1487 (2003), *disapproved of on other grounds by Reid v. Google, Inc.*, 50 Cal. 4th 512 (2010). *See also Fort v. Civ. Serv. Comm'n of Alameda Cnty.*, 61 Cal. 2d 331, 335 (1964). Under California law, there is no "doubt that the statutory protection for an employee's political activity, particularly political speech, inures to the public at large rather than simply to the individual or proprietary interests of the employee or employer." *Ali*, 112 Cal. App. 4th at 1487. As stated by the California Supreme Court, "[t]he freedom of the individual to participate in political activity is a fundamental principle of a democratic society and is the premise upon which our form of government is based." *Fort*, 61 Cal. 2d at 334. Plaintiff also brings suit under FEHA, which "represent[s] a fundamental public policy decision regarding the need to protect and safeguard the right and opportunity of all persons to seek and hold employment free from discrimination." *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 277 (2006) (internal quotation marks and citation omitted). To prevail on their defense that their expressive association rights bar Plaintiff's claims, Defendants must show that any impact on their claimed associational freedoms cannot justify California's interests in eradicating sex-based discrimination and employer pressure on employee political activity. *Roberts*,

468 U.S. at 623 ("Infringements on that right [to associate for expressive purposes] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.").  At this stage, Defendants have not made such a showing.

The Court thus denies the Motion insofar as it argues that Defendants' expressive association rights bar Plaintiff's claims.

> ### 2.    Whether Defendants' Rights to Control Their Speech Bar Plaintiff's Suit

Invoking the concept of "speaker's autonomy," as articulated in *Hurley*, Defendants argue Plaintiff's claims are barred because, as entities "engaged in expressive communication," Defendants may "choose to exclude from [their] own communications other speakers" who Defendants believe "would impair [Defendants'] ability to convey [their] own preferred message." (Mot. at 7–8, 11–12).  Specifically, Defendants contend that, if allowed to proceed, Plaintiff's lawsuit would unconstitutionally interfere with Defendants' control over *The Mandalorian*. (*Id.* at 17).  In opposition, Plaintiff contends that she "did not make any effort to alter the message of *The Mandalorian*" and further objects that "Defendants do not explain how [Plaintiff's] personal, off-the-job social media comments affected *Defendants*' speech." (Opp. at 11 (emphasis in original)).

The Court agrees with Plaintiff that Defendants' conclusory assertions of impairment do not suffice to establish a First Amendment bar to Plaintiff's claims, especially in light of Ninth Circuit caselaw that dismissal is appropriate "[o]nly when the plaintiff pleads itself out of court" by "admit[ting] all the ingredients of an impenetrable defense." *Durnford*, 907 F.3d at 604 n.8 (citation omitted).  As stated previously, it is well-established that television programs, such as *The Mandalorian*, qualify for First Amendment protection, *Schad*, 452 U.S. at 65; *Joseph Burstyn*, 343 U.S. at 501, and Plaintiff does not dispute this issue.  The parties disagree, however, on whether, under the First Amendment, Defendants enjoy a right of control over casting decisions such that

Plaintiff's antidiscrimination claims are barred.[6]  (Mot. at 17).  Defendants contend that the "messenger"—here, Plaintiff—"is part of the message," and that Plaintiff's lawsuit improperly impairs Defendants' right to control the content of *The Mandalorian*.  (*Id.* at 18 (citation omitted)).  As an initial matter, Defendants' argument focuses narrowly on their termination of Plaintiff, without addressing her allegations concerning Defendants' pre- or post-termination conduct, much of which lacks any obvious expressive or artistic import.  Defendants' affirmative defense is, for this reason alone, far from "impenetrable." *Durnford*, 907 F.3d at 604 n.8 (citation omitted).

As for the merits of Defendants' defense, courts outside of this Circuit have recognized a circumscribed right to make casting decisions free from antidiscrimination law in certain, fact-specific circumstances.  In *Claybrooks v. American Broadcasting Companies, Inc.*, for example, two African-American men who aspired to be chosen for the titular role in the television show *The Bachelor* sued the show's creators, alleging that the show engaged in intentional race discrimination when casting that role to prevent any "exhibition of actual romance between non-whites or whites and people of color."  898 F. Supp. 2d 986, 990 (M.D. Tenn. 2012) (citation omitted).  The court, finding that the plaintiffs sought "to regulate the content of the [s]hows," concluded that the First Amendment barred their claims.  *Id.* at 999.  Importantly, the *Claybrooks* complaint "explicitly [took] issue with and [sought] to alter the *messaging* of *The Bachelor*" by requiring it to alter its allegedly discriminatory hiring practices.  *Id.* (emphasis in original).

---

[6] Although Defendants claim that this right would "not extend to employers or employees *not* engaged in creating speech products," (Mot. at 8), Defendants have not sufficiently demonstrated that this limitation is a meaningful one.  If, as Defendants urge, courts must defer to employers' accounts of what does and does not impair their expression, *see* (*id.* at 13), there is no reason why an engineer, accountant, secretary, or janitor employed by Defendants—who, by virtue of their employment with Defendants, are at least peripherally engaged in creating speech—might not be subject to a similar argument.  Similarly, many entities outside of the entertainment industry create speech in some form, rendering Defendants' proposed "non-expressive employer[]" category tenuous, at best.  (*Id.* at 8).

-17-

The court also characterized "casting and the resulting work of entertainment" as "inseparable," reasoning that any First Amendment protections for the end product must also apply to the casting process.  *Id.*

*Moore v. Hadestown Broadway Limited Liability Company* concerned facts somewhat closer to Plaintiff's claims.  --- F. Supp. 3d ---, No. 23-cv-4837 (LAP), 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024).  There, the plaintiff, a Black woman hired as a member of the chorus in the Broadway production of *Hadestown*, brought suit for alleged racial discrimination and retaliation after she was terminated from her position.  *Id.* at *2. At the time the plaintiff joined the production, *Hadestown* had employed an all-Black chorus with white lead performers.  *Id.* at *1.  The producers of the show, sensitive about conveying a "white savior story," decided to change the racial composition of the chorus to avoid such connotations.  *Id.*  Immediately after the producers announced this change, the plaintiff made two complaints regarding racial discrimination she experienced in the production.  *Id.* at *2.  The plaintiff was then terminated from *Hadestown*, and her role was filled by a white actress.  *Id.*  Like Defendants, *Hadestown*'s producer asserted a First Amendment defense to the plaintiff's claims.  *Id.* at *15.

Interpreting the plaintiff's complaint, the court concluded that *Hadestown* "was making its casting decisions with an eye toward how the racial composition of the Musical's cast affected the story *Hadestown* was telling on-stage."  *Id.* at *16. Accordingly, the court dismissed the plaintiff's claims for racial discrimination.  *Id.* at *17. The court did not, however, apply a First Amendment defense to the plaintiff's claims for retaliation, reasoning that there was no basis upon which to conclude that plaintiff's allegedly retaliatory discharge "was related in any way to the 'inherently expressive' artistic decisions [the defendant] ma[de] with respect the cast it puts on stage."  *Id.* at *20. "Extending Defendant's First Amendment rights to Plaintiff's retaliation claims," the court reasoned, "would impermissibly enable Defendant to terminate any employee who engaged in protected activity—such as complaining about working conditions—under the auspice of its 'creative decisions.'"  *Id.* at *21.

Within this Circuit, one court has rejected a broad First Amendment claim to immunity over casting decisions in circumstances similar to *Moore*. In that case, *Rowell v. Sony Pictures Television, Inc.*, the creators of the soap opera *The Young and the Restless* argued that a plaintiff's suit over their refusal to rehire her after she advocated for more racially diverse casting was barred by the First Amendment. No. LA CV15-02442 JAK (AGRx), 2016 WL 10644537, at *10 (C.D. Cal. June 24, 2016), *aff'd*, 743 F. App'x 852 (9th Cir. 2018). The plaintiff in *Rowell*, an actress who had performed on the show for nearly two decades, alleged that the defendants decided not to rehire her "in retaliation for engaging in protected speech," not due to discrimination in the casting process. *Id.* (citation omitted). The court thus concluded that the plaintiff's claims were unrelated to "Defendants' creative vision for their programs" and did not raise any First Amendment concerns. *Id.* (citation omitted).

Here, in contrast to *Claybrooks* and *Moore*, Plaintiff's Complaint does not take issue with the message or content of *The Mandalorian*. She does not allege, for example, that she was fired because Defendants wished to have fewer female roles in the show, or that Defendants made an artistic choice to modify the show's cast to include only liberal-leaning actors. Instead, Plaintiff contends that Defendants fired her in retaliation for off-the-job political speech after attempting to make her renounce those comments and "re-educate" her. (Compl. ¶¶ 30, 75, 77). To be sure, the First Amendment may place certain limitations on the *remedy* Plaintiff may seek for her claims. In particular, although California Labor Code § 98.6(b) entitles employees to reinstatement, it is far from clear to this Court that such relief would, in this context, comport with the First Amendment. *See Rowell*, 2016 WL 10644537, at *10 (suggesting that an order requiring a specific casting decision "could be deemed to impinge Defendants' right to control creative content"). This matter is distinct, however, from Defendants' liability under California antidiscrimination law.

Defendants' Motion also misconstrues the proper framework for evaluating factual allegations within complaints. Defendants repeatedly ask the Court to disregard Plaintiff's

accounting of her conduct as "not relevant," instead urging the Court to defer to Defendants' claim that they viewed Plaintiff's speech as compromising their expression. (Mot. at 19–20).  On a motion to dismiss, however, courts "construe the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031.  Although Defendants might, with a more developed factual record, be able to prevail on their First Amendment defense on some or all of Plaintiff's theories of termination-related liability, the Complaint lacks allegations to support Defendants' assertion that Plaintiff's "presence as a prominent actor on *The Mandalorian* interfered with [Defendants'] choice not to produce a show associated with her beliefs." (Mot. at 19).

Indeed, the procedural posture of this case, as well as its distinguishable facts and issues, stand in stark contrast to other cases Defendants cite in support of their claimed First Amendment defense, such as *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), and *Hurley*.  *Redgrave* concerned the Boston Symphony Orchestra's ("BSO") decision to cancel a series of planned performances with actress Vanessa Redgrave after receiving calls from subscribers and other community members protesting Ms. Redgrave's support for the Palestine Liberation Organization.  *Redgrave*, 855 F.2d at 890–91.  At the conclusion of the jury trial, the jury awarded Redgrave $100,000 in consequential damages but, on the BSO's motion for judgment notwithstanding the verdict, the district court held that Redgrave could not recover consequential damages due to First Amendment limitations.  *Id.* at 890.  On appeal, in dicta, the First Circuit discussed at length its "grave concerns" about the "conflict of rights" created by Ms. Redgrave's Massachusetts civil rights claim.  *Id.* at 904.  Ultimately, however, the court resolved the issue on state law grounds, concluding that Massachusetts law did not give rise to a cause of action for "refusing to perform an artistic work." *Id.* at 912.  Given the many differences between *Redgrave* and this lawsuit, including in governing law and its procedural posture as a post-trial appeal, *Redgrave* has little persuasive value at this stage of the litigation.

*Hurley* is similarly unhelpful to Defendants.  In *Hurley*, the parade organizers sought to prevent certain marchers from appearing as a "parade unit carrying its own banner,"

which would have "affect[ed] the message conveyed by the private organizers." *Hurley*, 515 U.S. at 572.  After a four-day bench trial, the state court ruled that the marchers were entitled to participate in the parade on the same terms and conditions as other participants, and this ruling was affirmed by Supreme Judicial Court of Massachusetts.  *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos. v. City of Bos.*, 418 Mass. 238, 242 n.6, 251 (1994), *rev'd sub nom. Hurley*, 515 U.S. 557 (1995).  Due to this ruling's impact on the expressive content of the parade, however, the Supreme Court concluded that forcing the organizers to accept the marchers' application would "violate[] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573.

Here, in contrast, Plaintiff's Complaint alleges that Defendants terminated her from *The Mandalorian* not to control the show's content but as a form of retaliation for holding disfavored political beliefs and for objecting to conduct she perceived as harassment. (Compl. ¶¶ 30–40).

Defendants also cite two Ninth Circuit cases for the proposition that employers may not be held liable "for declining to express themselves through employees the organizations did not want to associate with their expressive messages." (Mot. at 14).  Upon examination of the cases in question, the Court concludes this characterization is inaccurate.  *Green v. Miss United States of America, LLC* is not an employment lawsuit but a case arising under Oregon public accommodations law.  52 F.4th 773, 777 (9th Cir. 2022).  There, the plaintiff, a transgender woman, sought admission to the Miss United States of America ("Miss USA") beauty pageant, contending that the pageant's "natural born female" requirement was an unlawful form of gender identity discrimination.  *Id.* at 778–79.  On appeal, the Ninth Circuit concluded that the pageant was, like the parade in *Hurley*, a blend of performance and visual expression entitled to First Amendment protection.  *Id.* at 780. In another similarity to *Hurley*, the court concluded that, "[g]iven a pageant's competitive and performative structure, it is clear that *who* competes and succeeds in a pageant is *how* the pageant speaks." *Id.* (emphasis in original).  In light of this lack of "daylight between

speech and speaker," the Ninth Circuit concluded that the plaintiff's suit impermissibly sought to change Miss USA's speech and affirmed the trial court's grant of summary judgment. *Id.* at 781, 802–03. As discussed at length above, the Court cannot conclude, based on Plaintiff's Complaint

In *McDermott v. Ampersand Publishing, LLC*, the Ninth Circuit affirmed the trial court's denial of injunctive relief that would have required a newspaper to reinstate eight employees it discharged during a union dispute. 593 F.3d 950, 955 (9th Cir. 2010). Reasoning that these eight employees were "bound to affect what gets published," the Ninth Circuit held that, "[t]o the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice." *Id.* at 962. Importantly, however, the union's "primary demand [was] for the publisher to cede control of her newspaper's content," raising First Amendment concerns not implicated by more typical wage and hour demands. *Id.* at 963. The court's First Amendment concern arose not because the newspaper did not want to associate its speech with disfavored employees but because the newspaper and staff were engaged in a struggle for editorial control.

Finally, after the parties' hearing, Defendants filed a Notice of Supplemental Authority asserting that their position is supported by the recently decided case *Moody v. NetChoice, LLC*, --- S.Ct. ---, No. 22-277, 2024 WL 3237685 (U.S. July 1, 2024). Unlike *Moody*, however, which concerned social media platforms, Plaintiff's lawsuit concerns a scripted television show, not a "forum" or "curated compilation of speech originally created by others." *Id.* at *10. The Court does not dispute Defendants' general right to control their expression. But *Moody* does not address Defendants' argument here: that employers who create expressive content are immune from liability under state antidiscrimination law when they wish to terminate an employee involved in the creation of that content.

The Court thus denies Defendants' Motion insofar as it argues that their right to control their speech bars Plaintiff's claims.

## IV.    CONCLUSION

In sum, Defendants have failed to set forth an "impenetrable defense" under the First Amendment.   *Durnford*, 907 F.3d at 604 n.8 (citation omitted).   Accordingly, for the foregoing reasons, the Court DENIES Defendants' Motion.

**IT IS SO ORDERED.**

DATED:  July 24, 2024

_____
HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

-23-